THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| JONATHAN LANGLEY | § | |
|     Plaintiff | § | |
| | § | |
| v. | § | CASE NO. 1:18-CV-00443-LY |
| | § | |
| INTERNATIONAL BUSINESS MACHINES | § | |
| CORPORATION | § | |
|     Defendant | § | |

## PLAINTIFF'S MOTION TO COMPEL PRODUCTION

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES, Plaintiff, Jonathan Langley, and files this, his Motion to Compel Production pursuant to Federal Rule of Civil Procedure 34, and would show the Court as follows.

I.

## Summary of the Argument

Jonathan Langley is a former long-time employee of International Business Machines Corporation ("IBM") who had objectively high levels of success at IBM before he was terminated without cause. After discovering evidence suggesting that his firing was part of a systematic, nationwide scheme created by IBM's top executives to clandestinely replace older workers with younger ones, Mr. Langley filed this suit against IBM in order to expose its nationwide discriminatory scheme. Mr. Langley has *never* alleged that his termination was *one* isolated case of age discrimination that occurred in *one* division perpetrated by *one* low-level manager. IBM, however, has attempted to improperly use discovery objections to force him to pursue such a case and limit his discovery to conform to a fact pattern that never occurred.



1

The evidence discovered by Mr. Langley that the clandestine directives from IBM Corporate were to blame for his termination included IBM Corporate document excerpts that reflect a company-wide goal of correcting the company's "seniority mix," doubling the percentage of young persons working in the company, and creating rolling lay off schemes designed so they would disproportionally terminate older employees to make room for the younger employees IBM desired in order to brand itself as a young, hip tech company akin to Google, Apple, and Nvidia. Mr. Langley has given IBM copies of the documents in his possession and gone to great lengths to narrowly tailor his discovery requests to obtain the remaining portions of those documents and others related to them. Despite the obvious connection and relevance, IBM has held fast to the obstructionist technique of claiming that IBM Corporate documents, executive communications, company directives, or anything else that was conceptually outside of Mr. Langley's little corner of IBM are not discoverable in an attempt to shield its executives and corporate policies altogether. After conferencing with IBM's counsel unsuccessfully, Mr. Langley has been left no choice but to ask this Court for relief from IBM's voluminous and unreasonable boilerplate objections and to allow him to pursue the case he actually filed rather than let IBM dictate this lawsuit's subject matter unilaterally.

II.

## Table of Contents

A. **Plaintiff's case theory is about a complex, nationwide scheme of age discrimination, and Plaintiff has the right to investigate & develop his nationwide case theory through discovery.**

B. **Plaintiff's discovery requests are few in number, narrowly tailored, and drafted in a way to target specific documents about IBM's national corporate malfeasance that Plaintiff already knows exist that are directly relevant to this suit.**

C. **If permitted to stand, IBM's objections based on its size and multinational nature, as well as its objections about Mr. Langley only being one single plaintiff, would in**

**effect impose a double standard protecting giant corporations while punishing individual citizens as less important.**

**D.  IBM's objections that finding and producing documents in its possession would be unduly burdensome ring hollow.**

III.

### Exhibits

1.  Plaintiff's discovery requests;

2.  Defendant's discovery responses and objections;

3.  Portions of documents already possessed that have been requested;

4.  Western District Order regarding discovery;

5.  California order regarding IBM discovery;

6.  Table of relevant news articles.

IV.

### Argument

**A.  Plaintiff's case theory is about a complex, nationwide scheme of age discrimination, and Plaintiff has the right to investigate & develop his nationwide case theory through discovery.**

Mr. Langley's entire case theory wholly revolves around the assertion that IBM, in a concerted effort to lower its average employee age and attract top millennial talent, engaged in a systematic, nationwide scheme to clandestinely fire a large chunk of its older employees to make room for top millennial talent in all areas of the company.[1]  To investigate and develop his case theory of the existence of systematic, nationwide pattern of discrimination by IBM, Plaintiff has formally requested that IBM produce documents that, in large part, are related to IBM's relevant corporate policies, directives, and goals set by its corporate

---

[1] Plaintiff incorporates by reference verbatim Plaintiff's Original Complaint as if written for any and all purposes herein.

executives, as well as IBM's company-wide pattern of treatment of other workers over the age of 40.

Despite Plaintiff's nationwide case theory, IBM has objected and responded to Plaintiff's discovery requests by arguing that Plaintiff is entitled to *only* documents directly related to Plaintiff's own local IBM division/team/unit and its respective low-level managers, and that any documents related to IBM on a corporate or nationwide scale are not discoverable on grounds of relevance. Not allowing a party to inquire about corporate policies and directives in a case that is wholly about corporate policies and directives is an absurd position for IBM to take on its very face. Determining what a company's corporate policies are is relevant to a lawsuit about that company's corporate policies.

Firing workers over the age of 40 for reasons related to age is an illegal practice.[2] Consequently, IBM's nationwide plan to lower its average employee age unsurprisingly included a mechanism meant to hide the overarching discriminatory intent of its scheme of layoffs and reductions in force. Specifically, that mechanism involved top IBM executives creating parameters for layoff decisions and tailoring its rolling layoff methodologies in a way that would result in low-level managers firing more older employees than younger employees without those managers ever necessarily realizing they were a party to the scheme.[3] It is precisely these low-level managers that IBM is only willing to allow Plaintiff to investigate in discovery, an act of obstruction that would fit perfectly into IBM's scheme of covering its tracks by providing the firing managers with plausible deniability. To shield IBM's executives and national corporate policies would thus act to shield IBM entirely, and IBM knows that.

---

[2] ADEA and Chapter 21 of the Texas Labor Code.
[3] *See*, *CUTTING 'OLD HEADS' AT IBM*, March 22, 2018, available at
https://features.propublica.org/ibm/ibm-age-discrimination-american-workers/.

Mr. Langley's case theory of IBM's concealment efforts using low-level managers as proverbial cat's paws[4] is not mere groundless speculation but is instead highlighted in and corroborated by recent investigative journalism exposés concerning IBM's nationwide and intentional pattern of age discrimination over the past four years, the most notable of which was from ProPublica. *See* Ex. 6. The notion that IBM has committed centralized, corporate acts of age discrimination is also corroborated by the fact that the EEOC has launched a large-scale investigation, is not treating age discrimination claimants as individual cases, and has instead consolidated them all into single investigation in New York.[5] One of the five main conclusions of the ProPublica author's investigation was that IBM "targeted people for layoffs and firings with *techniques that tilted against older workers*, even when the company rated them high performers."[6] IBM's referenced discriminatory scheme of techniques included but was not limited to (1) directing low-level managers to generally reduce employee headcounts through Resource Action rolling layoffs, (2) completely exempting "early professional hires" (read: young employees) from their Resource Action layoff pools; and (3) creating a ranking system for the low-level managers to use to make layoff decisions with criteria that was weighed down heavily based on certain age-correlated factors such as, for example, the high job bands that necessarily took decades to be promoted to at IBM.[7]

---

[4] "Cat's paw" liability was ratified by the Supreme Court in Staub v. Proctor Hospital, 562 U.S. 411, 131 S.Ct. 1186, 179 L.Ed.2d 144 (2011). The term comes from a 17th century fable about a monkey who persuaded a cat to pull chestnuts out of the fire so that the cat gets burned and the monkey gets to make off with the chestnut. In employment law, an employer is liable for discrimination even if the actual manager who fires the person does not act out of biased intent but the bias of another supervisor along the way worked its way into the final decision.
[5] Federal Watchdog Launches Investigation of Age Bias at IBM, May 17, 2018 available at https://www.propublica.org/article/federal-watchdog-launches-investigation-of-age-bias-at-ibm
[6] See https://features.propublica.org/ibm/ibm-age-discrimination-american-workers/ (emphasis added).
[7] *Id.*

Despite IBM's wishes otherwise, this case is specifically *not* about a rogue low-level manager in one division discriminating solely against Jonathan Langley. This case is about IBM's top executives' intentions of discriminating against older workers across the nation by devising the aforementioned corporate scheme, a corporate scheme which Jonathan Langley was caught up in much to his detriment. Sophisticated companies often attempt to mask discrimination by making it as subtle as possible, but subtle discrimination is still illegal. See generally, *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1081 (3d Cir.1996). ("Discrimination continues to pollute the social and economic mainstream of American life, and is often simply masked in more subtle forms. It has become easier to coat various forms of discrimination with the appearance of propriety, or to ascribe some other less odious intention to what is in reality discriminatory behavior. In other words, while discriminatory conduct persists, violators have learned not to leave the proverbial "smoking gun" behind. As one court has recognized, "[d]efendants of even minimal sophistication will neither admit discriminatory animus or leave a paper trail demonstrating it." citing *Riordan v. Kempiners*, 831 F.2d 690, 697 (7th Cir.1987)."). Mr. Langley should be able to investigate that nationwide, subtle corporate scheme through discovery as a matter of course.

Moreover, Mr. Langley is entitled to discovery about IBM's nationwide practices and systematic corporate schemes as a matter of law. In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 805, 93 S. Ct. 1817 (1973), the Supreme Court held that "[o]ther evidence that may be relevant to any showing of pretext includes facts as to the [defendant's] general policy and practice with respect to [the protected class]." *See also, Ezold v. Wolf, Block, Schorr and Solis–Cohen,* 983 F.2d 509, 542 (3d Cir.1992). IBM nevertheless here has objected to producing documents related to the *general policies and practices* of how IBM has treated

the protected class of older workers. In *Bruno v. W.B. Saunders Co.*, 882 F.2d 760, 766-767 (3rd Cir. 1989), the Third Circuit held that evidence of systemic disparate treatment is relevant to pretext in single plaintiff disparate treatment ADEA cases. Here, however, IBM has objected to producing evidence related to IBM's nationwide systemic disparate treatment of older employees in this single plaintiff disparate treatment ADEA case. In *Pace v. Southern Ry. System*, 701 F.2d 1383, 1388 (11th Cir. 1983), the Court held that "evidence of a pattern of terminating older workers ... allow[s] the reasonable inference that age had played a role in [the plaintiff's] discharge." *See also, McCorstin v. U.S. Steel Corp.*, 621 F.2d 749, 754 (5th Cir. 1980); *Hodgson v. First Federal Savings & Loan Association*, 455 F.2d 818 (5th Cir.1972). IBM, in contrast, has objected to Plaintiff's request for production of documents related to IBM's nationwide pattern of terminating older workers. In *Becker v. ARCO Chemical Co.*, 207 F.3d 176, 194 n.8 (3rd Cir. 2000), the Third Circuit held that "evidence of a defendant's prior discriminatory treatment of a plaintiff *or other employees* is relevant and admissible under the Federal Rules of Evidence to establish whether a defendant's employment action against an employee was motivated by invidious discrimination." IBM in this case has nevertheless objected to Plaintiff discovering evidence of how IBM as a whole has treated other employees outside of Plaintiff's own little corner of IBM. Lastly, but by no means exhaustively, "circumstantial proof of discrimination typically includes unflattering testimony about the employer's history and work practices," and "[i]n discrimination cases, such background evidence may be critical for a jury's assessment of whether a given employer was more likely than not to have acted from an unlawful motive." *Glass v. Philadelphia Electric Co.*, 34 F.3d 188, 195 (3d Cir. 1994), quoting *Estes v. Dick Smith Ford, Inc.*, 856 F.2d 1097, 1103 (8th Cir. 1988).  Nevertheless, IBM here has refused

to comply with discovery requests about its nationwide corporate history and work practices, nor is it willing to allow Plaintiff to learn of its executives' motives, unlawful or otherwise, when they created the rolling layoff scheme that forms the subject matter of this case.

Accordingly, allowing IBM to limit discovery to only documents generated from Mr. Langley's little corner of IBM and its low-level managers is exactly what IBM intended when it created its now well-publicized nationwide firing scheme. IBM's discovery objections and arguments alleging that Plaintiff is not entitled to discovery regarding IBM Corporate's pattern of treatment of older workers as a whole is in direct contrast to the relevant caselaw. Allowing IBM to self-limit the scope of discovery to only be about low-level managers reaching their paw into the fire and not its centralized policy makers who influenced them to do so would be akin to allowing a party to depose a puppet but not the puppet master.[8] Plaintiff's case theory revolves around the existence of a systematic, nationwide scheme and its effect on his employment. Mr. Langley merely asks that the Court allow him to investigate and develop his own case rather than the case IBM wishes he had filed instead.

**B.** **Plaintiff's discovery requests are few in number, narrowly tailored, and drafted in a way to target specific documents about IBM's national corporate malfeasance that Plaintiff already knows exist that are directly relevant to this suit.**

Mr. Langley's objected-to discovery requests are few in number, narrowly tailored, and drafted in a manner designed to target very specific documents and information that Plaintiff has considerable reason to believe exist. Plaintiff has propounded only 48 requests for production and 10 interrogatories in this case to date.[9] Modern litigation almost always involves a good deal of discovery, but for a case requiring investigation of a large, multi-

---

[8] See footnote 4 re "Cat's Paw" liability.
[9] Exhibit No. 1; Plaintiff's written discovery requests.

national company's hiring practices, such number of discovery requests are more akin to a surgical knife than a shotgun.

Mr. Langley has been able to narrowly tailor his discovery so efficiently and precisely because he already possesses portions and excerpts of the documents requested from IBM and because of the information contained in earlier referenced investigative journalism exposés about IBM's company-wide scheme. *See* Ex. 3; Ex. 6.  The IBM Corporate documents in his possession are incriminating enough on their own to allow Plaintiff to proceed forward developing his case of systematic, nationwide age discrimination, but at the very least these documents show that Plaintiff's discovery requests are as narrowly tailored as could ever be expected.

Document excerpts in Plaintiff's possession from the 2015-2016 Spring and Fall plans from IBM Corporate reflect that IBM created a plan to increase the ratio of "Early Professional Hires" (read: young people) to 55% of the company by 2020; that IBM intended to create room for its future "Early Professional Hires" through the use of a "continuous talent refresh" and by "establishing and maintaining 'healthy' attrition targets" in its current workforce; and also refer to certain "Dynamic Attrition Actions" meant to "maintain steady attrition to offset hiring.[10]  Despite the obvious manifestations of intent to discriminate against its older employees by IBM Corporate contained in its 2015-2016 Spring and Fall plans, IBM in this case has objected to Plaintiff's request to produce the documents from the 2015-2016 Spring and Fall plans for IBM Corporate as being irrelevant to the termination of Jonathan Langley.[11]

---

[10] *Id.*
[11] Ex. 2 IBM's response, #20-22.

There are other IBM Corporate documents that explicitly make young worker and new hires ineligible from IBM's planned rolling layoff scheme.[12] These documents dovetail perfectly with the obvious manifestations of intent to discriminate against its older employees by IBM Corporate contained in its 2017 Fall Plan and 2018 Spring Plan documents, IBM in this case has objected to Plaintiff's request to produce the documents from the 2017 Fall Plan and 2018 Spring Plan for IBM Corporate as being irrelevant to the termination of Jonathan Langley.[13]

As yet another example of IBM's corporate malfeasance from the highest executive levels, documents in Plaintiff's possession from the Late 2017 Hybrid Cloud Talent Plan Overview set goals for IBM to "hire and replace, and fund an influx of EP's (Early Professionals) to correct seniority mix (46% benchmark vs. 21% actual)," and accomplishing its stated goal of replacing older workers with younger workers by "utilizing various reduction initiatives."[14] Despite the obvious manifestations of intent to discriminate against its older employees by IBM Corporate contained in its Late 2017 Hybrid Cloud Talent Plan Overview documents, IBM in this case has objected to Plaintiff's request to produce the documents from the Late 2017 Hybrid Cloud Talent Plan Overview for IBM Corporate as being irrelevant to the termination of Jonathan Langley.[15]

IBM's legal counsel is fully aware of the existence of the above referenced documents in Plaintiff's possession and the manifestations of centralized, corporate intent to replace older workers with younger workers therein, in large part because Plaintiff produced them to IBM in discovery and because the undersigned counsel has conferenced with IBM's

---

[12] https://features.propublica.org/ibm/ibm-age-discrimination-american-workers/.
[13] Ex. 2 IBM's responses, #20-22.
[14] Ex. 3
[15] Ex. 2 IBM's responses, #21-22.

counsel about this dispute and the reasons why Plaintiff is entitled to more documents than just those from Plaintiff's little corner of IBM. This is not a case of an attorney making an objection of relevance because he or she did not realize that the requested documents were in fact relevant. Instead, IBM's objections constitute knowing and intentional discovery obstruction that rises to the level of the "Rambo tactics" and "forms of elementary school behavior" that the Court expects parties in the Western District of Texas to refrain from. *See* Exhibit 4, citing inter alia Fed. R. Civ. P. 26(b)(1) and W. Dist. Loc. R. CV-16 and CV-26 through CV-37. If nothing else, IBM's refusal to turn over the remaining portions of those obviously relevant and suspicious documents does not comply with the full and open discovery required in the Western District. *Id*.

Moreover, IBM's discovery obstruction has persisted despite the fact that the vast majority of Plaintiff's discovery requests could not possibly be considered overbroad or outside of the scope of discovery. Plaintiff's Requests for Production use specific and directly relevant IBM terminology, programs, and personnel that Plaintiff has knowledge of because they appear in the same aforementioned IBM Corporate documents already in his possession or the investigative journalism pieces that first exposed IBM's nationwide rolling layoff scheme. Examples include requests for emails to Band D or higher IBM executives from Bain & Company reflecting consulting services provided to IBM from 2012 to present; documents created by or sent to specific IBM executives, such as Diane Gherson and Ken Keverian, and only such documents created within approximately the last five years containing a specific word or phrase from a small, topical list provided to IBM. The keywords Plaintiff has limited his discovery to include directly relevant terms like "Early

Professional Hire…EPH…[and] Seniority Mix." As advertised, Plaintiff's discovery requests truly are more akin to a surgeon's knife than a shotgun.

Despite Mr. Langley's narrowly tailored discovery requests, IBM has chosen the path of boilerplate obstruction with its objections. In response to Plaintiff's last 31 of 48 total production requests, IBM objected to 26 of the requests as overbroad; 19 as irrelevant; 22 as unduly burdensome; 24 as disproportionate to the needs of the case, and 9 as being highly confidential competitive and/or proprietary business information, not including the many other objections IBM lodged to essentially every request by Plaintiff.[16] IBM even objected to the vagueness and ambiguity of terms with the most basic meanings, including "considered… relied upon… details…policies… procedures… standards… guidelines… responsible for… participated… [and] handbooks."[17] The party resisting discovery must show specifically how each discovery request is not relevant or otherwise objectionable. *See McLeod, Alexander, Powel & Apffel, P.C. v. Quarles*, 894 F.2d 1482, 1485 (5th Cir. 1990). IBM's objections to Plaintiff's narrowly tailored discovery requests here go on and on and, if presented to the court objection-by-objection, could take weeks to brief individually and argue to the Court, which is presumably exactly what IBM hoped for when making them given the disparate size and resources of the two parties. No such line-by-line dissection should be necessary in a case of discovery obstruction as blatant as this one. IBM has already had these same objections overruled in a similar age-discrimination lawsuit pending elsewhere, yet they still have asserted them in this case and refuse to withdraw any of them despite the obvious improper nature of the objections, as shown by the previous rulings

---

[16] Ex 2.
[17] Ex. 2 IBM's responses, #17, 36, 40, 41, 42, 47.

against them elsewhere and the obvious relevance their improperly withheld documents have to the case at bar. Ex 5.

For reasons that include the narrowly tailored nature of Plaintiff's discovery requests and the unreasonable volume of meritless objections in response, Plaintiff respectfully requests that the Court compel IBM to withdraw all of its objections to Plaintiff's Requests for Production Nos. 18-48, other than that of privilege, and to compel IBM to provide meaningful and complete production in response to each such request.

**C. If permitted to stand, IBM's objections based on its size and multinational nature, as well as its objections about Mr. Langley only being one single plaintiff, would in effect impose a double standard protecting giant corporations while punishing individual citizens as less important.**

Mr. Langley did not sue his former IBM *division*. Mr. Langley sued IBM, and rightfully so considering the centralized nature of IBM's nationwide rolling layoff scheme designed by IBM's top executives. Nevertheless, IBM has objected to Plaintiff's Requests for Production by essentially arguing that it is too large of a company to be subject to the usual rules of discovery and that only documents from Plaintiff's IBM *division* are discoverable. In response to Plaintiff's targeted requests for very specific emails from four specific executives, IBM objected to every single request because each respective executive is, "a very senior executive who has global responsibilities," and that the narrowly tailored list of email terms "would sweep up documents from across a company which operates in dozens of countries and consists of multiple different groups, business units, and organizations."[18] IBM cannot be allowed to shield its executives and policymakers from discovery because of its size. IBM is a party to this lawsuit; its localized divisions are not. If IBM possesses documents that are responsive to discovery, it must produce them regardless of what division

---

[18] Ex. 2 IBM's responses # 24, 25, 26, 27.

or business unit they are contained in. The fact that IBM is large cannot be used as a shield for its corporate executives and centralized corporate policies and directives to hide behind.

Inversely, IBM has objected to many of Plaintiff's discovery requests regarding its executives and corporate policies and directives on grounds that the requests are "seeking documents containing information not proportional to the needs of this single plaintiff discrimination case."[19] In effect, IBM is arguing that a mere one person seeking recompense is not a worthy enough cause to allow the person to find out what the corporate intent was behind a scheme that resulted in not only his layoff but also a disproportionate number of other older IBM workers, as well. Luckily, the fact that Plaintiff is only one person is not a legal objection. Congress chose single private litigants like Mr. Langley to be the primary agents of enforcement of anti-discrimination laws. See *General Telephone Co. v. EEOC*, 446 U.S. 318, 326 (1980) (private litigants acting as private attorneys general vindicate the public interest in the eradication of employment discrimination). As explained further by the Third Circuit in *Mardell v Harleysville Life Ins. Co.*:

> [A]n act of employment discrimination is much more than an ordinary font of tort law. The anti-employment discrimination laws are suffused with a public aura for reasons that are well known. Throughout this Nation's history, persons have far too often been judged not by their individual merit, but by the fortuity of their race, the color of their skin, the sex or year of their birth, the nation of their origin, or the religion of their conscientious choosing. Congress has responded to these pernicious misconceptions and ignoble hatreds with humanitarian laws formulated to wipe out the iniquity of discrimination in employment, not merely to recompense the individuals so harmed but principally to deter future violations. The anti-employment discrimination laws Congress enacted consequently resonate with a forceful public policy vilifying discrimination. A plaintiff in an employment-discrimination case accordingly acts not only to vindicate his or her personal interests in being made whole, but also as a "private attorney general" to enforce the paramount public interest in eradicating invidious discrimination.

---

[19] [19] Ex. 2 IBM's general objection at pg 2 and responses #20, 22, 28, 29, 32, 44.

*Mardell v Harleysville Life Ins. Co.*, 31 F.3d 1221 (3rd Cir, 1994), remanded for reconsideration on other grounds, 115 S.Ct. 1397 (1995), reaffirmed and reinstated in relevant part, 65 F.3d 1072 (3d Cir. 1995). Over 20,000 IBM employees have lost their jobs as a result of IBM's nationwide rolling layoff scheme, and thus any suggestion that the proportional needs of this case are minimal is to ignore the thousands of others affected by the same scheme that harmed Mr. Langley and the intended consequences of single plaintiff suits such as here that serve to deter future acts of illegal discrimination.[20] According to the EEOC's Victoria Lipnic, "age discrimination is an open secret…[e]verybody knows it's happening, but often these cases are difficult to prove….[t]he fact remains it's an unfair and illegal way to treat people that can be economically devastating."[21] Lone plaintiffs such as Mr. Langley are thus our primary means for the notoriously difficult-to-prove practices of age discrimination to be exposed and rooted out of our society. If IBM is allowed to shield its executives and central corporate documents because only a mere one man's quest for recompense is at stake, our society's only mechanism to root out discrimination will be what is eradicated, leaving the discrimination itself left standing.  Because IBM cannot use the size of its company nor the small number of plaintiffs in this case as a shield from discovery, Plaintiff respectfully requests that the Court compel IBM to withdraw all of its objections to Plaintiff's Requests for Production Nos. 18-48, other than that of privilege, and to compel IBM to provide meaningful and complete production in response to each such request.

**D. IBM's objections that finding and producing documents in its possession would be unduly burdensome ring hollow.**

---

[20] https://features.propublica.org/ibm/ibm-age-discrimination-american-workers/.
[21] *Id.*

IBM represents itself as one of the most sophisticated companies in the world, especially in terms of its ability to manage data. Yet, here, IBM has objected to a large portion of Plaintiff's discovery requests as being unduly burdensome. As the party resisting discovery, IBM has the burden of showing undue burden. *See, e.g., Fireman's Fund Insurance Co. v. Great American Insurance Co. of New York*, 284 F.R.D. 132, 135 (S.D.N.Y. 2012) ("Once relevance has been shown, it is up to the responding party to justify curtailing discovery."); See also *McLeod, Alexander, Powel & Apffel, P.C. v. Quarles*, 894 F.2d 1482, 1485 (5th Cir. 1990)(the party resisting discovery "must show specifically...how each [request] is...burdensome or oppressive). IBM objected to 22 of Plaintiff's final 31 Requests for Production as being unduly burdensome. IBM must accordingly prove to the Court that those 22 requests for production are simply too much for its data management capabilities to reasonably handle.

IBM's unduly burdensome objections on their own must fail. Generalized assertions of undue burden are inadequate to excuse withholding of documents. See *Merrill v. Waffle House, Inc.*, 227 F.R.D. 475, 477 (N.D. Tex. 2005); see also *S.E.C. v. Brady*, 238 F.R.D. 429, 437 (N.D. Tex. 2006) ("A party asserting undue burden typically must present an affidavit or other evidentiary proof of the time or expense involved in responding to the discovery request."). "Failing to do so, as a general matter, makes such an unsupported objection nothing more than unsustainable boilerplate." *Heller v City of Dallas*, 303 F.R.D. 466, 483 (N.D. Tex 2014); citing to *McLeod, Aleander, Powel & Apffel, P.C. v Quarles*, 894 F.2d 1482, 1485 (5th Cir. 1990). To date, IBM has given no explanation as to how finding and producing the requested documents constitutes a burden it cannot bear.

IBM claims to be on the cutting edge of "Big Data Analytics," which is defined by IBM as the use of "advanced analytic techniques against very large, diverse data sets that include structured, semi-structured, and unstructured data, from different sources, and in different sizes from terabytes to zettabytes."[22] In contrast, Plaintiff's discovery requests have only tasked IBM with finding specific pieces of data with very specific parameters that are located on its own servers, namely things like emails, PowerPoint presentations, and PDF files, which collectively could not be said to constitute zettabytes of data from a multitude of different sources. When IBM's data management and analytical prowess is considered alongside the targeted and narrowly tailored nature of Plaintiff's discovery requests, IBM will be inherently unable to meet its burden of proof. For reasons that include IBM's hollow objection of undue burden, Plaintiff respectfully requests that IBM be ordered to withdraw all of its objections to Plaintiff's Requests for Production Nos. 18-48, other than that of privilege, and to compel IBM to provide meaningful and complete production in response to each such request.

V.

<b><u>Prayer For Relief</u></b>

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests that IBM be ordered to withdraw all of its objections to Plaintiff's Requests for Production Nos. 18-48, other than that of privilege, and to compel IBM to provide meaningful and complete production in response to each such request, and for such other and further relief, whether legal or equitable, general or special, to which Plaintiff may be entitled.

---

[22] See https://www.ibm.com/analytics/hadoop/big-data-analytics

Respectfully submitted,

Heidi A. Coughlin
State Bar No. 24059615
Archie Carl Pierce
State Bar No. 15991500
Blair J. Leake
State Bar No. 24081630
WRIGHT & GREENHILL, P.C.
900 Congress Avenue, Suite 500
Austin, Texas 78701
512/476-4600
512/476-5382 (Fax)
HCoughlin@w-g.com
CPierce@w-g.com
BLeake@w-g.com

Charles A. Lamberton*
Lamberton Law Firm, LLC
Pa. Bar I.D. No. 78043
707 Grant Street
1705 Gulf Tower
Pittsburgh, PA 15219
412-258-2250
cal@lambertonlaw.com
*Admitted Pro Hac Vice

Attorneys for Plaintiff
Jonathan Langley

CERTIFICATE OF CONFERENCE

Counsel for Plaintiff has complied with the Court's requirement to confer.  On November 28, 2018, Plaintiff's counsel conferred with IBM's counsel and could not reach an agreement on IBM's production responses.  Therefore, Defendant IBM opposes this motion.

_____
Heidi A. Coughlin

CERTIFICATE OF SERVICE

I hereby certify that on December 10, 2018, I electronically filed the foregoing MOTION TO COMPEL PRODUCTION with the Clerk of Court using the CM/ECF system, which sent notification of such filing to the Court and Plaintiff's counsel.

_____
Heidi A. Coughlin