**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| JONATHAN LANGLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-cv-00443-LY |
| | ) | |
| INTERNATIONAL BUSINESS | ) | |
| MACHINES CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**DEFENDANT IBM'S OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL
REQUESTS FOR PRODUCTION AND DEPOSITIONS AND FOR LEAVE TO EXCEED
TEN DEPOSITIONS AND TO EXTEND THE DISCOVERY PERIOD**

On January 30, 2019, this Court directed IBM to produce documents from its "Hybrid Cloud Group" and documents concerning the "resource action" that resulted in plaintiff Jonathan Langley's termination.  (Dkt. 52 at 4.)  The Court also observed that discovery might need to extend outside of this group depending on how it progressed (*id*.) and suggested that IBM "take to heart" this observation.  (Dkt. 75 at 2.)  IBM heard the Court loud and clear.  IBM has responded to four sets of written document requests and produced documents and data for the relevant resource action (called "CLDR") and multiple other topics from within and outside of the Hybrid Cloud group.  IBM has also made executives from Hybrid Cloud, and executives from outside Hybrid Cloud, including its highest ranking Human Resources officer, Chief Human Resources Officer ("CHRO") Diane Gherson, available for deposition.

Despite IBM's extensive production, Langley has failed to identify a single shred of evidence that he was terminated pursuant to some alleged aged-based discriminatory plan.  Now, in a last-minute, last-ditch attempt, Langley filed this Motion seeking to depose IBM's Chief Executive Officer ("CEO") Virginia Rometty, its current Chief Financial Officer ("CFO") James Kavanaugh, and its former CFO Martin Schroeter.  Langley also seeks searches of their and other senior IBM officials' documents.  (Dkt. 86 ("Mot.").)

Langley should not be allowed to conduct discovery of IBM's highest-ranking executives.  CEO Rometty, former-CFO Schroeter, and CFO Kavanaugh have no unique or personal knowledge of Langley or his termination and Langley does not contend otherwise.  While the three attended fall and spring planning meetings that Langley wrongly claims caused a "discriminatory reshaping of IBM's workforce" (Mot. at 6), these meetings were attended by numerous managers and executives, many of whom Langley deposed, or had the opportunity to depose but chose not to, and whose documents have been searched and produced.  Any alleged

1

directive issued by IBM's CEO or CFO to Langley's managers or his group's senior leaders would have been captured in IBM's reasonable search of those individuals' documents or by their deposition testimony.  But no such evidence exists of an alleged discriminatory plan, let alone the involvement of senior executives in it.  Additional discovery from IBM's CEO and CFO on the same issues would be duplicative and unnecessary and would cause the kind of harassment of IBM's top executives that Rule 26(b) is designed to prevent.  Because Langley's discovery demands should be denied, his derivative requests to exceed the ten-deposition limit and extend the discovery deadline should be denied as moot.

## BACKGROUND

### A.    IBM & Langley's Separation.

IBM is a multinational information technology company with operations across the globe.  It is divided into numerous, worldwide groups that are defined by the customer services and products they provide.  (Declaration of Stephen Lasher ("Lasher Decl.") at ¶ 4; Declaration of Robert LeBlanc ("LeBlanc Decl.") at ¶ 6.)  The Hybrid Cloud group, in which Langley worked, provided cloud-based services including sales, cloud management services, and public cloud platform services.  (LeBlanc Decl. at ¶ 11.)

Contrary to Langley's suggestion that the CEO and CFO directly manage these groups' hiring and firing processes, each group within IBM operates independently and is led by its own Senior Vice President ("SVP").  (LeBlanc Decl. at ¶ 7; Declaration of Arvind Krishna ("Krishna Decl.") at ¶ 8; Lasher Decl. at ¶ 8.)  Each has its own Vice Presidents ("VP") of Finance and Human Resources ("HR") and contains sub-units led by General Managers ("GMs").  (LeBlanc Decl. at ¶ 7; Krishna Decl. at ¶ 8; Lasher Decl. at ¶ 8.)  In 2017, Langley's group, the Hybrid Cloud group, participated in the CLDR resource action that led to Langley's termination.

2

(Lasher Decl. at ¶ 11.)  Around the time of his termination, Langley reported to Kim Overbay; his second line manager was Kellie Penzien; his third line manager was Andrew Brown; and his fourth line manager was Steve Cowley.  His fifth line manager was Hybrid Cloud's SVP Arvind Krishna, who reported to John Kelly, SVP, Cognitive Solutions and Research; Kelly reported to CEO Rometty.[1]  (Krishna Decl. at ¶ 5; LeBlanc Decl. at ¶¶ 9-10.)

With respect to the CLDR resource action, Cloud's SVP LeBlanc consulted with his VP of Finance Stephen Lasher, his VP of HR Sam Ladah, and his GMs to determine whether a resource action was necessary.  (LeBlanc Decl. at ¶ 12; Lasher Decl. at ¶ 10.)  After the group determined it was, Cloud's GMs worked with their managers and HR leaders to develop headcount reduction recommendations based on the financial projections and needs of their sub-units.  (LeBlanc Decl. at ¶ 12; Lasher Decl. at ¶ 10.)  Lasher consolidated the recommendations, and in late 2016, submitted a consolidated restructuring funding request for the entire group to the Controller's Office, which granted the request in early 2017.[2]  (LeBlanc Decl. at  ¶ 13; Lasher Decl. at ¶¶ 10-11.)  IBM's Project Office, which assists with resource actions, labeled Hybrid Cloud's resource action "CLDR."  (Declaration of Diane Kennedy ("Kennedy Decl.") at ¶¶ 6-7.)[3]  The decision to conduct and the planning of the CLDR resource action took place

---

[1] Krishna became the SVP of Hybrid Cloud in February 2017, replacing Robert LeBlanc. LeBlanc had been the SVP of the Cloud group, which merged in early 2017 with the Analytics group to form the Hybrid Cloud group.  (Krishna Decl. at ¶¶ 5-6; LeBlanc Decl. at ¶ 10.)

[2] In late 2016, IBM's Controller's Office announced that restructuring funding known as "Baccarat" was available to groups that wished to participate in a resource action in the first quarter of 2017.  (Lasher Decl. at ¶ 9.)  Each individual group determined for itself whether to participate in a resource action.  (*Id*.)

[3] Langley asserts (Mot. at 4-5) that the term CLDR is a "fiction" created by IBM's legal department.  He is incorrect.  IBM has produced approximately 90 documents that contain the

within Hybrid Cloud; it was not directed by IBM's CEO or CFO (nor any other executive outside Hybrid Cloud).  (Lasher Decl. at ¶ 13; Krishna Decl. at ¶ 14; LeBlanc Decl. at ¶ 15.)

After funding was approved, SVP LeBlanc (and later SVP Krishna) worked with the group management team to decide how to allocate the headcount targets to the group GMs, who, in turn, distributed headcount targets to their reports.  (Lasher Decl. at ¶ 12; Krishna Decl. at ¶ 12; LeBlanc Decl. at ¶ 14).  First- and second-line managers decided which individuals within their teams to separate based on performance and other age-neutral metrics.  (Lasher Decl. at ¶ 12; Kennedy Decl. at ¶¶ 9-10.)  Langley's first-line manager, Overbay, selected him for termination, effective June 30, 2017.  (Kennedy Decl. at ¶ 11.)

IBM's executive officers—such as CEO Rometty and then-CFO Schroeter—were not involved in any aspect of the CLDR resource action or the selection of Langley for termination. (Declaration of Virginia Rometty ("Rometty Decl.") at ¶ 4; Declaration of Martin Schroeter ("Schroeter Decl.") at ¶ 4; LeBlanc Decl. at ¶ 15; Lasher Decl. at ¶ 13; Krishna Decl. at ¶ 14.) Neither IBM's CEO nor its CFO (nor any other executive outside Hybrid Cloud) instructed

---

acronym CLDR, including documents created in February 2017 by individuals within Hybrid Cloud.  (Lampe Decl. at ¶ 7.)  Because the resource action's denomination occurred at the Project Office level, it is unsurprising that high-level IBM officials would not know of, or remember, the term.  In addition, IBM's counsel did not prevent "[a]ny attempt by Mr. Langley to inquire about 'CLDR'" (Mot. at 4); rather, in the cited record, IBM's counsel objected to certain questions regarding legal review of layoff selection decisions and communications with counsel because they are privileged.  (Pl.'s Ex. 9, Wild Dep. Tr. at 159:20-24, 160:22-161:2.) Langley also misleadingly suggests that demographic data related to the CLDR resource action was created by IBM's legal department at the time of the resource action, allegedly for an improper purpose.  (Mot. at 4-5, n.14, n.17 (citing IBML-001623, IBML-002011, and IBML-003261).)  As Langley knows, the demographic data files that IBM produced at IBML-001623, IBML-002011, and IBML-003261 were created during this litigation to respond to Langley's discovery requests.  (Lampe Decl. at ¶ 8.)

4

Hybrid Cloud on how to structure its resource action, much less to structure it in a way to terminate older employees.  (*Id*.)

     **B.**    **IBM's Fall and Spring Planning Process.**

Langley asserts that IBM's CEO and CFO directed the groups to restructure IBM's workforce through the fall and spring planning process.  But the fall and spring plans are formulated within the groups, not by IBM's CEO, CFO, and CHRO.  (Krishna Decl. at ¶¶ 15, 20; LeBlanc Decl. at ¶¶ 16, 21; Lasher Decl. at ¶¶ 15, 20.)  Specifically, each group's SVP, GMs, and finance and HR teams develop the fall plan document for their respective group.  (Lasher Decl. at ¶ 15; LeBlanc Decl. at ¶ 16; Krishna Decl. at ¶ 15.)  Fall planning culminates in a meeting of group leaders with, among others, IBM's CEO, CFO, and CHRO, (Lasher Decl. at ¶ 16; LeBlanc Decl. at ¶ 17; Krishna Decl. at ¶ 16; Schroeter Decl. at ¶ 7; Rometty Decl. at ¶ 6), to determine how the group will achieve its near-term financial objectives.  (Lasher Decl. at ¶ 18; Krishna Decl. at ¶ 17; LeBlanc Decl. at ¶ 18.)  Spring planning centers on long-range strategic planning, and again the group leadership develops the spring plan document; IBM's CEO, CFO, CHRO, and Corporate Strategy team do not formulate the plan.  (Lasher Decl. at ¶ 20; Krishna Decl. at ¶ 20; LeBlanc Decl. at ¶ 21.)  This process culminates in a meeting between group leaders and IBM's CEO, CFO, CHRO, and members of IBM's Corporate Strategy team.  (Lasher Decl. at ¶ 20; Krishna Decl. at ¶ 20; LeBlanc Decl. at ¶ 21.)

With respect to the Hybrid Cloud fall and spring planning meetings, IBM has produced or offered to produce for deposition multiple attendees of these meetings—any one of whom could provide testimony about what was discussed at the meetings.  In 2016, for example, LeBlanc, Lasher, and Cowley, among others, participated in Cloud's fall planning meeting. (Lasher Decl. at ¶ 17; LeBlanc Decl. at ¶ 17.)  In 2017, Hybrid Cloud's Krishna, Lasher, Ladah,

and Cowley, among others, attended Hybrid Cloud's fall plan meeting.  (Lasher Decl. at ¶ 17; Krishna Decl. at ¶ 16.)  LeBlanc, Lasher, and group GMs attended Cloud's spring plan meetings in 2015 and 2016, and Krishna, Lasher, and the GMs attended the Hybrid Cloud spring plan meeting in 2017.  (Lasher Decl. at ¶ 20; LeBlanc Decl. at ¶ 21; Krishna Decl. at ¶ 20.)  CHRO Gherson attended all of the above-referenced meetings.  (Lasher Decl. at ¶¶ 17, 20; LeBlanc Decl. at ¶¶ 17, 21; Krishna Decl. at ¶¶ 16, 20.)  Langley deposed or had the opportunity to depose all of these individuals, as further detailed below.  He chose not to, but had he asked at these depositions, he would have discovered that there was no discussion of the CLDR resource action or any discriminatory plan in any of those fall or spring meetings.  (Krishna Decl. at ¶¶ 18-19, 21-22; LeBlanc Decl. at ¶¶ 19-20, 22-23.)

      **C.**    **Procedural Posture and Discovery to Date.**

On January 30, 2019, this Court ordered IBM to supplement its discovery to include information from the "Hybrid Cloud" group that contained Langley's business unit and observed that discovery beyond the Hybrid Cloud group was not prohibited.  (Dkt. 52 at 4.)  Consistent with this order, IBM has responded to four sets of written document requests, encompassing dozens of individual requests, along with interrogatories and requests for admission.  (Lampe Decl. at ¶¶ 2-3, 10, 11.)  IBM conducted reasonable searches of the documents and data of over 20 custodians in Hybrid Cloud and made extensive productions on topics including the CLDR resource action, headcount targets and layoff selection decisions in the CLDR resource action, financials on the PureApp product that Langley supported, financials on the Cloud and Hybrid Cloud groups, early professional hires (an IBM phrase for entry level hires), Langley and his comparators' performance, and fall and spring planning documents.  (*Id*. at ¶¶ 4-6; Kennedy Decl. at ¶ 12.)  Document custodians within Hybrid Cloud ranged from first and second-line

6

managers to SVPs and other senior HR and finance leaders.  (Lampe Decl. at ¶ 4.)  In addition,

IBM has produced documents and data from custodians and files *outside* the Hybrid Cloud

group, including portions of SVP Forum documents, additional fall and spring planning

documents, early professional hire guidance, emails from the Resource Project Office,

documents and data regarding Langley's job search, resource action guidance and training

materials, and company-wide policies and procedures.  (*Id*. at ¶ 6.)

IBM has also made executives from Hybrid Cloud available for deposition.  Langley

deposed LeBlanc, Cowley, Ladah, Lasher, and VP of HR for Software Sales Yara Saad.  (Lampe

Decl. at ¶ 12.)  The Company also offered Krishna for deposition, but Langley cancelled it the

night before it was scheduled.  (*Id*.)  Beyond Hybrid Cloud, IBM made other high level

witnesses available for deposition, including, among others, former VP of Human Resources,

Employee Relations and Engagement Alan Wild and IBM's Controller Robert Del Bene (who

Langley initially requested, but then decided not to depose).  (*Id*.)  Langley also deposed the

Company's highest ranking HR officer, CHRO Gherson.  (*Id*.)  IBM will make its corporate

witness available for a seventeen-topic 30(b)(6) deposition originally noticed for the last day of

discovery but moved to July 10, 2019 by agreement.  (*Id*. at ¶ 13.)

None of the extensive documents and data produced to date and none of the deposition

testimony demonstrates that Langley was terminated pursuant to some alleged high-level

directive to terminate older employees.  Thus, at the very end of the discovery period, Langley

filed the instant Motion, asking the Court (i) to compel apex depositions of CEO Rometty,

former-CFO Schroeter, and current-CFO Kavanaugh; (ii) to compel the production of their and

other high-ranking IBM executives' documents; (iii) to grant leave to exceed the ten-deposition

limit set by the Federal Rules; and (iv) to extend discovery by 90 days.  (Dkt. 86.)  Langley's requests should be denied.

## ARGUMENT

### I.   LANGLEY IS NOT ENTITLED TO THE APEX DEPOSITIONS

Langley is not entitled to depose IBM's CEO, or former or current CFOs.  (Mot. at 8-10.) Federal Rule of Civil Procedure 26(b)(2)(C) provides that a court "*must* limit the frequency or extent of discovery otherwise allowed by these rules" if "(i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;" or, "(ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action."  Fed. R. Civ. P. 26(b)(2)(C)(i) & (ii) (emphasis supplied).  Under this Rule, depositions of senior corporate executives—so-called "apex" depositions—are permissible only if the proponent establishes that (i) the executive "has unique personal knowledge about the controversy," and (ii) the information sought cannot be obtained through "less intrusive discovery methods."  *Computer Acceleration Corp. v. Microsoft Corp.*, 2007 WL 7684605, at *1 (E.D. Tex. June 15, 2007) (citing *Salter v. Upjohn*, 593 F.2d 649, 651 (5th Cir. 1979)); *see also Sanchez v. Swift Transp. Co.*, 2016 WL 10589438, at *3 (W.D. Tex. Apr. 22, 2016) (same; denying motion to compel); *Schmidt v. Goodyear Tire & Rubber Co.*, 2003 WL 27375844, at *1 (E.D. Tex. Jan. 7, 2003) (precluding deposition of high-ranking corporate individual with "no unique information").

These limits are intended to prevent all but the most necessary depositions of CEOs and senior officials because depositions of such executives "create[] a tremendous potential for abuse or harassment."  *Estate of Levingston v. City of Kern*, 320 F.R.D. 520, 525 (E.D. Cal. 2017) (internal cites and quotes omitted).  In addition, the limits recognize that "a high-level official's

8

deposition represents a significant burden upon the deponent." *U.S. ex rel. Galmines v. Novartis Pharm. Corp.*, 2015 WL 4973626, at *2 (E.D. Pa. Aug. 20, 2015).

Here, a deposition of IBM's CEO or the former or current CFO would be extremely burdensome, given that IBM is in the midst of closing "the largest transaction in IBM's history." (Rometty Decl. at ¶ 9; Schroeter Decl. at ¶ 10.)  In addition, such depositions would be abusive and harassing, as Langley has failed to satisfy the requirements necessary to permit them.  *First*, with respect to knowledge, Langley does *not* assert that these senior executives directed the CLDR resource action or personally selected him for termination.  He could not make such an assertion because it would be contrary to fact.  (*See* Kennedy Decl. at ¶ 11; LeBlanc Decl. at ¶ 15; Lasher Decl. at ¶ 13; Krishna Decl. at ¶ 14.)  *See Thomas v. IBM*, 48 F.3d 478, 483 (10th Cir. 1995) (precluding deposition of IBM's then-CEO where he "lacked personal knowledge of [plaintiff]").

Instead, Langley claims that CEO Rometty, former-CFO Schroeter, and current-CFO Kavanaugh attended fall and spring planning meetings with executives from Langley's Hybrid Cloud group, and according to Langley, those meetings involved discussions of IBM's "discriminatory scheme."  (Mot. at 9-10.)  Langley seriously mischaracterizes the record in making this argument: the testimony he cites (Mot. 9-10 at n. 41, 42) says nothing about discussion of a "discriminatory scheme."  And the record evidence is flatly to the contrary. (Lasher Decl. at ¶¶ 19, 21; LeBlanc Decl. at ¶¶ 19-20, 22-23; Krishna Decl. at ¶¶ 18-19, 21-22.)

More to the point, while Langley seeks to depose CEO Rometty, former-CFO Schroeter, and current-CFO Kavanaugh regarding their oral statements at these meetings (Mot. 9-10), they do not have unique personal knowledge about the statements.  Many others, including the executives from the Cloud and Hybrid Cloud groups (whom Langley deposed) and the CHRO

(whom Langley deposed), were present at those meetings and have knowledge of what was said or not said.  (Lasher Decl. at ¶¶ 17, 20; LeBlanc Decl. at ¶¶ 17, 21; Krishna Decl. at ¶¶ 16, 20; Rometty Decl. at ¶¶ 6-7; Schroeter Decl. at ¶¶ 7-8.)  This alone should preclude the apex depositions.  *Tierra Blanca Ranch High Country Youth Program v. Gonzales*, 329 F.R.D. 694, 698-99 (D.N.M. 2019); *see FDIC v. Galan-Alvarez*, 2015 WL 5602342, at *5 (D.D.C. Sept. 4, 2015) (attendance at a meeting "does not demonstrate that any knowledge [ ] gained of the project was unique").  CFO Kavanaugh, moreover, has *no* knowledge of any statements at those meetings.  He did not assume his position until January 2018, six months after Langley's June 2017 separation, which should preclude his deposition.  (Lasher Decl. at ¶ 14.)  *See Sanchez*, 2016 WL 10589438, at *3.  In short, the apex depositions Langley seeks would be burdensome, unnecessary, and disproportional.  Fed. R. Civ. P. 26(b)(2)(C)(i) & (ii).

     *Second*, Langley has not "exhausted other less intrusive discovery methods" regarding oral statements at the meetings.  *Estate of Levingston*, 320 F.R.D. at 525; *Motion Games, LLC v. Nintendo Co.*, 2015 WL 11143486, at *1 (E.D. Tex. Mar. 18, 2015) (denying apex discovery where information could be obtained through less-intrusive means).  Langley cancelled at the last minute the deposition he noticed of Hybrid Cloud SVP Krishna, who attended the meetings (Lampe Decl. at ¶ 12), and failed to ask other attendees whom he did depose about the oral statements.  While Langley cites (Mot. at 9 n.41, 42) the deposition transcripts of four individuals who attended Cloud and Hybrid Cloud spring and fall meetings between 2015 and 2017, Langley's counsel *never* asked those deponents what Rometty, Schroeter, or Kavanaugh verbally communicated during the planning meetings or about the nature of any "feedback" (Mot. at 9) they may have provided.  (*See generally* Pl.'s Exs. 2-5.)  Having failed to seek information through less intrusive discovery, Langley should not be allowed an apex deposition.

Langley's questions could have been, but were not, asked of knowledgeable, non-C suite witnesses long before today.  *See Reif*, 248 F.R.D. at 453; *Novartis Pharm.*, 2015 WL 4973626, at *2 (prohibiting deposition where party had deposed numerous knowledgeable fact witnesses).

Langley's reliance (Mot. at 8) on *Simms v. Nat'l Football League*, 2013 WL 9792709 (N.D. Tex. July 10, 2013), is misplaced.  In *Simms*, the party seeking an apex deposition had asked prior deponents about alleged statements from NFL Commissioner Roger Goodell, but they were "unable to answer."  *Id.* at *3.  Here, by contrast, Langley never asked other deponents about statements by CEO Rometty or CFO Schroeter.  Having never even posed the question "what was said," Langley cannot now claim that the prior depositions were insufficient to provide "a record of what executives said and why."  (Mot. at 9.)  Moreover, unlike *Simms*, we know here that other senior executives are able to testify that no discriminatory hiring plans were discussed or implemented.  (Lasher Decl. at ¶¶ 19, 21; LeBlanc Decl. at ¶¶ 19-20, 22-23; Krishna Decl. at ¶¶ 18-19, 21-22.)[4]

In sum, Langley has not cited and we are unaware of a decision that compelled the deposition of a CEO or CFO of a major corporation in a single-plaintiff discrimination case

---

[4] Langley also cites (Mot. at 9) *Salter*, but it holds that the party seeking an apex deposition must first depose lower level employees with knowledge of the same issue.  *See Salter*, 593 F.2d at 651.  To the extent that *Salter*'s *dicta* can be read to suggest that dissatisfaction with lower-level depositions is sufficient to compel an apex deposition, the *dicta* is inconsistent with current Rule 26(b)(2)(C)(i) & (ii).  In 1979, when *Salter* was decided, then-Federal Rule 26 lacked the express provisions empowering district courts to limit discovery.  Since 1979, Federal Rule 26 has been amended to add such language.  *See, e.g.*, Fed. R. Civ. P. 26(b) Advisory Committee's Notes (1983) (rule amended to "guard against redundant or disproportionate discovery"); Fed. R. Civ. P. 26(b) Advisory Committee's Notes (1993) (amendments "enable the court to keep tighter rein on the extent of discovery").  In all events, Langley cannot be dissatisfied with answers to questions that his counsel never asked.

where the senior executive had no connection to the plaintiff and played no role in his termination.  Such irrelevant and disproportional discovery would enmesh senior executives in disputes far removed from their personal knowledge and interfere with the discharge of their duties to the multiple stakeholders that depend on them.  The Court should not permit it here.

## II.    LANGLEY IS NOT ENTITLED TO ADDITIONAL DOCUMENT DISCOVERY

Langley's request (Mot. at 6-8) for documents from IBM executives should also be denied.

### A.    Langley Is Not Entitled to Senior Executive Documents.

IBM has already culled documents from over 20 custodians as part of its reasonable efforts to capture relevant information.  Yet Langley now asks the Court to compel responses to his Document Request Nos. 24-27, 150, 153-154, 156—all of which seek documents from IBM's most senior executives (specifically, CEO Rometty, CHRO Gherson, current CFO Kavanaugh, SVP of Corporate Strategy Ken Keverian, and former CFO Schroeter) (hereinafter the "Senior Executives").  Langley is not entitled to this cumulative and disproportionate discovery.  *See* Fed. R. Civ. P. 26(b)(1) & (2)(C)(i).  Like depositions, document productions from senior executives are allowed only where there is "a sufficient showing that this information is necessary and not cumulative of other materials," *Harris v. Union Pac. R.R. Co.*, 2018 WL 2729131, at *4 (D. Neb. June 6, 2018) (denying request for CEO's e-mails), and where "these high level executives have unique or personal knowledge of the subject matter." *Lutzeier v. Citigroup Inc.*, 2015 WL 430196, at *7 (E.D. Mo. Feb. 2, 2015).

In addition, where (as here) litigants dispute the appropriate scope of electronic discovery, the party seeking to compel discovery of additional custodians "bears the burden of establishing the relevance of the documents it seeks from those custodians."  *Mortg. Resolution*

*Servicing, LLC v. JPMorgan Chase Bank*, 2017 WL 2305398, at *2 (S.D.N.Y. May 18, 2017) (internal cites and quotes omitted).  Generally, "the responding party is entitled to select the custodians most likely to possess responsive information."  *Id*.  Unless its choice is "manifestly unreasonable" or "the requesting party demonstrates that the resulting production is deficient," the court should deny a motion to compel.  *Id*.; *Ford Motor Co. v. Edgewood Properties, Inc*., 257 F.R.D. 418, 427 (D.N.J. 2009) (speculation insufficient "to grant burdensome discovery requests late in the game").

 Applying these principles, electronic and other document discovery should be limited to the custodians IBM has selected, which include numerous managers in the Hybrid Cloud group. (*See* Dkt. 52 at 3; *supra* at pp. 6-7.)  IBM's comprehensive searches have captured documents from the relevant decisionmakers concerning the CLDR resource action, as well as other documents and data responsive to Langley's voluminous requests.  (*Supra* at pp. 6-7.)  This effort was more than reasonable to capture any communications from the Senior Executives directing the Cloud/Hybrid Cloud group leadership to participate in a resource action or to take particular reductions.  None were found.  That these Senior Executives participated in spring and fall planning meetings (Mot. at 3 n.8) does not establish that they possess uniquely relevant knowledge, especially since IBM has searched the Cloud/Hybrid Cloud managers' documents and made them available for deposition.

 Langley misplaces his reliance on public statements made by CEO Rometty and CHRO Gherson that, according to Langley, "tout[] [their] success in transforming IBM, pointing to millennials and 'New Collar' programs as vehicles for achieving such transformation."  (Mot. at 6.)  Langley's descriptions of the cited statements are misleadingly selective.  For example, Langley fails to note that Rometty's discussion of "New Collar" positions was part of her

13

discussion of IBM's partnership with government to develop "pathway to technology schools." (Mot. at 6 n.24, (CNBC, IBM CEO Ginni Rometty: Reinventing IBM | Mad Money | CNBC, YOUTUBE [June 21, 2017],  https://www.youtube.com/watch?v=fgc4aJ-JMJg&app=desktop at 2:30 (discussing high schools/trade schools that provide students with skills for "New Collar" jobs of the future)).).  *See also* Lampe Decl. at ¶ 14 (citing Gherson Tr. 238:5-20 ("Q. Okay.  Are new collar jobs typically filled by younger people? . . . A.  No, they're not.  They're filled with people from a variety of ages. . . .  And I would definitely not say they were mostly younger people.  They were from every age, from every walk of life.  Some people were reinventing their careers, and come from different – even  different areas of the country to come into this job.").)  And Langley omits the context of Rometty's quote regarding her "DNA," which was in response to a question regarding whether change made her job difficult.  (*See id*. at 6 n.29 (https://www.youtube.com/watch?v=fgc4aJ-JMJg&app=desktop at 16:55 ("[I]t's in my DNA and I think it's in IBM's DNA to keep changing and this is just what you do")).).  Similarly, Langley ignores statements regarding IBM's extensive efforts to retrain its existing workforce. (*Id*. at 6 n.25 (https://www.youtube.com/watch?v=fgc4aJ-JMJg&app=desktop at 4:17); *id*. at 7 n.30 (Human Resource Executive, IBM CEO Praises Gherson's Leadership, YOUTUBE [Oct. 22, 2018], https://www.youtube.com/watch?v=vpE-CS_ReWQ at 0:38).)

In all events, on their face, the highly generalized comments from CEO Rometty and CHRO Gherson do not suggest an age-based animus toward the retention and promotion of existing employees, only that IBM was expanding its hiring of new, entry-level employees.  *See*, *e.g.*, Mot. at 7; *id*. at Pl.'s Ex. 4 Gherson Dep. Tr. at 190-91 (preference for promoting from within, rather than "hir[ing] from the outside"); *id*. at Pl.'s Ex. 13 (noting the percentage of employees hired within the last five years).  Further, the statements are entirely disconnected

from Langley and the CLDR resource action that impacted him.  None suggests that CEO Rometty and CHRO Gherson planned or shaped the contours of the CLDR resource action, or in any way participated in the selection of Langley for termination.

Langley fares no better with his reliance on other documents.  For example, Exhibit 1 to his counsel's affidavit is an email exchange between Rometty and Stephen Leonard, a GM within the Sales and Distribution ("S&D") group (now known as Global Markets), describing a program that had nothing whatsoever to do with a resource action, the Hybrid Cloud group, or Langley.  (Declaration of Lisa Mihalik ("Mihalik Decl.") at  ¶¶ 10-11.)  And the program related to hiring experienced professionals from other companies, not entry-level employees.  (*Id*. at ¶ 9.)  Affidavit Exhibit 2 is a document in which Rometty makes the simple statement that "more than 30,000 new IBMers join[ed] the company" in 2016.  And Affidavit Exhibit 3 discusses initiatives surrounding the Offering Management role, which was not Langley's role.  (Dkt. 49-2 at ¶ 5.)  Nothing in this material demonstrates that apex-level document production is required.

Finally, Langley cites no statements from SVP of Corporate Strategy Keverian, Kavanaugh, or Schroeter justifying searches of these high-level executives' documents.

### B.     Langley Is Not Entitled to More Cloud/Hybrid Cloud Executive Documents.

Langley also asks the Court (Mot. at 2) to compel responses to Request Nos. 149, 151, and 152 which seek documents from Hybrid Cloud SVP Krishna, Cloud HR Leader Ladah, and Cloud SVP LeBlanc containing the term "Talent Remix" or "SVP Forum."  Remarkably, Langley presents no argument whatsoever in support of this demand, and the Court should deny it on that basis alone.  In any event, IBM searched for and produced all documents from those custodians that contain the term "Talent Remix" in relation to Cloud or Hybrid Cloud from 2016 and the first half of 2017 (Requests Nos. 149, 151, 152).  (Lampe Decl. at ¶ 9.)  IBM also

directed Langley to the portions of SVP Forum presentations from 2016 and the first half of 2017 that it was producing in response to Requests Nos. 144-48.  (*Id.* (seeking SVP Forum presentations on hiring, talent management, training, headcount reductions, and resource actions.))  Such production was reasonable, and Langley does not argue to the contrary.

## III.    THE COURT SHOULD DENY LANGLEY'S DERIVATIVE REQUESTS

Finally, Langley's requests (Mot. at 10-11) to exceed the ten deposition limit and to extend discovery for ninety days should be denied as moot.  In the alternative, Langley's requests should be denied due to his lack of diligence.  *See Crawford v. San Marcos Indep. Sch. Dist.*, 2011 WL 2970576, at *2 (W.D. Tex. July 20, 2011) (Austin, J.).  Langley served Document Requests Nos. 24-27 on September 6, 2018, and since that time, IBM has objected to them and the apex deposition requests.  (Lampe Decl. at ¶ 2).

<u>CONCLUSION</u>

For the foregoing reasons, the Court should deny Langley's Motion in its entirety.

16

Dated: July 2, 2019                    Respectfully submitted,

                                       /s/ *Matthew W. Lampe*
                                       Matthew W. Lampe*
                                       JONES DAY
                                       250 Vesey Street
                                       New York, NY 10281
                                       Phone: (212) 326-7838
                                       Fax: (212) 755-7306
                                       mwlampe@jonesday.com
                                       *Admitted Pro Hac Vice*

                                       Alison B. Marshall*
                                       JONES DAY
                                       51 Louisiana Ave., N.W.
                                       Washington, D.C. 20001
                                       Phone: (202) 879-7611
                                       Fax: (202) 626-1700
                                       abmarshall@jonesday.com
                                       *Admitted Pro Hac Vice*

                                       Brian M. Jorgensen
                                       (Texas Bar No. 24012930)
                                       JONES DAY
                                       2727 North Harwood Street
                                       Dallas, Texas 75204
                                       Phone: (214) 969-3741
                                       Fax: (214) 969-5100
                                       bmjorgensen@jonesday.com

                                       Joanne R. Bush
                                       (Texas Bar No. 24064983)
                                       JONES DAY
                                       717 Texas, Suite 3300
                                       Houston, TX 77002
                                       Phone: (832) 239-3782
                                       Fax: (832) 239-3600
                                       jrbush@jonesday.com

                                       *Attorneys for Defendant*
                                       *International Business Machines Corporation*

17

2fb7b6bd239f061c

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 2, 2019, true and correct copies of the foregoing were served via ECF on the Court and all counsel of record.

/s/ <u>*Matthew W. Lampe*</u>
Matthew W. Lampe
