**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| JONATHAN LANGLEY, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-cv-00443-LY |
| | ) | |
| INTERNATIONAL BUSINESS | ) | |
| MACHINES CORPORATION, | ) | |
| | ) | |
|     Defendant. | ) | |
| _____ | ) | |

**DEFENDANT INTERNATIONAL BUSINESS MACHINES
CORPORATION'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Jonathan Langley filed this litigation on the basis of documents (including media publications) that have no nexus to him, his employment, or his termination.  After extensive discovery reaching to the top of his business group and beyond, he still has no evidence linking his termination to age animus.  Just the opposite.  Langley himself concedes that his group-level managers were *not* biased against older workers.  The undisputed evidence demonstrates that *these* individuals – Langley's first to fifth level managers within the Cloud group (which, in 2017, became the Hybrid Cloud group) – were the decisionmakers in the resource action (reduction in force) that impacted him.  They elected to hold the resource action.  They determined which of the group's sub-units would be impacted.  They selected Langley for separation as part of the action.  And they based all of their decisions on legitimate non-discriminatory reasons, including various Cloud group sub-units' failure to meet IBM financial objectives and the poor sales record of the product Langley sold (one for which the Company no longer has any dedicated sellers or sales leads).

Throughout this litigation, Langley has attempted to shift attention away from his unbiased group-level managers – the majority of whom he did not even depose – arguing instead that "IBM's most senior executives created and perpetrated a high-level, nationwide scheme of age discrimination."  (Dkt. 86 at 1; *see also* Dkt. 40-1 at 2 ("These schemes came from IBM Corporate on high.").)  Yet, Langley cannot proffer a shred of evidence that executives outside of his group ordered the resource action or directed where within the group reductions would occur, let alone that such executives themselves were biased or that he was terminated pursuant to an unlawful corporate scheme.  This Court should grant IBM summary judgment on all counts in Langley's Complaint.

**BACKGROUND**

A.      **IBM's Structure and Langley's PureApp Sales Lead Position.**

IBM is a global technology company made up of independent groups defined by the

services and products they provide.  (Declaration of Robert LeBlanc ("LeBlanc Decl.") ¶ 5;

Declaration of Stephen Lasher ("Lasher Decl.") ¶ 4.)  Each group is led by a Senior Vice

President, who functions as a chief executive officer responsible for revenue, expenses, and

profits.  (LeBlanc Decl. ¶¶ 4, 6; Declaration of Arvind Krishna ("Krishna Decl."), Dkt. 97-5

(under seal) ¶ 8; Lasher Decl. ¶ 8.)  Each has its own Vice President of Finance, who acts as a

chief financial officer, and a Vice President of Human Resources.  (Lasher Decl. ¶ 8; LeBlanc

Decl. ¶ 6.)  Each contains sub-units led by General Managers, who have line managers working

beneath them.  (Lasher Decl. ¶ 8; LeBlanc Decl. ¶ 6.)

In 2016, IBM's Cloud group[1] was led by Senior Vice President Robert LeBlanc.  (Pl.'s

Dep. Tr. 252:11-18; LeBlanc Decl. ¶¶ 4, 9.)  It had a number of sub-units, including Cloud Sales

led by Steve Cowley.  (LeBlanc Decl. ¶ 7; Declaration of Andrew Brown ("Brown Decl.") ¶¶ 4-

5.)  The Cloud Sales sub-unit handled sales of products that the group's other sub-units

produced.  (Brown Decl. ¶ 5.)  For example, Cloud Sales teams led by Andrew Brown (who

reported to Cowley) were assigned to sell for the group's HCI (Hybrid Cloud Integration) sub-

unit.  (Brown Decl. ¶¶ 4-5; *see* Pl.'s Dep. Tr. 92:23-94:17.)

HCI's portfolio, which Cloud Sales marketed, included middleware offerings such as

PureApp (also known as PureApplication).  (Brown Decl. ¶ 5.)  PureApp was an integrated

software product that contained middleware.  (Pl.'s Dep. Tr. 77:12-17; Declaration of Kimberly

_____

[1] For a graphical description of the Cloud Group's organizational structure as it pertained
to Langley at the end of 2016, see Attachment A.

Overbay ("Overbay Decl.") ¶ 5.)  It was primarily an on-premises product, involving a physical box containing software that was installed at a customer's premises.  (Overbay Decl. ¶ 5.) Langley was a sales lead on Kim Overbay's PureApp team, one of the teams under Brown.[2] (Pl.'s Dep. Tr. 80:9-16; 92:19-93:11; Brown Decl. ¶ 4; Overbay Decl. ¶ 4.)  In this role, Langley supported other salespeople who sold PureApp, and he was expected to be a subject matter expert regarding the product.  (Pl.'s Dep. Tr. 200:10-18; Overbay Decl. ¶¶ 4, 7-8.)  Langley was working exclusively on PureApp functions at the time of his separation from IBM.  (Pl.'s Dep. Tr. 76:15-77:16; 81:1-12; 83:4-17; 86:15-21; Overbay Decl. ¶¶ 7-8.)

### B.   The Resource Action.

Though many of the Cloud group's sub-units and organizations were strong, others did not meet IBM financial objectives in 2016.  (Lasher Decl. ¶ 10; LeBlanc Decl. ¶ 14.)  In particular, the group's HCI sub-unit, which included PureApp and other middleware products, experienced significant financial challenges.  (Lasher Decl. ¶ 10.)  Not only did HCI miss its revenue and profit objectives for 2016, it shrunk in revenue from the previous year.  (*Id*. at ¶ 13.)

PureApp, in particular, was struggling.  (Overbay Decl. ¶ 9.)  Its sales were weak by early 2016.  (Declaration of Danny Mace ("Mace Decl.") at ¶ 7.)  Further, the PureApp Offering Management Team – which was responsible for PureApp's product management and development – expected PureApp revenues only to decline as customers migrated away from on-premises products to cloud-based applications.  (Mace Decl. ¶¶ 5, 7.)  As such, the Cloud group

---

[2] Langley reported to Kim Overbay, and prior to February 2016, she reported directly to Brown.  (Pl.'s Dep. Tr. 89:8-12, 91:25-92:10; Overbay Decl. ¶ 4.)  In February 2017, Overbay began reporting directly to Kellie Penzien, who in turn reported to Brown.  (Brown Decl. ¶ 4; Overbay Decl. ¶ 4.)

began making plans to transition away from PureApp and toward more viable strategic cloud solutions.[3]   (*Id*. at 8-11.)   Following discussion with the PureApp Offering Management Team in April 2016, Cloud group Senior Vice President LeBlanc decided to curtail investment in the PureApp product line, reducing development activity and the number of dedicated sellers (whom Langley supported) assigned to the product line.   (Mace Decl. ¶ 8; LeBlanc Decl. ¶ 11; Pl.'s Dep. Tr. II 35:25-36:8.)   For the year, PureApp significantly underperformed against its revenue plan. (Overbay Decl. ¶ 9; *see also* Pl.'s Dep. Tr. 140:14-16 ("We struggled in 2016.").)

Against this backdrop, in late 2016, Senior Vice President LeBlanc consulted with his Vice President of Finance Lasher, his Vice President of Human Resources Sam Ladah, and his General Managers regarding whether a resource action was necessary to cut costs in an effort to improve profitability.   (LeBlanc Decl. ¶ 12; Lasher Decl. ¶ 11.)   After they decided that it was, the Cloud group's General Managers worked with their managers and human resources leaders to develop headcount reduction recommendations based on the financial projections and needs of their respective sub-units.   (LeBlanc Decl. ¶ 12; Lasher Decl. ¶ 11; Brown Decl. ¶ 8.)   Lasher consolidated the recommendations, and he submitted a restructuring funding request[4] for the group to the Controller's Office.   (LeBlanc Decl. ¶ 13; Lasher Decl. ¶ 11; Brown Decl. ¶ 8.)

---

[3] It is hardly unusual for IBM's products and services to change as technology and customer demands change.  As Langley acknowledges, "any successful company" has to create new products to keep pace with changes in the marketplace.  (Pl.'s Dep. Tr. 108:8-109:3; *see also id*. at Ex. 6 (document written by Langley, noting that "[o]ne reason for IBM's longevity is that it has a history of innovation with each generation of new technology").)

[4] Lasher's request sought restructuring funding for severance expenses associated with the resource action.  (Lasher Decl. ¶ 9; LeBlanc Decl. ¶ 13.)  In late 2016, IBM's Controller's Office announced that funding, coded as "Baccarat," was available for this purpose to groups across IBM that wished to participate in a resource action in the first quarter of 2017.  (Lasher Decl. ¶ 9.)  Each group determined for itself whether to participate in a resource action, and groups that elected to do so could request funding amounts.  (*Id*. at ¶¶ 9, 11.)

In February 2017, the Controller's Office granted Lasher's request (Lasher Decl. ¶ 12), and IBM's Project Office, which assists with resource actions, labeled the action CLDR (Declaration of Diane Kennedy ("Kennedy Decl. I"), Dkt. No. 95-4 (under seal) ¶¶ 6-8).  By this time, the Cloud group had merged with the Analytics group to form the Hybrid Cloud group, and some of its sub-units were projected to miss IBM financial objectives in the first quarter of the year.  (LeBlanc Decl. ¶¶ 9, 14.)  LeBlanc worked with the group's management team to decide how to allocate headcount reduction targets to the group's sub-units, and the sub-units' General Managers then allocated headcount targets to their reports.  (Lasher Decl. ¶ 14; LeBlanc Decl. ¶ 15.)  Some areas did not receive targets because they were meeting or exceeding their individual IBM financial targets.  (Krishna Decl. ¶ 13.)  In the areas that received reductions, first- and second-line managers decided who within their teams to separate.  (Lasher Decl. ¶ 14; LeBlanc Decl. ¶ 16.)

Within the Cloud Sales sub-unit, Brown's teams took reductions because they were collectively large, and they sold products for the underperforming HCI sub-unit.  (Brown Decl. ¶ 8.)  Further, Cowley indicated that he wanted reductions to focus on face-to-face sellers.  (*Id*.) He reasoned that the Company would need fewer face-to-face sellers in the coming years, because as customers became more technologically sophisticated, they tended to prefer digital (on-line) sales.  (Cowley Dep. Tr. 221:1-21.)

Brown, in turn, distributed headcount reduction targets to his reports based upon financial projections and the needs of their teams.  (Brown Decl. ¶ 9.)  As part of this process, Brown directed Langley's supervisor Overbay to select two employees for the resource action, reasoning that her face-to-face selling teams supported HCI products and, in particular, her PureApp team supported a product in which the Company had curtailed investment.  (*Id*. at ¶ 10;

Overbay Decl. ¶ 13.)  Brown gave Overbay responsibility to determine whom to select from her teams for the resource action.  (Brown Decl. ¶ 10; Overbay Decl. ¶ 13.)  Overbay first decided that her cuts would come within her PureApp sales team, rather than a second team she led, the WebSphere Application team, which was experiencing strong sales and meeting its targets. (Overbay Decl. ¶¶ 9-11; Pl.'s Dep. Tr. 123:18-21.)  Like Brown, Overbay reasoned that IBM would have decreasing need for employees to support PureApp.  (Overbay Decl. ¶ 13.)

In making termination selections from within her PureApp team of employees who supported worldwide sales, Overbay compared those team members' historical performance ratings, current performance trends, and skills.  (Overbay Decl. ¶ 14.)  Overbay selected Langley, whom she rated lowest.  (*Id*.)  She also selected a PureApp team member who did business value assessments for the product.[5]  (*Id*. at ¶ 15.)  In March 2017, Overbay notified Langley – the youngest member of the PureApp team who supported worldwide sales – that he had been selected for layoff.  (*Id*. at ¶ 21.)

Overbay also notified Langley that he would have 90 days to find another job.  (Pl.'s Dep. Tr. 193:23-194:6.)  During this period, Langley applied to three IBM-internal job postings. (Pl.'s Dep. Tr. 198:16-199:7, 203:22-204:17, 211:4-10; Declaration of Carey Samson ("Samson Decl.") ¶¶ 4-5, Ex. A.)  Two of these – the WW Cloud & Cognitive Portfolio Executive posting

---

[5] Arvind Krishna became the Senior Vice President of Hybrid Cloud in February 2017, replacing Robert LeBlanc.  (LeBlanc Decl. ¶ 9.)  After he assumed this role, Krishna increased Brown's headcount target.  (Brown Decl. ¶ 9.)  Brown, in turn, distributed these increased targets to some of his direct reports, based upon the financial projections and the needs of their teams, and as part of this process he raised Overbay's target from two to three.  (Brown Decl. ¶ 9; Overbay Decl. ¶ 16.)  Overbay then selected a third individual from the PureApp team for separation in the resource action.  (Overbay Decl. ¶ 16.)  In total, more than 130 employees were selected for separation in the CLDR resource action.  (Declaration of Diane Kennedy ("Kennedy Decl. II") ¶ 8.)

6

and the Director, IP Partnership Hybrid Cloud Software posting – were for openings that were later cancelled and thus never filled.  (Samson Decl. ¶¶ 6-7.)  The third – Cloud Software-SaaS Sales –was a "pipeline requisition."  (*Id.* at ¶ 8.)  It was not tied to a particular position, but was rather a means to source resumes for potential future openings.  (*Id*.)  To date, the Company had not hired anyone against that posting.  (*Id*.)  Though the positions that Langley applied for were not filled, nine other employees selected for layoff in the CLDR resource action did find positions within IBM, and they did not separate.  (Kennedy Decl. II ¶ 9.)  These employees were all over age 40; four were over 50; and two were over 60.  (*Id*.)

Langley's employment ended on June 30, 2017.  (Overbay Decl. ¶ 21.)  IBM did not replace him, and it now employs no dedicated PureApp sales leads or sellers.  (*Id*. ¶¶ 22, 24.)

IBM's executive officers – such as Chief Executive Officer Virginia Rometty and former Chief Financial Officer Martin Schroeter – were not involved in any aspect of the CLDR resource action or the selection of Langley for termination.  (LeBlanc Decl. ¶ 12; Lasher Decl. ¶¶ 11, 14; Brown Decl. ¶¶ 8-9; Overbay Decl. ¶ 19.)  Neither IBM's Chief Executive Officer, nor its Chief Financial Officer, nor any other executive outside of the Cloud group (or later the Hybrid Cloud group) instructed Langley's group-level managers on how to structure the resource action, much less to structure it in a way to terminate older employees.  (LeBlanc Decl. ¶ 12; Lasher Decl. ¶¶ 11, 14; Brown Decl. ¶¶ 8-9; Overbay Decl. ¶ 19.)  Moreover, no senior executive directed Langley's group-level managers to discriminate against him or any other person.  (LeBlanc Decl. ¶ 12; Lasher Decl. ¶¶ 11, 14; Brown Decl. ¶¶ 8-9; Overbay Decl. ¶ 19.)

### C.  Procedural History.

On May 25, 2018, Langley filed a two-count complaint, alleging "Disparate Treatment Involving Termination."  (Dkt. 1 (Counts I & II).)  In Count I, Langley alleges that "IBM

terminated [him] because of his age" in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a)(1). (*Id*. at ¶ 68.) In Count II, Langley alleges that his termination violated Texas' age discrimination statute. (*Id*. at ¶ 72.)

Throughout the case, Langley's "theory has always been that he was one of the many victims of a company-wide layoff initiative created by IBM's highest executives." (Dkt. 86 at 6.) By contrast, he concedes that his Hybrid Cloud managers treated him fairly and did not possess age animus. (Dkt. 40-1 at 2 (stating that "division heads" and "[l]ow level managers like Kim Overbay are not who created schemes designed to correct IBM's 'seniority mix'"); *see also* Pl.'s Dep. Tr. 91:25-92:18 (admission that he has no complaints against Overbay); *id*. at 95:9-21 (admission that Cowley treated him fairly and that he has no evidence that Cowley was biased); *id*. at 99:17-100:7 (similar regarding Brown); *id*. at 100:19-101:17; Pl.'s Dep. Tr. II 37:4-9 (similar regarding LeBlanc, noting that "[h]e's my age").

## ARGUMENT

The Court should grant summary judgment to IBM. Langley challenges his termination under the ADEA and the Texas Commission on Human Rights Act ("TCHRA"), which prohibit discrimination "because of . . . age." 29 U.S.C. § 623; Tex. Labor Code Ann. §§ 21.051, 21.125. To succeed on his TCHRA claim, Langley must prove that age was a "motivating factor" for his termination. *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 439 (5th Cir. 2012) (internal cites and quotes omitted). Under the ADEA, Langley must prove that age was the "but-for" cause. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009).

If a plaintiff has no direct evidence of age discrimination – Langley has none – his claims under the ADEA and TCHRA are governed by the *McDonnell Douglas* framework. *See Reed*, 701 F.3d at 439-40 (applying the "the familiar *McDonnell Douglas* burden-shifting framework"

to both statutes).  Under the framework, the plaintiff must first establish a *prima facie* case of discrimination.  *See id*. at 439.  If he does, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the plaintiff's separation.  *See id*.; *see also Vazifdar v. Air India*, 2013 WL 371651, at *5 (S.D. Tex. Jan. 29, 2013) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000), holding that "[t]he employer's burden is easily satisfied because it is a burden 'of production, not persuasion' and it need not involve a 'credibility assessment'").  Once that is done, the plaintiff must produce "substantial evidence" indicating that the employer's proffered non-discriminatory reason was instead "pretext for discrimination."  *Campbell v. Zayo Group, LLC*, 656 F. App'x 711, 713 (5th Cir. 2016).

Summary judgment is proper when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed.R.Civ.P. 56(a).  Here, there are no triable issues on any *McDonnell Douglas* element.  Langley cannot establish a *prima facie* case of discrimination.  Further, IBM has legitimate, non-discriminatory reasons for terminating Langley's employment, and he has no "substantial evidence" that IBM's reasons were pretextual.

## A.    There Are No Triable Issues as to *McDonnell Douglas'* First Step.

Langley cannot make out a *prima facie* case.  In a "reduction-in-force case," the plaintiff's *prima facie* burden is to present evidence "from which a factfinder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue."  *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 41 (5th Cir. 1996) (internal cites and quotes omitted).  As such, Langley's evidence must be sufficient to allow a factfinder reasonably to conclude that decisionmakers "consciously refused" to retain him "because of his age" or "regarded age as a negative factor in" selecting him for termination.  *Powell v. Dallas Morning News L.P.*, 776 F.

Supp. 2d 240, 272 (N.D. Tex. 2011), *aff'd per curiam* 486 F. App'x 469 (5th Cir. 2012) (finding that plaintiffs "failed to make a *prima facie* case of disparate treatment"); *see also Anaya v. Donahoe*, 2011 WL 3841403, at *4 (E.D.N.Y. Aug. 26, 2011) (granting summary judgment, finding that plaintiff failed to make out *prima facie* case where he "readily admitted that he had no reason to believe that the majority of decision-makers . . . harbored any discriminatory animus"); *Chin v. ABN-AMRO N. Am., Inc.*, 463 F. Supp. 2d 294, 299, 303-04 (E.D.N.Y. 2006) (granting summary judgment in reduction-in-force case, finding that plaintiff failed to make out *prima facie* case where he admitted "that his supervisor held no discriminatory animus").

Under these standards, Langley's *prima facie* case fails in light of his concession that his managers within the Cloud group – the relevant decisionmakers – did *not* harbor discriminatory animus. Langley concedes that LeBlanc (who led the management group that decided to conduct the resource action (LeBlanc Decl. ¶ 12)) and Cowley (who allocated cuts among his Cloud Sales reports, including Brown (Brown Decl. ¶¶ 8-9)) did not harbor animus based on age. (Pl.'s Dep. Tr. 95:9-21, 100:22-101:15; Pl.'s Dep. Tr. II 37:4-9.) Similarly, Langley concedes that Brown (who assigned headcount targets to Overbay (Brown Decl. ¶ 10)) was "a straight shooter" and "a good guy," and Langley has no reason to believe that he would discriminate. (Pl.'s Dep. Tr. 99:17-100:7, 195:15-16.) Likewise, Langley concedes that Overbay (who selected him for the resource action (Overbay Decl. ¶¶ 13-14)) was "fair and honest," and he never observed any behavior from her suggesting animus. (Pl.'s Dep. Tr. 91:25-92:18.) These concessions, and the undisputed evidence (*supra* at 7) that the executives whom Langley alleges (without proof) discriminated against him were not even involved in the resource action, foreclose a finding that IBM "consciously refused" to retain Langley "because of his age," or otherwise "regarded age as a negative factor in" selecting him for termination. *Powell*, 776 F. Supp. 2d at 272-73.

### B.    There Are No Triable Issues as to *McDonnell Douglas*' Remaining Steps.

Even if Langley could make a *prima facie* case – he cannot – his claims would still fail as a matter of law.  IBM had legitimate, non-discriminatory reasons for its actions, and Langley has no evidence that those reasons were pretext for discrimination.

### 1.    IBM Terminated Langley Based on Non-Discriminatory Reasons.

IBM's burden at *McDonnell Douglas*' second step is minimal.  *See Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 958 (5th Cir. 1993) ("The employer need only articulate a lawful reason, regardless of what its persuasiveness may or may not be.").  In the Fifth Circuit, a reduction in force is a presumptively legitimate, nondiscriminatory reason for a termination.  *See, e.g.*, *EEOC v. Tex. Instruments, Inc.*, 100 F.3d 1173, 1181 (5th Cir. 1996) ("[A] reduction in force . . . is itself a legitimate, nondiscriminatory reason for discharge."); *Armendariz v. Pinkerton Tobacco Co.*, 58 F.3d 144, 150 (5th Cir. 1995) (same).  Courts have repeatedly granted summary judgment to employers where the plaintiff was terminated as part of a workforce reduction grounded in financial reasons, and the employer's selections were based on good-faith comparisons of unit performance and employee ratings.  *See, e.g.*, *Simmons-Myers v. Caesars Ent. Corp.*, 515 F. App'x 269, 271-72 (5th Cir. 2013) (summary judgment appropriate where reduction cut $10 million in expenses and selection factors included "the profitability of each business unit" and "planned increases in productivity"); *Powell*, 776 F. Supp. 2d at 251-52 (similar result where reduction followed "drops in advertising revenues and increases in operating costs" and the selection criteria included "employees' overall performance ratings"); *Gifford v. Lone Star Steel Co.*, 2 F. Supp. 2d 909, 913 (E.D. Tex. 1997), *aff'd*, 170 F.3d 183 (5th Cir. 1999) (same result where reduction occurred because company "was operating at a lower margin of profit").

11

Here, as demonstrated, IBM terminated Langley as part of a reduction in force, and the Company's rationale was wholly legitimate.  Cloud's senior leadership determined that a resource action was necessary to reduce costs in an effort to improve financial performance. (*Supra* at 3-4.)  Within Cloud Sales, Brown's teams took reductions because he had a large organization that sold HCI's portfolio of on-premises, middleware products that were struggling as customer demands changed.  (*Supra* at 3-5.)  Brown, in turn, allocated reductions to Overbay, and both recognized that reductions should come from the team responsible for the PureApp product, which was performing poorly and as to which IBM had curtailed its investment.  (*Supra* at 5-6.)  Overbay selected Langley because his performance ratings, trends, and skills fell short when compared to others on the PureApp team.  (*Supra* at 6.)

### 2. Langley Has No Evidence of Pretext.

Against this backdrop, Langley cannot raise a jury question as to the third *McDonnell Douglas* step because he has no evidence – let alone substantial evidence – that IBM's reasons for his termination were false, or that age was otherwise a "motivating factor" of his termination. *Agoh v. Hyatt Corp.*, 992 F. Supp. 2d 722, 737 (S.D. Tex. 2014); *see also Campbell v. Zayo Grp. LLC*, 656 F. App'x 711, 713-14 (5th Cir. 2016) ("Evidence is substantial if it is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions."); *Nobles v. Cardno, Inc.*, 549 F. App'x 265, 267 (5th Cir. 2013) ("subjective assertions" that a decision was unwise are insufficient to satisfy plaintiff's burden).

### a. Langley Has No Evidence That His Termination Was Part of a "Scheme" to Rid the Company of Older Workers.

Langley argues that his termination was part of a "scheme[] . . . from IBM Corporate on high" that was "designed to correct IBM's 'seniority mix'" by terminating older employees to make room for millennial new hires in various areas of the Company.  (Dkt. 40-1 at 2; *see also*

Dkt. 86 at 6 (noting that Langley's "case theory has always been that he was one of the many victims of a company-wide layoff initiative created by IBM's highest executives"). For multiple reasons, this argument fails.

First, Langley has no evidence that his termination was connected to any alleged "scheme" involving "IBM's highest executives" outside Hybrid Cloud. *Compare Moore v. Eli Lilly & Co.*, 990 F.2d 812, 817 n.24 (5th Cir. 1993) (affirming summary judgment, noting that "the most prevalent flaw in the losing plaintiffs' evidence is the absence of proof of nexus between the firing . . . and the allegedly discriminatory acts of the employer"); *see also Rogers v. Pearland Indep. Sch. Dist.*, 827 F.3d 403, 408 (5th Cir. 2016) (holding that "the pattern-or-practice method of proving discrimination is unavailable in a private, non-class action"). Rather, as shown above (*supra* at 2-5), the undisputed evidence demonstrates that managers within the Cloud group – persons whom Langley conceded did not discriminate against him – were the decisionmakers in the resource action that led to Langley's separation. Members of the Company's senior leadership outside of the Cloud group – whom Langley falsely accuses of discrimination – played no role in these decisions. (LeBlanc Decl. ¶ 12; Brown Decl. ¶¶ 8-9; Overbay Decl. ¶ 19.) Given the undisputed evidence, Langley's theory of the case collapses at the outset.

Second, IBM never maintained any "scheme" to correct its "seniority mix," and Langley has no evidence suggesting otherwise. For instance, Langley focuses on a 2017 planning document – which the *group* leadership created *after* Langley left the Company – that contains the phrase "seniority mix." (Declaration of Liezl Hughson ("Hughson Decl.") ¶¶ 4-5; Pl.'s Dep. Tr. 252:25-253:17 (Langley's testimony that he has never seen any other document with "that blatant of phrase").) That document, however, stated only that the group looked to improve the

"seniority mix" in the offering manager position, a role that Langley did not hold.  (Hughson Decl. ¶¶ 8-9; Pl.'s Dep. Tr. 105:15-17.)  Even here, "seniority" referred only to experience, not age.  (Hughson Decl. ¶¶ 4-8.)  The undisputed evidence shows that the group wanted to ensure that it had the most effective mix of experienced offering managers and entry-level offering managers, so that senior offering managers would not be required to do entry-level tasks that a more junior employee could perform, the Company's costs remained in sync with those of competitors, and the Company could maintain a pipeline of talent who may someday be promoted to higher-level positions.  (*Id*. at ¶¶ 13-16.)  In short, the document Langley repeatedly cites is not evidence of age discrimination, let alone an unlawful scheme.

Third, Langley cannot create a triable issue of pretext by arguing that, at or near the time of his termination, IBM hired new employees (some of whom were younger than him) elsewhere in the Company.  (*See*, *e.g.*, Pl.'s Dep. Tr. 183:20-24 (asserting that IBM "doesn't directly replace those people in most cases with young people, but hires them elsewhere within the corporation or across that division").)  No inference of age discrimination arises from the mere fact that an organization reduces its workforce in one area – particularly one not meeting financial expectations – while hiring employees into other, more successful areas.  *See Wasson v. City of Dallas*, 1998 WL 7154, at *3 (N.D. Tex. Jan. 7, 1998) (granting summary judgment where new hires were "placed in non-supervisory positions," finding this "merely evidence[s] that there was an increased demand for the type of work performed by lower level employees"); *see also Crawford v. Dep't of Investigation*, 324 F. App'x 139, 142 (2d Cir. 2009) (affirming summary judgment when the plaintiffs "suppl[ied] no evidence that the new hires went into positions similar, in level, unit, or duties, to those held by the plaintiffs"); *Watkins v. Sverdrup Tech., Inc.*, 153 F.3d 1308, 1316 (11th Cir. 1998) (affirming judgment as a matter of law, noting

14

that the employees "hired during the month of the RIF were critically skilled in areas that [the plaintiffs] were not"); *Conway v. Allstate Ins. Co.*, 2016 WL 6248179, at *5-6 (N.D. Ill. Oct. 26, 2016) (granting summary judgment where no "younger workers were hired or promoted to occupy the same positions, with the same benefits, responsibilities and salaries, as terminated older workers").

Fourth, Langley cannot establish pretext with his unsupported claims (Pl.'s Dep. Tr. 197:15-198:9) that IBM imposed "onerous" requirements on the internal hiring of individuals selected for resource actions.[6]  At least nine people selected for the CLDR resource action found other positions with IBM.  (Kennedy Decl. II ¶ 9.)  All were over age 40; four were over age 50;

---

[6] Langley's two-count Complaint does not allege an independent failure-to-hire claim based upon the postings to which Langley applied following his selection for the CLDR resource action.  (*See* Dkt. 1 at ¶¶ 67-75 (asserting claims related to Langley's termination).)  Had Langley asserted such a claim, it would fail.

On a failure-to-hire theory, the plaintiff must establish that "(1) he belongs to a protected class; (2) he applied for and was qualified for a position that was seeking applicants; (3) he was rejected; and (4) following his rejection, another applicant not of the protected class was hired." *Haas v. ADVO Sys., Inc.*, 168 F.3d 732, 733 (5th Cir. 1999).  Here, Langley applied for three postings, but in no case was he rejected in favor of a younger applicant.  (Samson Decl. ¶¶ 4-8; Pl.'s Dep. Tr. II 20:11-22))  Moreover, nine other employees over 40 found other positions within IBM after being selected for the CLDR resource action, which forecloses any argument that Langley was not hired because of a Company-wide scheme that (he alleges without any evidentiary support) discriminated against older employees.  *See Price v. Marathon Cheese Corp.*, 119 F.3d 330, 337 (5th Cir. 1997) (evidence that employer "rehired many older employees" indicated that motive was not discriminatory).  Thus, were Langley asserting a failure-to-hire theory, IBM would be entitled to summary judgment because he could not make out even a *prima facie* case.  *See McClaine v. Boeing Co.*, 2013 WL 1155223, at *3 (E.D. La. Mar. 19, 2013), *aff'd*, 544 F. App'x 474 (5th Cir. 2013) (failure-to-hire claim failed when "positions…were subsequently canceled" and never filled).  Further, Langley has no evidence that IBM's reasons for not hiring him – two postings were cancelled and the third was not for a particular open position – were pretext for discrimination.

and two were over age 60.  (*Id*.)  These facts foreclose any assertion that the alleged new requirements were discriminatory toward older workers.

Finally, Langley cannot demonstrate pretext by noting that Cloud decided to limit its investment in PureApp.  Langley does not disagree with the decision to limit *development* of the on-premises PureApp product or to shift resources to cloud-based products.  (Pl.'s Dep. Tr. 125:19-126:6 (testifying that this decision did not lead to PureApp's failure to meet sales goals).)  But he does challenge the corresponding decision to reduce the number of *sellers* dedicated to PureApp.  (*Id*. at 156:6-11; 169:2-22.)[7]  The undisputed evidence demonstrates that this decision was made because PureApp sales were struggling in early 2016, the Cloud group's leadership team expected the product's revenue performance to worsen as customers trended away from on-premises applications, and the team wanted to direct its sales on the type of cloud-based technologies that customers increasingly demanded.  (Mace Decl. ¶¶ 7-12; LeBlanc Decl. ¶ 11.)  Langley has no evidence that the decision was driven by his age (or anyone's age).  And as a matter of black letter law, he cannot conjure non-existent evidence of animus by purporting to question IBM's business judgment as to selling resources.  *See*, *e.g.*, *Gifford v. Lone Star Steel Co.*, 2 F. Supp. 2d 909, 914 (E.D. Tex. 1997), *aff'd,* 170 F.3d 183 (5th Cir. 1999) ("Employment discrimination laws are not vehicles for federal courts to second-guess legitimate and reasonable business decisions."); *see also Vazifdar*, 2013 WL 371651, at *7 (granting summary judgment

---

[7]  Langley readily concedes that "[o]ne reason for IBM's longevity is that it has a history of innovation with each generation of new technology."  (Pl.'s Dep. Tr. 120:16-23; Ex. 6 to Pl.'s Dep.).  In other words, like "any successful company," it "has to create new products."  (Pl.'s Dep. Tr. 108:24-25.)  As part of that process, the Company has throughout its history moved away from obsolete products for which there is no viable market.  (*See id*. at 200:10-18 (Langley's testimony that "IBM doesn't sell typewriters anymore.  It doesn't sell hole-punch machines anymore.").)

where layoff resulted from office closure, though "sales in [that office] had grown by 300% in eight years and [plaintiff] was producing approximately $9,000,000.00 dollars in revenue").

### b. Langley Cannot Establish Pretext with Expert Submissions.

Langley also attempts to establish pretext through the opinions of his putative experts, Daniel Kuang and Rhoma Young. As IBM detailed in its *Daubert* motions (Dkts. 89, 93), Kuang's and Young's reports are inadmissible, and they should not be qualified as experts. But the substance of Kuang's and Young's submissions do not create any jury questions in any event.

### (1) Kuang's Opinions Are Not Evidence of Pretext.

Kuang's opinions are based on cherry-picked data, and they are wholly insufficient to rebut the legitimate, non-discriminatory reasons for Langley's termination. The Fifth Circuit has expressed repeated "skepticism" as to "the ability of statistics to rebut the employer's nondiscriminatory reasons" for an employee's termination. *Tex. Instruments*, 100 F.3d at 1185 ("[P]articularly in age discrimination cases where innumerable groupings of employees are possible according to ages and divisions within the corporate structure, statistics are easily manipulated and may be deceptive.") (internal quotation marks and citation omitted); *see also Bauer v. Albermarle Corp.*, 169 F.3d 962, 968 (5th Cir. 1999) ("[M]ore than statistics are usually necessary to rebut an employer's strong showing of a legitimate, non-discriminatory reason for discharging a particular employee."). For example, in *Texas Instruments*, the Fifth Circuit found that a statistical analysis could not show pretext where the expert cherry-picked data to bolster his conclusion. *See* 100 F.3d at 1185-86 (expert included data showing statistically significant relationship between age and layoff for a *subgroup* of supervisors over 50, while omitting analysis reaching contrary conclusion for other subgroups of employees over 40).

This is exactly what Kuang did.  He opines that, for the individuals in the CLDR resource action, "age is significantly related to termination outcomes."  (Kuang Report (Conclusions).)  But as IBM detailed in its *Daubert* papers, Kuang cherry-picked a sliver of data, omitting analyses he conducted that contradicted Langley's conclusion.  (Dkt. 93 at 3-7.)  Further, as IBM also showed (*id.*), Kuang did not control for facts specific to Langley or for non-discriminatory reasons underlying Langley's selection.  *See*, *e.g.*, *Tex. Instruments*, 100 F.3d at 1185 (expert could not show pretext where "statistical analysis did not consider the specific talents or duties of the manufacturing supervisors" or "even purport to analyze the facts concerning individual supervisors"); *Joseph v. City of Dallas*, 277 F. App'x 436, 442 (5th Cir. 2008) (statistical analysis could not show pretext where expert "has not purported to control for factors such as the applicant's ability to pass the physical fitness examination, the applicants' qualifications, or any other potential variable").

Rather, Kuang focused exclusively on one factor – job band – while failing to account for a range of others that could explain Langley's selection.  (Dkt. 93 at 7-9.)  Critically, Kuang disregarded the job group, the foundational grouping by which managers compare employee performance and skills in the selection process.  (*Id.*)  Such an omission is an inherent apples to oranges comparison.  Kuang's failure to analyze or account for other factors renders his opinion "impotent . . . to rebut [the employer's] particularized reasons for the termination."  *Tex. Instruments*, 100 F.3d at 1185.

### **(2)     Young's Opinions Are Not Evidence of Pretext.**

Young's three opinions fare no better.  She asserts that:  (1) Langley's selection for a resource action was part of a "pattern," (2) an aspect of IBM's policies and practices do not

comport with her view of recognized industry standards, and (3) the Company deviated from its resource action procedures in some instances.  These opinions do not create triable issues.

First, Young's "pattern" opinion is wholly immaterial:  a plaintiff asserting an individual discrimination claim may not rely on "pattern or practice" evidence.  *See, e.g.*, *Rogers*, 827 F.3d at 408 ("[T]he pattern-or-practice method of proving discrimination is unavailable in a private, non-class action . . . ."); *Gillum v. ICF Emergency Mgmt. Servs., LLC*, 2010 WL 370338, at *3 (M.D. La. Jan. 29, 2010) ("The Fifth Circuit Court of Appeals, however, has held that an *individual* plaintiff pursuing an *individual* claim of disparate treatment . . . may not rely on the type of pattern-or-practice evidence that is acceptable in class action suits alleging similar conduct . . . .").

Second, Young's opinion regarding IBM's policies and practices only supports the Company's position.  Young conceded that IBM's procedures largely *comport* with industry standards, and her lone quibble is that the Company should have provided Langley with Older Workers Benefit Protection Act data disclosures.  (Dkt. 89 at 6-8.)  But, here, Young concedes that IBM had no legal duty to do so since it did not seek a waiver of ADEA claims, and she pointed to no standard stating that disclosures should be provided when they are not required.  (*Id*. at 7 (citing Young Dep. Tr. 87:23-89:2).)

Third, Young's opinion as to whether IBM followed its procedures is not even tied to Langley.  When asked whether IBM manipulated processes in Langley's case, Young candidly conceded that she did not "have that as an opinion." (Young Dep. Tr. 130:2-7; *see also id*. at 136:19-137:1 (testifying that "the process seemed to be manipulated to come up with a predetermined outcome, not specifically for Mr. Langley *but for another employee*") (emphasis added).)  As such, Young's opinion is immaterial to Langley's claims.  *See*, *e.g.*, *Moore*, 990

F.2d at 817 n.24 (requiring "proof of nexus between the firing . . . and the allegedly discriminatory acts").

## <u>CONCLUSION</u>

Langley has adduced no evidence of discrimination.  The Court should enter summary judgment in favor of IBM and dismiss his Complaint in its entirety.

Dated: July 15, 2019                    Respectfully submitted,

                                        */s/ Matthew W. Lampe*
                                        Matthew W. Lampe*
                                        JONES DAY
                                        250 Vesey Street
                                        New York, NY 10281
                                        Phone: (212) 326-7838
                                        Fax: (212) 755-7306
                                        mwlampe@jonesday.com
                                        *Admitted Pro Hac Vice*

                                        Alison B. Marshall*
                                        JONES DAY
                                        51 Louisiana Ave., N.W.
                                        Washington, D.C. 20001
                                        Phone: (202) 879-7611
                                        Fax: (202) 626-1700
                                        abmarshall@jonesday.com
                                        *Admitted Pro Hac Vice*

                                        Joanne R. Bush (Texas Bar No. 24064983)
                                        JONES DAY
                                        717 Texas, Suite 3300
                                        Houston, TX 77002
                                        Phone: (832) 239-3782
                                        Fax: (832) 239-3600
                                        jrbush@jonesday.com

                                        Brian M. Jorgensen (Texas Bar No. 24012930)
                                        JONES DAY
                                        2727 North Harwood Street
                                        Dallas, Texas 75204
                                        Phone: (214) 969-3741
                                        Fax: (214) 969-5100
                                        bmjorgensen@jonesday.com

                                        *Attorneys for Defendant*
                                        *International Business Machines Corporation*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on July 15, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which sent notification of such filing to the Court and Langley's counsel.

<u>/s/ *Matthew W. Lampe*</u>
Matthew W. Lampe