**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| JONATHAN LANGLEY, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )    Case No. 1:18-cv-00443-LY |
| | ) |
| INTERNATIONAL BUSINESS | ) |
| MACHINES CORPORATION, | ) |
| | ) |
|     Defendant. | ) |
| | ) |

**DEFENDANT INTERNATIONAL BUSINESS MACHINES CORPORATION'S
REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Langley fails to raise a dispute of fact as to age discrimination and instead resorts to conjecture and unsupported assertion to attempt to mask this deficiency. Langley claims that IBM targeted him for separation in a companywide "scheme" to reduce the age of its workforce. There is no, and was no, such scheme, only a non-existent quote Langley attributes to Alan Wild. IBM reduced headcount on an age-neutral basis in its less productive businesses, while hiring new workers, using age-neutral criteria, in different, productive areas. That is not discrimination. It is the sound way to run a business.

Langley next claims that "HR" targeted him for separation, suggesting that IBM's Human Resources Department is a tool for implementing age discrimination. Langley does not support this incredible claim. His "smoking guns" are the kinds of emails one would expect from HR—explaining procedures and assisting with planning—without reference to age or a suggestion of animus. No one in HR directed Langley's termination or "blocked" a transfer.

Langley resorts to the incredible because the actual evidence confirms that *no one* at IBM considered Langley's age when selecting him for separation. Langley cannot genuinely dispute who decided to conduct the resource action (his managers) or who selected Langley for separation (his managers). And Langley concedes that his managers lacked any discriminatory animus. Indeed, Langley was the *youngest* person in his PureApp job group when terminated. Because Langley cannot state a *prima facie* claim for discrimination, the Court need not consider pretext. But, Langley's claim that pretext exists because PureApp is sold today fails. Langley does not dispute that PureApp performed poorly in 2016 or that IBM then-curtailed its PureApp investment, including by reducing the number of workers dedicated to selling PureApp. There are *none* today. Today, IBM is investing in Cloud Pak technology, with new hardware and software capabilities. For these reasons, IBM is entitled to summary judgment.

I. **THERE ARE NO TRIABLE ISSUES ON *MCDONNELL DOUGLAS*' FIRST STEP.**

Langley has not proved a *prima facie* case of discrimination. (Mot. 9-10.) He concedes that his Cloud managers harbored no discriminatory animus (Mot. 10) and actively assisted his efforts to locate alternative employment within IBM (Opp. 10-12). To sidestep this evidentiary problem, Langley argues (Opp. 12-14) that HR targeted him, but he must demonstrate that HR "exhibited discriminatory animus" and "possessed leverage, or exerted influence, over the titular decisionmaker" with respect to his termination. *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 653 (5th Cir. 2004). Langley fails both requirements.

<u>First</u>, there is no evidence of "discriminatory animus" by HR. Langley relies entirely (Opp. 13) on a so-called "smoking gun" email from Cloud Talent Director Kevin Kubicki, which discusses only *age neutral* evaluation factors—finding "new/better talent" and managing out those lacking "necessary performance, potential, behaviors, or skills." (Pl. Ex. 20 at 3866.) Age neutral factors cannot create a triable dispute of age-based animus. *See Powell v. Dallas Morning News L.P.*, 776 F. Supp. 2d 240, 271-74 (N.D. Tex. 2011) ("job performance" and "skill set" age-neutral); *Gifford v. Lone Star Steel Co.*, 2 F. Supp. 2d 909, 913 (E.D. Tex. 1997), *aff'd*, 170 F.3d 183 (5th Cir. 1999) (same for "least experience and expertise"); *Doan v. Seagate Tech., Inc.*, 82 F.3d 974, 978 (10th Cir. 1996) ("potential" is a legitimate factor).

<u>Second</u>, HR personnel were not the "real decisionmakers" (Opp. 12-13). The undisputed testimony (Mot. 4-6) is that *Cloud managers*, not HR, decided to conduct the resource action and selected Langley for separation. (*See also* Dkt. 37-3, Ex. 2 at 4 (email to managers on "your . . . [headcount] cuts that you need to make").) Langley's proffered evidence confirms this. Langley cites a chat from an HR employee stating that *Brown* was "counting [Langley] as reduction" (Pl. Ex. 18), which proves that *Brown* (not HR) selected Langley. As Langley concedes (Opp. 11), HR Partner Barbara Heathcote's email merely notes that a potential "transfer required approval"

2

from "senior vice presidents and CFOs" (not HR).  Langley asserts (Opp. 13) that HR created a list of individuals for separation.  But the cited attachment does not identify *anyone* for layoff; it identifies employees whose "data would suggest that they do not have the necessary performance, potential, behaviors, or skills," and thus merit a "hard look."  (Pl. Ex. 20 at 3866.)  Critically, Langley was not on the list.  As to the January 2017 "HR document" that "identif[ies] Langley as an 'RA'" (Opp. 12), Langley omits that the "Action" for Langley is "ReDeploy," which does not mean terminate.  (Pl. Ex. 21 at 1690_A; *see* Lampe Decl. Ex. D, Saad Dep. 144:14-19 ("redeploy . . . [to] try to find a role for them").)  And Langley's claim (Opp. 10-12) that HR "blocked" his attempted transfers is just wrong.  HR was explaining the transfer process to Overbay and helping her navigate it.  (*See, e.g.*, Pl. Ex. 1 at 1524, 1507, 1621A; *see also* Lampe Decl. Ex. A, Pl. Dep. II 17:5-22, Ex. H, Pl. Dep. Ex. 43.)

## II.   THERE ARE NO TRIABLE ISSUES AS TO *MCDONNELL DOUGLAS*' REMAINING STEPS.

Even if Langley could establish a *prima facie* case (and he cannot), he cannot create a triable issue of pretext.  *See Graise v. Entergy Operations, Inc.*, 211 F. App'x 253, 255 (5th Cir. 2006).  Langley does not and cannot dispute that:  a resource action was necessary to improve Cloud's profitability; Brown's teams required reductions due to waning customer demand; the poorly performing PureApp team required reductions; and, Langley was selected due to his lower performance ratings and skills.  (Mot. 11-12.)  Langley's contrary arguments fail.

### 1.   Langley's Termination Was Not Part of a Companywide "Scheme."

Langley has not shown pretext by alleging a conspiratorial companywide "scheme" targeting older workers.  (Opp. 3-7, 14-18, 24-25.)  <u>First</u>, Langley does not demonstrate a scheme through the deposition testimony of former HR executive Alan Wild that "IBM has laid off *50,000 to 100,000 employees in just the last several years*" (Opp. 3) (emphasis in original).

Langley's counsel asked Wild how many people he estimated had been separated in his *eight* years (2011-2018). (Pl. Ex. 5, Wild Dep. 249:23-25.) Wild said he did not know and when pressed acknowledged it was "probably" at most between 50,000 and 100,000 over eight years. (*Id*. at 250:3-9.) This amounts to 3% of IBM's workforce per year. Equally misleading, Langley makes up the Wild quote that "IBM set out to slough off large portions of its older workforce using rolling layoffs." (Opp. 6.) Wild said no such thing (*see* Pl. Ex. 5), as shown by Langley's attempt to later correct this made-up quote. (Dkt. 155 at 2.)

In all events, even crediting Langley's claim that 50% of IBM's current workforce is "Millennials," Langley's assertion that "50% of [the] IBM workforce [is] younger than their [older] counterparts that were cast off" (Opp. 3) does not follow. Langley's logical leap lacks an evidentiary foundation, and even if 50% of IBM's workforce were Millennials, it would simply mirror the U.S. workforce. *See* https://www.bls.gov/cps/aa2017/cpsaat03.htm (data indicating that 46.36% of U.S. civilian labor force was between 16 and 39 in 2017). In any event, Langley has not identified *any* new hire who replaced him; he was never replaced. (Mot. 7.) Langley cannot infer age discrimination from IBM's decision to reduce its workforce in underperforming areas while hiring for *different* roles in *different*, high-performing areas. (Pl. Ex. 11, Gherson Dep. 57:6-12, 73:19-74:25; Lampe Decl. Ex. E, Wild Dep. 187:16-188:17.)

Second, IBM's use of the phrase "Early Professional Hire" ("EPH") and EPH practices and policies (Opp. 5-7) are legally and factually irrelevant. "Early Professional Hire," like the terms "refresh," "revitalization hiring," and "skills remix," "does not have an age-based connotation." *Ransom v. CSC Consulting*, 217 F.3d 467, 470 (7th Cir. 2000) ("refresh"); *Blackwell v. Cole Taylor Bank*, 152 F.3d 666, 671-72 (7th Cir. 1998) ("energetic" and "flexible"). Such terms are demonstrably age-neutral. (Mot. 13-14.) In any event, Langley was

not replaced by an EPH (or anyone else).  (Mot. 7.)  He offers no evidence that the Cloud Sales Worldwide Top team "utilized" EPHs (Opp. 6-7), and the undisputed evidence is to the contrary.  (*See* Dkt. 94, Ex. C.)  In addition, Langley concedes (Opp. 5) that IBM defines "EPH" by experience, not age, which is not discriminatory even if experience "correlate[s] with age." *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 608-11 (1993); *Armendariz v. Pinkerton Tobacco*, 58 F.3d 144, 152 (5th Cir. 1995).  Likewise, it is lawful to hire less-experienced workers for entry-level tasks and build a talent pipeline during a reduction in force.  (Mot. 14-15 (citing cases)); *see Bell v. Raytheon Co.*, 2009 WL 2365454, at *8 (N.D. Tex. July 31, 2009).  Doing so is a sound business practice.  (Pl. Ex. 11, Gherson Dep. 245:22-247:4.)  Finally, all but one of the cited EPH hiring plans (Opp. 6) are unrelated to Cloud and/or were drafted after Langley's termination.  (*See* Pl. Corr. Ex. 4 at 2454 (11/2015 Analytics Group), 2505 (11/2017 document).)

Langley's allegation (Opp. 7) that IBM "exempted" EPHs from separation is of no moment.  EPHs were exempt only from staff reductions, not from other types of resource actions, during their first nine months.  (Pl. Ex. 14 at 1426_A; Lampe Decl. Ex. E, Wild Dep. 210:24-211:13.)  This exemption did not impact Langley because there were no EPHs in his job group (Overbay Decl. Ex. C).  The mere existence of an exemption is not evidence of discrimination.  *Fallis v. Kerr-McGee Corp.*, 944 F.2d 743, 745 (10th Cir. 1991) (first-year employee exemptions); *Doan*, 82 F.3d at 978-79 ("new hires").  With respect to Langley's claim (Opp. 7) that IBM "exempted bands 6 & 7 from its rolling layoffs," the cited document (Pl. Corr. Ex. 4 at 2555) is a Digital Business Group document dated months *after* Langley left IBM; it does not reflect a companywide policy, and does not apply to "low performers."  (*Id.*)

Third, Langley's assertion (Opp. 4-5, 24-25) that IBM fosters a culture of age animus is misrepresentation through omission.  Langley claims (Opp. 4) that IBM referred to older workers

5

Case 1:18-cv-00443-DAE-AWA   Document 168   Filed 08/12/19   Page 7 of 13

as "gray hairs" and "old heads" and referenced "'wear and tear' disabilities." But he quotes a 2006 publication from the consulting arm of IBM UK, Ltd. encouraging its customers to *retain* older workers. (*See* Pl. Ex. 7 at 275 ("When [the Baby Boomers] go, they take their skills and their knowledge with them, and the organization they've left behind is much the poorer."); *id.* at 276 ("business needs [boomers]" as much as they want to work); *id.* ("to benefit from their considerable talents" businesses "must make the working environment and conditions suitable and appealing to older people").) Langley states (Opp. 4 (citing Pl. Ex. 7 at 110, 127)) that "IBM accused" baby boomers of being less likely to admit mistakes, less collaborative, and so on. But as the cited documents state, IBM's Institute for Business Value was detailing a survey of *other companies*. The document has nothing whatsoever to do with IBM policies or employees. Similarly, Erika Riehle's statements (Opp. 4 (citing Pl. Corr. Ex. 7, 295-98)) are in an article discussing these survey results and say nothing about "IBM's belief." In sum, these documents fail to exhibit age bias by *IBM* and lack any nexus to Langley. (*See* Pl. Ex. 11, Gherson Dep. 196:9-17, 203:19-23, 204:8-10, 219:11-16, 220:4-11.) Langley's failure to prove a nexus is fatal. *See Moore v. Eli Lilly & Co.*, 990 F.2d 812, 817 n.24 (5th Cir. 1993) (requiring "nexus").

<u>Fourth</u>, Langley cites out-of-context IBM executive comments that do not relate to Langley. The Wild "interview" transcript (Opp. 5 n.23 (Pl. Ex. 8)) omits *any* basic context, where it was given, for what purpose, or even the question(s) posed to Wild; it contains no disparaging comments about older workers. A remark "presented entirely out of context" cannot defeat summary judgment. *Bell*, 2009 WL 2365454, at *7. This is particularly true given Wild's undisputed testimony that he had no role in IBM's hiring plans or policies (Lampe Decl. Ex. E, Wild Dep. 137:15-138:23). CHRO Gherson's comment in a college newsletter about "break-

6

through thinking" (Pl. Ex. 9) merely encourages college students to take initiative, which does not give rise to an inference of animus and is unrelated to Langley. *McDaniel v. Nat'l R.R. Passenger Corp.*, 705 F. App'x 240, 247-48 (5th Cir. 2017); *Bell*, 2009 WL 2365454, at *7.

### 2. Langley Has No Evidence Of Pretext For His Selection.

Lacking evidence of a companywide scheme to eliminate older workers, let alone a scheme connected to Langley, Langley offers arguments for pretext based on *his* selection. But, again, Langley misrepresents the record and otherwise falls short of creating a fact issue.

First, Langley argues (Opp. 15) there are "contradictory narratives" as to whether he was, in fact, first selected for layoff in February 2017. For support, Langley cites December 2016 communications between himself and Brown, in which Brown responds to Langley's request for "more responsibility" by saying that this would require a new position because Langley's team was going to be "reduce[d]." (Pl. Ex. 1 at 826.) Brown did *not* say that Langley was *selected* but that Langley could not have more responsibility in a declining unit. (*Id*.) Brown confirmed to Langley later that day that "nothing [wa]s final" on reductions. (Lampe Decl. Ex. A, Pl. Dep. 175:5-176:13, Ex. B, Pl. Dep. Ex. 18.)

Langley also claims (Opp. 15 (citing Pl. Ex. 21)) that he was designated for layoff on an HR planning document "[o]ne month before the proffered selection date." This is false. Langley was also marked "Redeploy," which does not mean terminate. (*Supra* 3.) None of Langley's submissions conflict with the undisputed evidence that, in the fourth quarter of 2016, Brown learned that a resource action was anticipated in early 2017. (Brown Decl. ¶ 8). At that time, Brown also asked Overbay to participate in a planning exercise, which was *not* part of the final selection process (*id.* ¶ 12), and Overbay identified Langley as an employee for redeployment, not separation. (Overbay Decl. ¶ 12.) All evidence confirms this testimony. (Pl. Ex. 1 at 826;

Pl. Ex. 18; Pl. Ex. 21 at 1690_A; Lampe Decl. Ex. D, Saad Dep. 144:1-145:5, 149:7-150:5.)

Second, there is no evidence for Langley's claim (Opp. 16) that an "onerous" HR review board process precluded older workers from transferring to new roles. The review process is the same for *all* RA-ed workers, and the board did not consider age-based factors. (Pl. Ex. 1 at 1524 (considering performance reviews and age-neutral information ).) Thus, nine employees over the age of 40 successfully transferred to new roles, and four (one over age 40, one over age 50, and two over age 60) did so through the *very* process Langley identifies. (Hill SJ Decl. ¶¶ 5-7.) In any event, the review board process is irrelevant. Langley did not receive offers for any new position (*see* Samson Decl. ¶ 5, Ex. A), meaning he never advanced to the review board.

Third, Langley argues (Opp. 16-17) that Brown "direct[ed]" Overbay to "downgrade Langley's performance review score." But Langley omits that *every* member of the PureApp team had their ratings reduced in the "Business Results" category based on the undisputed "struggle[s]" of the *whole* team. (*See* Pl. Ex. 22 at 1248; Overbay Decl. Ex. C; Lampe Decl. Ex. A, Pl. Dep. 140:14-16.) In the cited correspondence (Pl. Ex. 22 at 1249), Brown states that Overbay's ratings seemed "overly generous" given the PureApp team's poor business results. After acknowledging the group's failure, Overbay changed the "Business Results" rating from "Achieves" to "Expects More" and lowered the "Skills" rating by one level for *each member of the team*. (*Id.* at 1248; Pl. Corr. Ex. 22 at 1251.) The uniform adjustment of *all* the comparators' performance scores based on undisputed, non-discriminatory reasons refutes any claim of pretext and distinguishes this case from the ones Langley cites. (Opp. 17, nn.115-16.) *See Mendoza v. El Paso Cty.*, 2012 WL 1952278, at *9 (W.D. Tex. May 30, 2012).

Fourth, Langley argues (Opp. 18) pretext from IBM's alleged representation that PureApp "no longer even exists." PureApp is still sold, as IBM expressly acknowledged in its

Motion (Overbay Decl. ¶¶ 22-23), but there are *no* dedicated PureApp sellers, and sales remain substantially below even the subpar 2016 level. (*Id.*; Mot. 7.) Langley disputes none of this and contemporaneously acknowledged IBM's lack of investment in PureApp and its poor performance. (Lampe Decl. Ex. A, Pl. Dep. II 32:13-33:4, 35:25-36:15; Overbay Decl. Ex. A at 19); *see also* Mace Decl. ¶¶ 7-10; LeBlanc Decl. ¶ 11; Pl. Ex. 12, LeBlanc Dep. 187:13-17 and Lampe Decl. Ex. G, LeBlanc Dep. Ex. 12 at 2877 (documenting 2016 de-investment decision).) Langley nonetheless attempts to manufacture a dispute, citing Cowley's incorrect testimony that PureApp is not now sold. (Opp. 18.) But Cowley admitted to knowing only "a little of" PureApp (Lampe Decl. Ex. C, Cowley Dep. 180:6-9), and whether PureApp sales are substantially down or nonexistent two years after Langley's separation is not material. Finally, Langley wrongly conflates (Opp. 18-19) "Cloud Pak" and PureApp. Today, various parts of the PureApp appliances have been renamed IBM Cloud Pak System, and IBM will deliver feature enhancements to those offerings, including changes to their existing hardware and software capabilities. (Murray Decl. ¶ 7.) The term "Cloud Pak" is not unique to the PureApp appliances; there are a variety of Cloud Pak products. (*Id.* ¶ 8.) The announcement of new and different products two years after Langley's separation also cannot preclude summary judgment.

      **3.**      **Langley Cannot Establish Pretext with Expert Submissions.**

Finally, Langley's experts, Kuang and Young, cannot create a fact dispute for the reasons stated in IBM's pending Motions to Exclude both experts' submissions, its Motion to Exclude Kuang's Supplemental Expert Report, and its replies on the Motions (Dkts. 89, 93, 140, 142, 144), which IBM adopts and incorporates herein. IBM will not respond to Kuang's untimely report or repeat its previous arguments but notes that Kuang admitted that differences in average employee ages are reasonable (Dkt. 93 at 5), that any average age "anomaly" can be explained

by varying experience requirements (*id.*; Dkt. 94, Ex. C.); and that his excluded "statistical outliers" (Opp. 21) are younger employees selected for the CLDR resource action. (Dkt. 142 at 5.) Moreover, statistical evidence like Kuang's is probative of pretext only when the plaintiff has "particularized evidence directly challenging" the defendant's termination rationale, which Langley does not have. *E.E.O.C. v. Tex. Instruments Inc.*, 100 F.3d 1173, 1186 (5th Cir. 1996). Finally, Langley's assertion (Opp. 8) that CLDR is a "fiction" is refuted by his cited document. (*See* Pl. Ex. 15 (Cloud Sales had "CLDR" "RA Acronym").)

Young's declaration is untimely (Dkt. 144 at 5) and her analysis lacks any nexus to Langley (*see* Pl. Ex. 14A, Young Decl. ¶¶ 10-19), a point she concedes. (Lampe Decl. Ex. F, Young Dep. 85:5-15, 190:25-191:2, 194:4-16.) Young also fails to analyze employees similarly situated to Langley and thus cannot create a dispute of fact regarding a "pattern" of discrimination. As Langley's cases confirm, "pattern" evidence must relate narrowly to individuals "similarly situated" to Langley. *See, e.g.*, *Wyvill v. United Cos. Life Ins. Co.*, 212 F.3d 296, 302 (5th Cir. 2000) (abuse to admit otherwise); *Jiang v. Tex. Comm'n on Env. Quality*, 2018 WL 8415878, at *1 (W.D. Tex. Sept. 20, 2018); *Smith v. World Wide Tech.*, 2009 WL 10699654, at *5 (W.D. Tex. Feb. 20, 2009). Finally, Young's declaration contradicts her deposition testimony (*compare* Pl. Ex. 14A, Young Decl. ¶ 17 *with* Dkt. 144-3, Young Dep. 158:4-9) and includes improper legal opinions (*see, e.g.*, Pl. Ex. 14A, Young Decl. ¶ 6), rendering it incapable of raising a dispute of fact. *See* Dkt. 144 at 5 n.8, 10; *Romano v. City of San Marcos*, 2017 WL 3996427, at *5 (W.D. Tex. Sept. 11, 2017).

## CONCLUSION

For the foregoing reasons and those in IBM's Motion (Dkt. 126) and the Motions incorporated by reference, the Court should enter summary judgment in IBM's favor.

Dated: August 12, 2019

Respectfully submitted,

*/s/ Matthew W. Lampe*
Matthew W. Lampe*
JONES DAY
250 Vesey Street
New York, NY 10281
Phone: (212) 326-7838
Fax: (212) 755-7306
mwlampe@jonesday.com
*\*Admitted Pro Hac Vice*

Alison B. Marshall*
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
Phone: (202) 879-7611
Fax: (202) 626-1700
abmarshall@jonesday.com
*\*Admitted Pro Hac Vice*

Joanne R. Bush (Texas Bar No. 24064983)
JONES DAY
717 Texas, Suite 3300
Houston, TX 77002
Phone: (832) 239-3782
Fax: (832) 239-3600
jrbush@jonesday.com

Shannon H. Ratliff
(Texas Bar No. 16573000)
Davis, Gerald, & Cremer, P.C.
300 West 6th Street
Suite 1830
Austin, TX 78701
(512) 493-9601
shratliff@dgclaw.com

*Attorneys for Defendant*
*International Business Machines Corporation*

## **CERTIFICATE OF SERVICE**

      I hereby certify that on August 12, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which sent notification of such filing to the Court and Langley's counsel.

                                          */s/ Matthew W. Lampe*
                                          Matthew W. Lampe