THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| JONATHAN LANGLEY | § | |
| Plaintiff | § | |
| | § | |
| v. | § | CASE NO. 1:18-CV-00443-LY |
| | § | |
| INTERNATIONAL BUSINESS MACHINES | § | |
| CORPORATION | § | |
| Defendant | § | |

---

**PLAINTIFF'S CORRECTED RESPONSE OPPOSING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

---

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

NOW COMES Plaintiff Jonathan Langley, and files this, his Corrected Response in Opposition (Original Docket No. 150) to Defendant International Business Machines Corporation's (hereinafter "IBM") Motion for Summary Judgment,[1] (hereinafter "Defendant's Motion") and would respectfully show as follows:

### Summary of IBM's Evidence

To support its summary judgment, IBM elects *not* to point this Court toward relevant demographic data or other exculpatory evidence that might explain away the patent ageism contained within IBM planning documents. Instead, IBM has chosen to deflect this Court away from the evidence—what little it decided to produce—and instead rely on ***nine*** self-serving affidavits with scant supporting evidence to claim there is "no nexus" between Langley and the ageist internal documents. Regardless, these affidavits are entirely unresponsive to Plaintiff's case in chief, and cannot mask the stench of IBM's discriminatory scheme.

---

[1] Def. Mot. For Summary Judgment, Dkt. No. 126

I.   Procedural History and Background

**A.  Langley's Termination.**

Jonathan Langley ("Langley") was 59 years old and had been employed by IBM for 24 years when he was laid off in 2017.[2] Prior to his termination, he held the role of Sales Lead for the PureApp team.[3] His direct manager was Kim Overbay ("Overbay") and her direct manager was Andrew Brown ("Brown").[4]

On December 6, 2016, Brown informed Langley that he was going to lose his job via a layoff, or as IBM calls it, a "resource action."[5] This conversation is corroborated by emails from Brown and Langley.[6] After learning he would be laid off, Langley sought to obtain a new position within IBM as he had done many times in the past when technology shifted or changed.[7] He applied for positions through both formal and informal means.[8] However, this time his search ran aground when he was repeatedly advised there were mandates for external hiring, HR impediments, and the requirement of high level executive approval.[9]

On or about June 30, 2017, Langley's employment from IBM was permanently terminated.[10] After his termination, Langley received a letter from IBM congratulating him on his "retirement."[11] A call to IBM revealed the internal classification for Langley was "resigned/retired," even though he had been involuntarily terminated.[12] Subsequently obtained high level planning documents, known as Fall Plans, revealed a high level scheme to lay off older workers while simultaneously infusing the company with

---

[2] Ex. A, Jonathan Langley Affidavit
[3] *Id.*
[4] *Id.*
[5] Ex. 1 at IBML_826.
[6] *Id.*
[7] Ex. 1 at 256 – 257, 284-285, 1513, 1526, 3308; *see also* Dkt. No. 126-15, Declaration of Carey Samson
[8] *See generally* Ex. 1, Evidence Langley Qualified for Other Jobs
[9] Ex. 1 at IBML 1505, 1621A, 3308, 284; Langley-IBM 573-574
[10] *See* Ex. A
[11] Ex. 2
[12] Ex. 3 at Langley-IBM 644

millennials, early professional hires ("EPH"), or early professionals ("EP")—to remix the seniority of the company.[13]

These documents reveal a discriminatory motive by IBM to terminate Langley and his similarly situated peers. While IBM has been less than forthcoming with its discovery and has utilized numerous tactics to prevent Langley from taking depositions and obtaining documents necessary to prove his case, Langley has managed to acquire enough evidence to successfully defend IBM's summary judgment and get to a jury on the issue of fact.[14]

### B.  IBM's Scheme – Broken Down to its Common Denominator

The stripped-down essence of IBM's fire-and-hire discriminatory scheme to make its workforce significantly younger is simple: (1) lay off a large portion of its current workforce, focusing on targeting older persons; and (2) simultaneously hire thousands of new employees, focusing on targeting younger persons. The actual mechanisms of the scheme, however, are much more complex, have been actively concealed by IBM, and require some background context to understand.

IBM has refused in discovery to provide before-and-after age demographic information from even just the Hybrid Cloud group that Plaintiff could use to offer as proof that IBM did achieve its goal of becoming younger. Nevertheless, three pieces of birds-eye evidence do exist that corroborates the allegation that IBM has engaged in the fire-and-hire scheme alleged. (1) IBM has laid off *50,000 to 100,000 employees in just the last several years*, which is proof of IBM's efforts to cast off a large portion of its workforce very recently.[15]  (2) Approximately 50% of IBM's current workforce has been hired just in the last five years, which is proof that IBM has engaged in aggressive hiring during that same time period.[16] (3) Over 50% of IBM's current workforce is currently comprised of "Millennials" according to its own CEO, which allows the an easily-drawn inference that the majority of the persons recently hired

---

[13] Ex. 4
[14] *See e.g.* numerous discovery rulings by Judge Austin (Dkt. Nos. 21, 36, 52, 86)
[15] Ex. 5, Alan Wild Dep. Tr. at 249:9-250:8.
[16] Ex. 6

who make up 50% of IBM workforce are younger than their ADEA counterparts that were cast off.[17]

Indeed, there is good reason that the EEOC is still actively investigating IBM for this very scheme.[18]

### a.  IBM's driving motive: Valuing Young Employees More than Old Employees

The century-old IBM is obsessed with getting younger, and that obsession is based in a belief in the broad-brush stereotype that one class of persons—young people—is more valuable to IBM than another class of persons—old people. If an IBM executive were to publicly suggest that white people were inherently harder workers than persons of other races—and that IBM viewed white people as more valuable employees as a result—the national outcry of racial discrimination would be deafening. For some reason, ascribing more value to younger persons relative to older persons—a legally protected class just like race—fails to register the same degree of public outrage, which is perhaps why IBM has been so bold in making the following discriminatory statements and publications about age:

In a 2015 publication, IBM compared employees in the "Millennial" generation with those from Gen X and Baby Boomers.[19] Therein IBM referred to older workers as "***gray hairs***" and "***old heads***," and represented that "age is catching up with Baby Boomers," and ***those still working often needed accommodations for "'wear and tear' disabilities like hearing and vision impairment [sic] that older people routinely develop***."[20] IBM also accused Baby Boomer employees of being less likely to admit mistakes at work, less likely to collaborate in decision making, less likely to understand IBM's business strategy, less likely to understand their manager's expectations, less likely to understand what customers wanted, and less likely to understand IBM's brand.[21] In 2016, IBM's Marketing Manager, Erika Riehle, reiterated IBM's belief in the stereotype that Baby Boomer employees are less collaborative, less committed, less accountable, and less attentive to results.[22]

---

[17] https://www.youtube.com/watch?v=fgc4aJ-JMJg&app=desktop at 4:22
[18] Ex. 6a
[19] Ex. 7 at Langley-IBM 279
[20] Ex. 7 at Langley-IBM 275-276
[21] Ex. 7 at Langley-IBM 116-117, 295-298
[22] *Id.* at Langley-IBM 295-298

In contrast—just as one of many examples—IBM's sentiments about young people are captured perfectly by Alan Wild, a high level HR executive, during an interview in which he articulates the value of millennial employees to businesses:

> I think the big difference is Millennials today are born on the – born on the web, they're digital citizens, and they live socially…so when you bring new people into the organization, they don't come in to train for five years before they add value. They start to add value immediately…The difference is they're much more valuable to organizations today.[23]

In response to one millennial intern's efforts to upgrade a PowerPoint slide, IBM top HR executive Diane Gherson offered up the stereotype that, "[i]t's break-through thinking like this that you wouldn't have gotten prior to this generation."[24] IBM's scheme to transform its workforce was built on these very same stereotypes about age.

**b.  Early Professional Hire – Defined**

Understanding and defining IBM's term of art, "Early Professional Hire," a.k.a. "EPH," is key to understanding the mechanics of its fire-and-hire overall scheme. IBM internal documents make it clear that the term is used to mean persons with traits that can very easily be correlated with age as a matter of common sense even without the age demographic information IBM has refused to produce in discovery. For instance, IBM classifies Early Professional Hires as persons who obtained their degree within the past three years[25], persons …with little to no experience."[26]

While IBM's definitions of EPH leave some wiggle room to be able to argue that older persons could technically be classified as Early Professional Hires in some cases, the reality on the ground is different. One high-level IBM executive, IBM's Chief Human Resources Officer, Diane Gherson, testified that Early Professional hires are definitely generally younger persons,[27] that the majority of Early Professional Hires are under 40 years old,[28] and that IBM is aware that there is a correlation between

---

[23] Ex. 8 at p. 3; *see also* Ex. 5 at 148:16-149:2
[24] Ex. 9
[25] Ex. 10 at IBML-3349, 3248
[26] *Id.* at IBML-3348
[27] Ex 11, Gherson Dep. Dep. Tr.at 86:20-24.
[28] *Id.* at 88:16-20.

higher band levels and older age.[29] With those EPH metrics in mind, IBM set out to design its hire-and-fire scheme in a way meant to achieve its desired result.

### c. IBM's Discriminatory Scheme - Explained

Discussing IBM's current talent recruitment problems, Wild emphasized in his aforementioned video interview that, "when people look at IBM, we're blue and we're 100 years old. So it's a question of in the eyes of people coming to join the organization, how do we show IBM as a different place to the one they have in their mind?"[30] As Wild testified during his deposition, IBM determined that one way to show Millennials that IBM was not "an old fuddy duddy organization" was to make itself appear "as [a] cool, trendy organization" like Google and Amazon.[31]  To do that, IBM set out to slough off large portions of its older workforce using rolling layoffs over the course of several years.[32]

As one of the main prongs of its scheme, IBM issued headcount targets in a manner that deliberately targeted older workers. ***For instance, IBM's layoffs focused on specifically culling employees in higher band levels—with the quiet understanding that employees with higher band levels are almost assuredly going to be older workers***.[33] High-level IBM internal planning documents used coded language that not-so-subtly referred to IBM's fire-and-hire discrimination scheme. The coded language used included but was not limited to "Early Professional Hire," "seniority mix," "skills remix," "seniority remix," "reinvent," "next generation," "refresh," "revitalization hiring," "reinvention of the workforce," and "transformation."[34] Set headcount targets were created based on how many "Early Professional Hires" were desired in the respective divisions.[35] The rolling layoffs were cited as a means to make room for—and free up money to hire—the young, Early Professional Hires IBM so values.[36] Specifically, they were utilized in Langley's Hybrid Cloud group, and even more specifically his

---

[29] *Id.* at 144:17-19
[30] Ex. 8 at 2-3
[31] Ex. 5, Alan Wild Dep. Tr. At 144:16-17
[32] *DELETED*
[33] Ex. 11 at 144:5-145:7; *see also* Ex. 5 at 126:18-128:8
[34] Ex. 4 at IBML-2568, 2563, 2447, 2559, 2452, 3096; *see also* Ex. 10 at 3243
[35] *See generally Id.* at IBML-2367, 2368, 2449, 2454, 3091, 3094, 2500, 2501, 2505
[36] Ex. 4 at IBML-2439.

position—sales. IBM also took steps to ensure that its younger employees would not be collateral damage of the layoffs and would instead remain within the company. ***IBM flat out exempted Early Professional Hires from being considered for its rolling layoffs.***[37] IBM's documents prove that it is aware that Early Professional Hires—and thus most of its *young* workforce—work almost exclusively within job bands 6 & 7.[38] Consequently—as an added layer of protection against losing young workers as collateral damage—***IBM likewise exempted bands 6 & 7 from its rolling layoffs, as well***.[39]

IBM's plan contained multiple other moving parts, as well, some of which were designed to effectuate the scheme while others were meant to make it easier to cover up. IBM HR switched IBM over to "Checkpoint," which is a much more subjective employee performance review process that—as discussed below—is easily and readily manipulated by IBM's HR Partners to obtain the company's desired layoff results.[40] Once an employee was selected for a layoff (referred to by IBM as a "Resource Action" or "RA") and notified about it, IBM applied positively draconian requirements to make being rehired internally nigh impossible, which both Alan Wild and Plaintiff's HR expert have stated under oath is a practice extremely outside of the norm for HR business standards.[41]

IBM also compartmentalized its layoff actions into several smaller, artificial layoff populations in an attempt to—as IBM has done here—limit discovery so that the forest cannot be seen for the trees.

### C. The CLDR is a Fiction IBM is Using to Hide Discovery.

IBM has repeatedly attempted to limit discovery based on the "CLDR" and refused Langley discovery beyond its artificial population. Suspiciously, not a single deponent to date has ever heard of "CLDR."[42] In fact, no "CLDR" document even appeared until the month it was carried out. Any attempt

---

[37] Ex. 9A at IBML-321; Ex. 10 at IBML-3347
[38] Ex. 10 at IBML-3250; Ex. 12, LeBlanc Dep. Tr. at 160:8-11
[39] Ex. 4 at IBML-2555
[40] Ex. 13, Ladah Dep. Tr. at 229:18-131:5;
[41] Ex. 14A
[42] Ex. 14B

by Mr. Langley to inquire about the "CLDR" population has been conveniently objected to on the basis of privilege and legal work product.[43]

IBM's production shows that internal planning documents and employees using the documents refer to Langley's resource action as Baccarat and not "CLDR."[44] The obvious deduction is that IBM's legal department cherry-picked employees from Baccarat to create smaller artificial groups that, when analyzed, reduced the obviousness of the disparate effect of Operation Baccarat as a whole. This suspicion is reinforced by IBM's own production, where an IBM HR Partner mentions that the Resource Action names are needed by a deadline, so that HR can go into "cleanup mode" and so that these names can be "locked down" by legal.[45] As best Plaintiff can tell, IBM succeeded in "locking down" these names, as the CLDR is in no way representative of the IBM population as a whole,[46] or even representative of all the employees that had been selected for the Resource Action *within Brown's* group of employees.[47] The Judge's Order specifically stated discovery is "not constrained by artificial borders created within a corporation." IBM has defied Judge Austin's January 30, 2019 Order (Dkt No. 52) by refusing to produce witnesses or responsive documents outside the "CLDR."

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is only appropriate "when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits…show that there is no genuine issue as to any material fact."[48] When ruling on a motion for summary judgment, the Court must view "all inferences drawn from the factual record in the light most favorable to the nonmoving party."[49] As long as there is some support for the disputed allegations such that "reasonable minds could differ as to the import of the evidence," then IBM's motion for summary judgment must be denied.[50]

---

[43] Ex. 5, Alan Wild Dep. Tr. at 159:15-161:3.
[44] Ex. 15 at IBML-2734
[45] Ex. 16 at IBML 3171
[46] Ex. 15
[47] Ex. 17
[48] FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).
[49] *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).
[50] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

III.  **ARGUMENTS AND AUTHORITIES**

Under the ADEA, a plaintiff may prove a claim of disparate treatment with either direct or circumstantial evidence.[51] Courts across the nation have recognized that "employers are rarely so cooperative as to include a notation in the personnel file, 'fired due to age,' or to inform a dismissed employee candidly that he is too old for the job."[52] Accordingly, the Supreme Court developed the *McDonnell Douglas* framework, which is used to establish age discrimination via circumstantial evidence.

Under *McDonnell Douglas*, the plaintiff must first establish a prima facie case of discrimination.[53] Second, "the employer must then respond with a legitimate, nondiscriminatory reason for its decision."[54] Third, to establish pretext under the circumstances of a reduction in force, Langley must "raise a genuine issue of material fact as to whether [IBM's] proffered reason was not the true reason, but was merely pretext for discrimination."[55] In its motion, IBM first asserts that Plaintiff Langley cannot state a prima facie case—despite IBM being caught red-handed with patently ageist high-level planning documents. IBM's argument strains credulity. Langley has more than made a prima facie case.

**A.  *Prima Facie Case***

IBM misstates Langley's burden to make out his *prima facie* case. In a reduction in force case, a Plaintiff may make out their *prima facie* by satisfying three prongs.[56] First, the Plaintiff must demonstrate that they are within the protected group and that they have been adversely affected by the employer's decisions.[57] This prong is assuredly uncontested. Mr. Langley was over 40 when IBM decided to

---

[51] *See Woodhouse v. Magnolia Hosp.*, 92 F.3d 248, 252 n. 3 (5th Cir.1996); (*See also Bauer v. Albermarle Corp.*, 169 F.3d 962, 966 (5th Cir.1999).

[52] *Thornbrough v. Columbus & Greenville R. Co.*, 760 F.2d 633, 638 (5th Cir. 1985), abrogated by St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993) (overruled on other grounds in *St. Mary's Honor Center v. Hicks*, 509 U.S. 502).

[53] *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000) (*see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 793 (1973)).

[54] *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000).

[55] *Jones v. R.G. Barry Corporation*, 2017 WL 10495666 at *7 (W.D. Tex. 2017), citing *inter alia Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142–43, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

[56] *See Thornbrough*, 760 F.2d at 633; *see also Amburgey v. Corhart Refractories Corp., Inc.*, 936 F.2d 805, 812 (5th Cir. 1991).

[57] *See id.*

terminate his decades long employment.[58] Second, the Plaintiff must demonstrate he was qualified to assume another position at the time of the adverse employment action.[59]  Third, the Plaintiff must produce 'evidence, circumstantial or direct, from which a factfinder might reasonably conclude that the employer intends to discriminate in reaching the decision at issue.'[60] In a reduction in force case, the Fifth Circuit has held that this third prong may be satisfied merely by showing "that the defendant regarded age as a negative factor in such [a] consideration."[61]

Previous Fifth Circuit decisions have articulated that "the necessary elements of a prima facie employment discrimination case are not Platonic forms, pure and unchanging; rather, they vary depending on the facts of a particular case."[62] Here, under the facts of this particular case, Langley has more than satisfied his burden under the second and third prong of the prima facie test.

**B.   The conduct of Langley's managers established he was qualified for another position – satisfying the second prong.**

Langley was qualified for another job at the time he was terminated, because the documents are replete with references to managers that wanted to hire Langley.[63] Furthermore, Langley had just been a member of the Tiger Team, which was comprised of individuals selected by high level management for their deep technical skills.[64] The evidence also reveals that Overbay believed Langley was qualified for other jobs, because there are numerous documents that show Overbay was attempting to get Langley another job at IBM.[65] There are also several managers that attempted to hire Langley.[66] In fact, evidence reveals that a team in North America wanted Langley so badly that it transferred another employee to a

---

[58] Ex. A, Jonathan Langley Affidavit
[59] *Amburgey*, 936 F.2d at 812.
[60] *Id.*
[61] *Id.*
[62] *Thornbrough*, 760 F.2d at 641.
[63] Ex. 1, IBML-3308, 256, 1621A.
[64] Ex. 12, LeBlanc Dep. Tr. at 19:16-20 & 22-23; *See also* Ex. A, Jonathan Langley Affidavit.
[65] Ex. 1, 1621A; 1524.
[66] Id. at 1621A; 256; 3308; 255.

new role to make room for Langley.[67] However, Allison Fisher—Brown's "HR Partner"—blocked Langley's transfer multiple times and in multiple communications.[68]

Despite the difficulties of the process, Overbay tried to go around the HR red tape. But once again, her efforts were blocked by a "Senior" HR Partner.[69] The amorphous and frustrating process caused Overbay to state "we are not making this easy"[70] and "this process seems to change and become more difficult."[71]

The documents show Brown also attempted to place Langley in another role within IBM.[72] Brown offered advice to Overbay designed to help Langley get his transfer.[73] Even after HR blocked Langley's transfer, Brown remained in contact with Overbay and recommended a name to Overbay as a possible placement opportunity for Langley.[74] In Brown's own words he "pushed for [Langley]" in a number of roles" at IBM.[75]

Overbay's final attempt to place Langley internally was stymied by Barbara Heathcote—an HR Partner. In her response, Heathcoate outlined the draconian requirements needed for an internal transfer for a new position.[76] This transfer required approval from the senior vice presidents and CFOs for the units sending and receiving the request.[77] This shows high level management getting involved with the determination of whether Langley could remain employed at IBM.[78] It is worth noting that Heathcote advised Overbay that this is a secret process, that Langley should not be told, and that HR would not meet with the Langley to discuss this process.[79]

---

[67] Id. at 1621A; 1487 – 1489.
[68] Ex. 1 at 1507 and 1621A.
[69] Ex. 1 at 1505-1509
[70] Ex. 1 1621A; 1507.
[71] Ex. 1 at 1505 – 1509.
[72] Ex 1 at 1517.
[73] Ex. 1 at 1487.
[74] Ex. 1 at 1512
[75] Ex. 1 at 1517
[76] Ex. 1 at 1524.
[77] Ex. 14 at 1524, 3373, 1443_A; *see also* Ex. 13 at 70:17-25
[78] Id.
[79] Ex. 1 at 1524

These substantial efforts on the part of Overbay and Brown—blocked by "HR Partners"—drive home three points. First, the so-called "relevant decision makers" that IBM identified in its Motion for Summary Judgment, thought that Langley was qualified for other jobs at IBM.[80] Second, it shows that IBM's Human Resources Department contained the real decision makers. Finally, it shows that when an employee was selected for elimination as part of a reduction in force, IBM's HR staff actively blocked efforts to allow the employee to remain employed.

### C.  The real IBM decisionmakers regarded age negatively.

#### a.   Overbay and Brown were not the real decisionmakers.

As asserted *supra*, Langley knew that he was going to be terminated in early December. However, the evidence shows that Overbay—in contrast to her Jones Day drafted affidavit—actually knew that Langley was going to be terminated in the previous month of January. This is clearly demonstrated by an instant message between Overbay and Brown's HR Partner, Allison Fisher. How is it demonstrated? Because Mrs. Fisher tells Overbay that Langley has already been selected, and that Langley cannot be transferred because "Andrew [Brown is] counting him as reduction."[81] This *clearly* means that IBM had selected Langley for termination long before Overbay's affidavit claims she used "IBM's staff reduction methodology" to identify Langley for termination.[82]

What the evidence actually shows is Langley was preselected by HR, the very entity that created the fire-and-hire scheme referenced *supra*. High-level HR documents identify Langley as an "RA" by January 25, 2017—long before Overbay claims she first made the determination to terminate Langley.[83] However, the connections between the fire-and-hire scheme, IBM's HR department, and the decision to terminate Langley do not stop there.

---

[80] *See supra.*
[81] Ex. 18 at 1621A
[82] *DELETED*
[83] Ex. 21, attachment to email 1690A

On January 18, 2017, the evidence shows that Mr. Kubicki—a leader in the talent unit which also reports to the head of HR—sent out an email to *several* "HR Partners"—including Allison Thompson, who was Brown's "HR Partner."[84] This email is a smoking gun for Langley's case. Within that email, Kubicki discusses the Resource Action that includes Langley's unit, and he encourages all of these HR Partners to think of this specific resource action as "**[a]n opportunity to remix our headcount, freeing-up space for new / better talent.**"[85] The email includes an attachment where HR literally identifies individuals for layoffs. Kubicki directly quotes an ageist HR plan (discussed *supra*) that states the individuals do not have the "necessary performance, potential, behaviors or skills,"[86] and that Human Resources should "take a hard look at this 'manage out'[87] list to infuse the pending resource action with additional exits."[88] This is direct evidence that the real decisionmakers were HR, and that HR viewed age negatively.

### b. IBM's argument that Langley fails his prima facie case is meritless

IBM argues that Langley cannot make out his *prima facie* case of age discrimination because Langley cannot prove that IBM "regarded age as a negative factor" in its decision to terminate Langley.[89] Langley has directly refuted this assertion *supra* because he has proven that Brown and Overbay are not the relevant decisionmakers, distinguishing himself from IBM's cited case law. Langley's case is a clear scenario that calls for the "cat's paw" analysis, as outlined by Judge Posner in *Shager v. Upjohn Co.*[90] Under the "cat's paw" theory, a court will not "blindly accept the titular decisionmaker as the true decisionmaker."[91]

The Fifth Circuit, and many other Circuits have "echoed the idea underlying Judge Posner's cat's paw analysis and have held that "a defendant may be held liable if the manager who discharged the

---

[84] Ex. 20
[85] *Ex. 20 at* 3866 (emphasis added).
[86] Id.
[87] Id.
[88] Id.
[89] *See Amburgey*, 936 F.2d at
[90] *See Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir.1990).
[91] *Russell*, 235 F.3d 219, 227 (5th Cir. 2000).

plaintiff merely acted as a rubber stamp . . ."[92] Furthermore, the Fifth Circuit, in *Russell*, recognized the validity of this theory, and that this "decisionmaker rule" was never intended to be applied formalistically.[93] Accordingly, the Fifth Circuit "look[s] to who actually made the decision or ***caused the decision to be made***, not simply to who officially made the decision."[94] IBM's arguments should be dismissed out of hand.

### D. IBM's affidavits present a thinly veiled pretext for discrimination.

IBM's weakly supported cover story for the discrimination perpetrated against Langley is just that—a cover story. IBM has represented to this Court that Langley was selected for layoff (1) based on subjective evaluations of his first-line manager, and (2) because the products being sold as part of IBM's PureApp were supposedly being phased out. Neither of these narratives are supported by the documents produced by IBM. Rather, the documents show (1) the decision to select Langley for layoff was actually made *months before* Overbay supposedly first chose Langley to be laid off, and (2) IBM PureApp products are still alive and well under a different name, despite IBM's deceitful attempts to hide that fact in discovery. **In reality, his selection for layoff was rooted in a discriminatory scheme designed to target divisions with older workers, aggressively hire new young employees simultaneously, and make it nearly impossible for older IBM employees targeted for layoff to transfer or be rehired internally—the fire and hire scheme.**

To establish pretext under these circumstances, Langley must "raise a genuine issue of material fact as to whether [IBM's] proffered reason"—that Langley was organically selected for a reduction in force layoff (1) by a low-level manager and (2) the failure of the PureApp division—"was not the true reason, but was merely pretext for discrimination."[95] The evidence presented to prove pretext "must allow a reasonable jury to find that the proffered reason is 'false or unworthy of credence,' and that the true

---

[92] *Id.* (citing *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1231 (10th Cir.2000).
[93] *See Russell*, 235 F.3d at 227 (citing *Griffin v. Washington Convention Ctr.*, 142 F.3d 1308, 1312.
[94] Id.
[95] *Jones v. R.G. Barry Corporation*, 2017 WL 10495666 at *7 (W.D. Tex. 2017), citing *inter alia Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142–43, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

reason is discrimination."[96] When the evidence is viewed altogether, there is no question that reasonable minds could determine that IBM's cover story is exactly that—a cover story.[97]

### E. IBM asserts it first selected Langley layoff in February 2017—its documents show otherwise.

The notion that Overbay—and IBM as a whole—first selected Langley for a reduction in force layoff on February 16, 2017 is squarely contradicted by IBM's own evidence. Brown's declaration states that his direct reports—in this case Overbay—are the persons responsible for choosing employees selected for layoff. Overbay swore in her declaration that she did not know that a layoff was going to happen until February 2017. She also swore she did not select Langley for layoff until February 2017. As discussed *supra*, the evidence shows otherwise. Brown told Langley two months before the proffered selection date that he was going to lose his job in the near future.[98] One month before the proffered selection date, Langley's name appeared on an HR planning document wherein he was designated for layoff.[99] Later that same month—but still before IBM says Langley was first selected for layoff—an IBM HR partner represented in a chat log that Langley had already been counted as a reduction.[100] Either Brown and the HR Partners are magically prescient, or Langley had already been selected for layoff before the date IBM says it occurred, and by a different person, no less. [101] The contradictory narratives about Langley's termination create a genuine issue of material fact that only a jury should decide.[102] Summary judgment should be denied accordingly.

---

[96] *Jones v. R.G. Barry Corporation*, 2017 WL 10495666 at *2 (W.D. Tex. 2017), citing *Vaughn v. Woodforest Bank*, 665 F.3d 632, 637 (5th Cir. 2011); Laxton v. Gap Inc., 333 F.3d 572, 579 (5th Cir. 2003).
[97] *See Burton v. Teleflex Inc.,* 707 F.3d 417, 427 (3d Cir. 2013)(holding that if the plaintiff can discredit the employer's proffered non-discriminatory reasons, he or she does not need to produce additional evidence beyond the prima facie case in order to survive summary judgment); *See also Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 147-48, 120 S.Ct. 2097, 2108 (2000)
[98] Ex. 1
[99] Ex. 21
[100] Ex. 18
[101] *See Jones v. R.G. Barry Corporation*, 2017 WL 10495666 at *2 (W.D. Tex. 2017), citing Fed. R. Civ. P. 56(c) (holding that inferences are to be drawn in favor of the nonmovant).
[102] S*ee Abramson v. Wm. Patterson College of N.J.*, 260 F.3d 265, 284 (3d. Cir. 2001) (holding that inconsistent information about the circumstances of the employee's termination creates a fact issue about the employer's proffered non-discriminatory reason that precludes summary judgment).

**F.   IBM"s intentionally onerous transfer process rebuts IBM's representation that low-level managers were the actual decision makers.**

Langley established s*upra* that IBM intentionally placed hurdles in the path of IBM managers attempting to internally place individuals selected for layoff.  If—by a stroke of luck—a low-level IBM manager could get a job posting actually approved for internal hires, IBM created even more hurdles to make success near impossible for older workers to stay in IBM. A hiring review board comprised of extremely high-level executives made up of Sam Ladah—IBM's talent director for all of IBM and the head of Hybrid Cloud HR; Stephen Lasher—Hybrid Cloud's CFO; and Robert LeBlanc—Hybrid Cloud's Senior Vice President, was put in place as a second intentionally draconian barrier intended to block individuals like Langley, who were slated for a resource action, from being rehired within IBM.[103] Having executives of this caliber convene to decide the fate of individuals can only be explained as a means to take the power to retain IBM employees out of the hands of first line decisionmakers. Alan Wild, IBM's layoff guru, was shocked upon hearing during his deposition that such a process had been instituted by IBM.[104] In an effort to mitigate this glaring abnormality, IBM represented to the Court that **nine** employees selected for the resource action were rehired. It conveniently withheld the fact that **five** of those employees were under circumstances specifically exempting them from review by the high-level executive board—the very mechanism put in place to ensure these employees would not find another job within IBM.[105] In other words, only 44% of the already small number of IBM transfers IBM holds up as proof actually were subjected to the purposefully draconian hurdles discussed herein.

**G.   Manipulation of ultimate layoff selection at IBM is seemingly rampant.**

In January of 2017, Overbay gave Langley the grade of "Achieves" across the board in every category of his performance review.[106] Overbay emailed a copy of the performance review to Brown.[107] Brown responded to Overbay with an email arguing that her performance review ratings were too high and all

---

[103] Ex. 14 at 170:17-25; 1524, 1443_A
[104] Ex. 5 at 230:11-234:11
[105] Ex. 14 at 3373, 1443_A; *see also* Ex. 24 at 1339
[106] Ex. 22 at IBML 1242-1243
[107] *Id.*

but instructed Overbay to reduce the review grades to "Expects More."[108] In response, Overbay sent an email that actually defended Langley's business unit's performance by mentioning that any business goals not achieved can be explained in part because IBM had gutted Langley's business unit in the year prior.[109] Nevertheless, Overbay kowtowed to Brown's de facto directive to artificially downgrade Langley's performance review score by retroactively changing his "Skills" and "Business Results" scores down to "Expects More."[110] To put it differently, the retroactive reduction directed by Brown amounted to reducing Langley's performance review grades in *40% of the possible categories*.[111]

As additional proof of manipulation, the same internal document identifying Langley for a resource action on January 25, 2017 lists Langley's peer, B.B., as also classified as RA.[112] A subsequent email exchange between Overbay and her HR Partner, Jerry Jackson, establishes that Jackson told Overbay how to manipulate two employees' respective performance review grades in order to ensure that another employee, M.A. was selected for layoff instead of B.B.[113] In fact, in a demonstrative exhibit, Langley has highlighted all of the changes Overbay made to Exhibit C to her declaration at the direction of HR.[114] In *Long*, the Fifth Circuit held that a fact issue was created for pretext where a supervisor downgraded the Plaintiff's performance rating.[115] In *Kirkland*, the Second Circuit overturned an employer's summary judgment and held that a plaintiff's affidavit swearing that a manager falsified documents related to the plaintiff's performance reviews was evidence of pretext.[116] Here, Plaintiff offers the Court far more than just a sworn affidavit: Overbay—at other's direction—manipulated performance review grades for Langley and two of his fellow employees, which is three of the four employees in the

---

[108] Id. at  IMBL-001249
[109] Id. at IBML 1248.
[110] Ex. 22 at IBML-1251
[111] *Id.*
[112] Ex. 21 at 1690A (Brown Tab)
[113] Ex. 27; Ex. 21 at 1690A (Brown Tab)
[114] Ex. 19
[115] *Long v. Eastfield College*, 88 F.3d 300, 305 (5th Cir. 1996)
[116] *Kirkland v. Cablevision Systems, 760 F.3d 223, 226* (2d Cir. 2014). *See also White v. Baxter Health Corp.*, 533 F.3d 381 (6th Cir. 2008)(denying summary judgment and holding that the plaintiff's downgraded performance evaluation constituted an adverse employment action because it resulted in less compensation).

*entire business unit.* Because IBM's proffered cover story is unworthy of credence from this Court, summary judgment should be denied accordingly.

**H. IBM's other proffered reason—that IBM PureApp failed—is likewise a blatant manipulation of the truth.**

IBM represented to this Court that PureApp—Langley's business unit formally known as IBM PureApplication—failed and was consequently "curtailed" by IBM, which is meant to serve as a non-discriminatory excuse for IBM to have conducted a reduction in force and layoff of Langley.[117] Steve Cowley, the General Manager of Cloud Sales Sub-Unit & WW Top Organization, explained what IBM's self-serving declarants likely meant when using the word "curtailed" when he testified that IBM no longer even *sells* PureApp products whatsoever.[118] In other words, PureApp must have failed so fantastically that it no longer even exists, at least if how IBM has portrayed PureApp to Plaintiff in discovery and to this Court up to this point is true. IBM has a habit of changing the names of is divisions, business units, and job titles on a regular basis. When Cowley was asked whether perhaps PureApp products were now being sold under a different name, he responded in the negative.[119] Unfortunately for IBM's cover story—and in contrast to the sworn testimony of its high-level executive—IBM PureApp is actually alive and well under the name IBM "Cloud Pak," creating an obvious fact issue for the purposes of this motion and beyond.

Corporate documents from June 2019 make an announcement literally titled  "IBM Cloud Pak System (or PureApplication System) [. . .]"[120] Another IBM publication references the fact that Cloud Pak can be operated on Pure App Systems, and lists the part numbers for all of the Cloud Pak products.[121] Therein, IBM references 318 Cloud Pak products that are actually PureApp products.[122] On IBM's website under product videos, when one clicks on a link titled "What are Cloud Pak Systems," the user is

---

[117] *See e.g.* LeBlanc dec. pg. 3.
[118] Ex. 26, Cowley depo, pg.181:15-25; 182:1.
[119] *See generally* Ex. 23; *see also* Ex. 26 at 256:25-257:9
[120] Ex. 23 at 1 – 2
[121] Ex. 23 at 8 – 44
[122] Ex. 23 at 10 – 44

directed to a video describing PureApp titled "What are IBM PureApplication Systems."[123] The renaming and rebranding of PureApp products to now simply being called Cloud Pak raises a fact issue about whether or not IBM's proffered cover story is worthy of credence from this Court. In *Smith v. City of Jackson Miss*, the Court held that the defendants' failure to "comply with their discovery obligations such that the plaintiffs were prohibited from presenting their best case to the district court, summary judgment in favor of the defendants improperly denied the plaintiffs an opportunity to continue discovery and supplement the record."[124]

IBM's concealment of Cloud Pak being simply a renamed PureApp raises questions about why IBM never disclosed the identities and demographic information of persons hired to do the same functions for Cloud Pak that Langley performed for PureApp in discovery; questions as to why IBM executive Steve Cowley also vehemently denied under oath that Cloud Pak is a revised version of PureApp before this most recent announcement,[125] and whether or not under these circumstances any court could rule in IBM's favor given IBM's most recent iteration of hide-the-ball discovery. Summary judgment should be denied accordingly.

## I.   Langley can use testimony of Daniel Kuang and Rhoma Young to Prove Pretext.

### a.   Daniel Kuang's Testimony is Probative of Pretext

IBM attacks the general probative value of statistics in a pretext determination and Dr. Kuang's statistical methodology in hopes of drawing this Court's attention away from Dr. Kuang's main conclusion – the population of the CLDR is highly suspect. The CLDR contains anomalies that cause him to suspect bias in the grouping of these individuals by IBM.[126] Suspiciously, the makeup of this group varies significantly from IBM's general population.[127] Dr. Kuang established the average age of the

---

[123] Ex. 23 at 3 – 6
[124] *Smith v. City of Jackson*, Miss., 351 F.3d 183, 198 (5th Cir. 2003), aff'd on other grounds, 544 U.S. 228, 125 S. Ct. 1536, 161 L. Ed. 2d 410 (2005).
[125] Ex. 26 at 254:25 – 257:8
[126] *See* Dkt. No 138, Ex. 2 (7/12/19 Kuang Supplemental Report) at 10-12, 16-21
[127] *Id.*

CLDR is over 50.[128] While IBM has refused to provide the average age of its workforce, publicly available information indicates the average age is 38.[129] The age variance between the CLDR and IBM as a whole is evidence the population is engineered.[130] He additionally determined the population of the CLDR includes outliers and "sliced and diced" information that skews meaningful analysis.[131] These factors, as well as other outlined in his Reports, [132] are evidence of the intentional acts by IBM to conceal the true discriminatory nature of the Resource Action affecting Langley.

Statistical evidence of IBM's discriminatory RIF, the "CLDR," is one of many pieces of evidence offered by Langley to prove pretext. Statistical evidence is probative of pretext when coupled with other evidence contradicting an employer's non-discriminatory reasons for terminating an employee.[133] Courts routinely find statistical evidence probative of pretext.[134] The probative value of statistical evidence depends on "all the surrounding facts, circumstances, and other evidence of discrimination." [135] Throughout this response to IBM's Motion, Langley presents a multitude of evidence contradicting IBM's assertion that Langley's termination resulted from a financially motivated Resource Action. The

---

[128] *Id.*

[129] *Id.*

[130] *Id.*

[131] *Id.* at 7.

[132] In further support of the sufficiency of Dr. Kuang's opinions to rebut IBM's purported reasons for his termination, Langley incorporates Dr. Kuang's Supplemental Report and his Response to IBM's Motion to Exclude Dr. Kuang (Dkt. No. 138) by reference herein for all purposes.

[133] *Deloach v. Delchamps, Inc.*, 897 F.2d 815, 820 (5th Cir. 1990), *holding modified by Smith v. The Berry Co.*, 198 F.3d 150 (5th Cir. 1999); *see also Walther v. Lone Star Gas Co.*, 977 F.2d 161, 152 (5th Cir. 1992) ("[G]ross statistical disparities resulting from a reduction in force or similar evidence may be probative of discriminatory intent, motive or purpose").

[134] *See e.g. Tanner v. McCall*, 625 F.2d 1183, 1192-93 n. 16 (5th Cir. 1980) (statistics can be used to show that defendant's asserted reasons for decision were a pretext); *Smith v. World Wide Tech., Inc.*, No. A-08-CA-60-SS, 2009 WL 10699654, at *5 (W.D. Tex. Feb. 20, 2009) (finding statistical disparities may be probative of an employer's pretext in an individual discrimination case if they show a pattern of discrimination where certain conditions are met to ensure reliability of statistical data); *Freeman v. Package Mach. Co.*, 865 F.2d 1331, 1342 (1st Cir. 1988) (statistical evidence of a pattern of discrimination based on age combined with conflicting evidence of employee's job performance sufficient evidenced of pretext); *Pers. v. J. S. Alberici Const. Co.*, 640 F.2d 916, 919 (8th Cir. 1981) (statistics can be used to show discriminatory motive); *Denison v. Swaco Geolograph Co.*, 941 F.2d 1416, 1424 (10th Cir. 1991) (statistical evidence is admissible to prove that an employer's proffered reason for terminating an employee is purely pretextual); *Brown v. Am. Honda Motor Co.*, 939 F.2d 946, 952 (11th Cir. 1991) ("statistical evidence is an appropriate method for demonstrating both a prima facie case of discrimination and pretext").

[135] *E.E.O.C. v. Texas Instruments Inc.*, 100 F.3d 1173, 1185 (5th Cir. 1996), (citing) *Int'l. Bd. of Teamsters v. U.S.*, 431 U.S. 324, 340 (1977).

statistical evidence proffered by Dr. Kuang colors and informs Langley's overwhelming evidence of IBM's discriminatory intent.

Contrary to IBM's contention, Dr. Kuang did not "cherry pick" data. Rather, in an attempt to address the concerns outlined above, he did not include analyses based on data that was obviously unreliable.[136] Instead, he focused on reliable data. His concern—which is justified—is analysis of flawed data will yield flawed results.[137] Dr. Kuang sought to prevent this Court from being misled by IBM's egregious attempts to use statistical outliers to skew and bias its data. IBM relies primarily on *EEOC. v. Tex. Instruments,* which is easily distinguishable from the facts of Langley's case and does not establish a wholesale exclusion of statistical evidence to prove pretext.[138] In *Tex. Instruments,* the expert arbitrarily presented evidence of a statistically significant relationship between age and layoff for a subgroup of employees over 50, while omitting analysis reaching contrary conclusions for other subgroups of employees over 40.[139] This case is not analogous because the *Tex. Instruments* expert did not have a legally justifiable rationale for his analysis of a particular subgroup at the exclusion of others.[140] Here, Dr. Kuang assessed the credibility of IBM's data for each job Band and group included in the "CLDR," before proffering any statistical expert opinions.[141] Dr. Kuang found IBM's data was deliberately designed to be confusing, with "Job Group" being the most suspicious data field.[142] Dr. Kuang notes that IBM deceptively chose to create the populations of the "CLDR" by "(1) disaggregated similarly situated and analyzable jobs, (2) created disparately situated job groups, and (3) employed unstructured circular job group methodology."[143] Kuang chose to analyze the data by "Band" because the data field, specifically Band 10, had a reasonable sample size and quality being the only data field IBM produced

---

[136] *See* Dkt. No 138, Ex. 2 (7/12/19 Kuang Supplemental Report) at 16-20 ("Drawing conclusions from unreliable data can lead to incorrect conclusions that scientists refer to as "false negative" – improperly concluding that there is no significant effect, when in reality the effect exists . . . In the present matter, the data, especially for Bands 7, 8, and 9, falls short.")

[137] *Id.*

[138] *E.E.O.C. v. Texas Instruments Inc.,* 100 F.3d 1173, 1185-86 (5th Cir. 1996)

[139] *Id.*

[140] *Id.*

[141] Dkt. No 138, Ex. 2 (7/12/19 Kuang Supplemental Report) at 16-20

[142] *Id.* at 28

[143] *Id.*

that had any indicia of reliability.[144] His credibility analysis of Band data revealed the only reliable statistical evidence produced by IBM was from Band 10, Mr. Langley's employment Band.[145] During his deposition and in his Supplemental Report, Dr. Kuang goes to great lengths to explain why certain subgroups were eliminated from his analysis. Indeed, despite the engineered nature of the CLDR population data, Dr. Kuang *still* found that termination decisions in Band 10—Langley's job band—were statistically related to age.[146] In his Supplemental Report Dr. Kuang analyzed the entire CLDR data set, while controlling for job differences, which IBM fails to mention, and *still* found that age was statistically significantly related to age.[147] It should be emphasized that Dr. Kuang analyzed all age-related information for the CLDR produced by IBM. **Plaintiff cannot be faulted for gaps in IBM's data when it possesses the information necessary to close those gaps and refuses to provide it to Langley.** Any insinuation that Dr. Kuang's opinions are unreliable due to "cherry picking" is an admission by IBM that the employment data it produced is incomplete, misleading, and designed to deliberately obstruct Plaintiff, Plaintiff's expert, and this Court. If anything, IBM's argument only supports Plaintiff's argument that IBM should be compelled to produce employment data for Operation Baccarat—the true population of IBM's rolling layoffs that resulted in the termination of Langley.

### b.   Rhoma Young's Testimony is Probative of Pretext.

As this Court has held, Langley may establish pretext and carry his ultimate burden to prove intentional age discrimination with evidence that IBM engaged in a pattern or practice of age discrimination.[148] It is thus readily apparent that IBM's misrepresentation of Fifth Circuit case law

---

[144] *Id.* at 14-15, 25, 29.

[145] *Id.*

[146] *Id.* at 19 – 21, 28 – 29.

[147] *Id.* at. 28

[148] *Shiyan Jiang v. Texas Comm'n on Envtl. Quality*, No. 1:17-CV-739-RP, 2018 WL 8415878, at *1 (W.D. Tex. Sept. 20, 2018) ("It is clear . . . that pattern-or-practice evidence can be relevant [in an individual discrimination case] to the pretext inquiry of the *McDonnell Douglas* framework provided the other employees are similarly situated to the plaintiff"); *see also Wyvill v. United Companies Life Ins. Co.*, 212 F.3d 296, 302 (5th Cir. 2000) (discussing admissibility of pattern-or-practice evidence in a *McDonnell Douglas* discrimination case); *Smith v. World Wide Tech., Inc.*, No. A-08-CA-60-SS, 2009 WL 10699654, at *5 (W.D. Tex. Feb. 20, 2009) (finding statistical disparities may be probative of an employer's pretext in an individual discrimination case if they show a pattern of discrimination where certain conditions are met to ensure reliability of statistical data); *Lewis v. City of*

regarding the admissibility of pattern or practice evidence in a *McDonnell Douglas* case is a deceptive attempt to exclude portions of Rhoma Young's testimony.

IBM continues its deceptive misrepresentations by mischaracterizing Rhoma Young's testimony as it relates to Langley, and by minimizing the many ways IBM failed to follow acceptable HR industry standards.[149] Contrary to IBM's contention, Young's testimony directly addresses the effect IBM's discriminatory layoff procedures had on Langley and his peers.[150] Further, Young does not have a "lone quibble" with IBM's discriminatory layoff procedures.[151] Young's *many* "quibbles" extend far beyond IBM's failure to provide Langley with Older Workers Benefit Protection Act ("OWBPA") disclosures.

Young concluded IBM failed to utilize  transparent, open, and honest layoff procedures when implementing layoff actions affecting Langley.[152] IBM purposefully limited laid off employee access to outplacement assistance by making eligibility for such assistance contingent on signing a severance and arbitration agreement.[153] This agreement waived certain legal rights, like the right to a jury trial—including a class action suit—and the right to OWBP disclosures.[154] Ms. Young further opined that IBM obscured its layoff procedures by segregating and dividing its layoff actions into many smaller layoff actions—like the "CLDR"—without any discernable proper purpose or benefit.[155] IBM's opaque and deceptive layoff procedures clearly do not conform to HR industry standards and practices.

Ms. Young also concluded that IBM failed to clearly define the job or skill criteria it used for selecting persons to include in its Resource Action, like the CLDR.[156] By not clearly defining selection criteria and basing its layoff decisions on employee Band level, IBM failed to follow accepted HR

---

*Shreveport*, No. CV 16-1115, 2018 WL 752362, at *4, n. 5 (W.D. La. Feb. 7, 2018) (finding pattern or practice evidence available to a plaintiff to demonstrate pretext in a *McDonnell Douglas* case).
[149] *See* Dkt. No. Pl.'s MSJ at 19-20.
[150] Langley incorporates Rhoma Young's Expert Report (Dkt. No. 89, Ex. A (Young Expert Report)) and Supplemental Declaration (Dkt. No. 110-1) herein for all purposes
[151] Pl.'s MSJ at 19
[152] Young's Supplemental Declaration (Dkt. No. 110-1) at 5-6
[153] *Id.*
[154] *Id.*
[155] *Id.* at 6.
[156] *Id.*

industry standards for implementing layoffs.[157] Suspiciously, rather than basing Langley's termination on an assessment of his skills, the decision to terminate Langley was pre-determined before his skills were even assessed by his manager.  Further, Ms. Young has seldom ever seen a company use a reduction in forces to address or remedy employee skills, problems, or deficiencies.[158] Unlike most companies, IBM used pure layoffs in lieu of performance management and accountability programs.[159]  Contrary to HR industry standards, IBM employees were not given the opportunity to prove that they possess desired skills or provided an opportunity to learn such skills.[160]

Ms. Young also found it outside of the HR norm that IBM created obstacles to make it nearly impossible for employees selected for layoffs to transfer within IBM.[161] In Ms. Young's experience, companies normally desire to retain their employees and *encourage* employee transfer within a company.[162] Further, despite IBM's cries that Langley's Resource Action was financially motivated, it has been hiring new employees in large numbers while simultaneously laying off thousands of IBM employees—fire-and-hire scheme.[163] Ms. Young finds this practice highly unusual and not in conformance with accepted HR standards and procedures.[164] Thus, IBM's assertion that Ms. Young has a "lone quibble" regarding IBM's violation of HR industry standards is patently false and a misrepresentation of Young's expert opinions.

**J.   IBM's company culture and pattern of age discrimination is probative evidence.**

The company culture of—and discriminatory statements made by—IBM during the midst of the creation and implementation of its age discrimination scheme are pieces of legally probative evidence of discrimination. In *Brewer*, the Third Circuit considered the admissibility of evidence of company newsletter statements from two years before the plaintiff was terminated where the Company praised two

---

[157] *Id.*
[158] Young's Supplemental Declaration (Dkt. No. 110-1) at 7.
[159] *Id.*
[160] *Id.*
[161] *Id.* at 8.
[162] *Id.*
[163] *Id.* at 8-9.
[164] *Id.*

young workers and stated, "[t]hat age group is our future."[165] The Court held that such evidence is valid, admissible evidence that may be used to build a circumstantial case of discrimination.[166] The Court went on to say:

> "When a major company executive's comments prove to be disadvantageous to a company's subsequent litigation posture, it cannot compartmentalize this executive as if he had nothing more to do with company policy than the janitor or watchman."[167]

IBM cannot be allowed to compartmentalize the clear age animus and planning contained in its own high-level internal documents and pretend it had no nexus to Langley's layoff. IBM cannot be allowed to compartmentalize the discriminatory statements made by its own executives and publications that set the tone for IBM's discriminatory culture. IBM cannot be allowed to compartmentalize the clear evidence of HR manipulation in what is supposed to be a layoff scheme decided only by first-line managers based on an employee's respective merits *alone.* Accordingly, summary judgment must be denied.

## PRAYER FOR RELIEF

WHEREFORE PREMISES CONSIDERED Plaintiff respectfully requests that the Court deny Defendant IBM's Motion for Summary Judgment and for all other relief for which he may be justly entitled.

---

[165] *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 333 (3rd Cir. 1995)
[166] Id.
[167] *See Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 333 (3rd Cir. 1995), citing *Lockhart v. Westinghouse Credit Corp.*, 879 F.2d 43, 54 (3d Cir.1989).

Respectfully submitted,

Heidi A. Coughlin
State Bar No. 24059615
Archie Carl Pierce
State Bar No. 15991500
Blair J. Leake
State Bar No. 24081630
Brantley Ross Pringle, Jr.
State Bar No. 16330001
WRIGHT & GREENHILL, P.C.
900 Congress Avenue, Suite 500
Austin, Texas 78701
512/476-4600
512/476-5382 (Fax)
HCoughlin@w-g.com
CPierce@w-g.com
BLeake@w-g.com
RPringle@w-g.com

*Attorneys for Plaintiff*
*Jonathan Langley*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 31, 2019, I electronically filed the foregoing CORRECTED RESPONSE TO IBM'S MOTION FOR SUMMARY JUDGMENT with the Clerk of Court using the CM/ECF system, which sent notification of such filing to the Court and Defendant's counsel.

_____

Heidi A. Coughlin