**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| JONATHAN LANGLEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:18-cv-00443-LY |
| | ) |
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

**DEFENDANT IBM'S PARTIAL APPEAL FROM THE
MAGISTRATE JUDGE'S SEPTEMBER 20, 2019 ORDER
<u>COMPELLING DOCUMENT PRODUCTION BY SENIOR-LEVEL EXECUTIVES</u>**

In his September 20, 2019 order, Magistrate Judge Andrew W. Austin determined that Plaintiff Jonathan Langley failed to demonstrate that IBM's "CEO, CFO or former CFO have 'unique' information relevant to his claims," and the Magistrate also found that Langley "can obtain . . . information these witnesses may have from other sources." (Dkt. 185 at 7-8.) Nevertheless, in this single-plaintiff termination case, the Magistrate ordered IBM to produce company-wide documents from the files of these and other senior executives. (*Id.* at 8.) That portion of the Magistrate's Order was clearly erroneous and contrary to law. Moreover, the production that will result from that portion of the Order would be wholly untethered to either Langley or this case. The requests at issue call for a pure "word search method" of production, which would require IBM to identify documents from the files of five senior executives that hit on any one of more than 26 generic search terms, and then produce each of these documents without regard to whether they have a connection to Langley or the resource action (IBM's term for "reduction in force") that led to his separation from the Company. This production would include documents that are wholly irrelevant, including those related to the Company's international operations, business sensitive information unrelated to this case, and personal communications. For these reasons, and others specified below, the Court should set aside the portion of the Magistrate's September 20, 2019 Order compelling IBM to respond to Langley's Document Request Nos. 24-27, 150, 153-54, and 156.

## BACKGROUND

### A.   IBM's Senior Level Executives Had No Role In Langley's Separation.

IBM is a multinational information technology company that is divided into numerous, worldwide groups defined by the customer services and products that they provide. (Lasher

Decl.[1] ¶ 4; LeBlanc Decl. ¶ 6.)  Each group operates independently and is led by its own Senior Vice President.  (LeBlanc Decl. ¶ 7; Krishna Decl. ¶ 8; Lasher Decl. ¶ 8.)  Each has its own Vice Presidents of Finance and Human Resources and contains sub-units led by General Managers.  (LeBlanc Decl. ¶ 7; Krishna Decl. ¶ 8; Lasher Decl. ¶ 8.)

In 2016, Langley worked in IBM's Cloud group.  (LeBlanc Dec. ¶¶ 8-9.)  In early 2017, however, the Cloud group merged with the Company's Analytics group, forming the Hybrid Cloud group.  (Krishna Decl. ¶¶ 5-6; LeBlanc Decl. ¶ 10.)  Langley joined Hybrid Cloud at this time, and his reporting structure was as follows:  (1) he directly reported to Kim Overbay; (2) his second-line manager was Kellie Penzien; (3) his third-line manager was Andrew Brown; (4) his fourth-line manager was Steve Cowley; and (5) his fifth-line manager was Hybrid Cloud's Senior Vice President Arvind Krishna.  (Krishna Decl. ¶ 5; LeBlanc Decl. ¶¶ 9-10.)  Krishna reported to John Kelly, Senior Vice President, Cognitive Solutions and Research, and Kelly reported to CEO Virginia Rometty.  (Krishna Decl. ¶ 5.)  When Langley was still a member of the Cloud group, his reporting structure was largely the same, although his fifth line manager was the Cloud Group's SVP Robert LeBlanc, not Krishna.  (Krishna Decl. ¶¶ 5-6; LeBlanc Decl. ¶ 10.)

Langley separated from IBM effective June 30, 2017, as part of a reduction in force known as the CLDR resource action.  (Kennedy Decl. ¶ 4.)  As the Magistrate recognized, CLDR took place within Hybrid Cloud, and it impacted employees who "had been in the then-defunct Cloud group."  (Dkt. 185 at 6; *see also* Kennedy Decl. ¶ 7; Lasher Decl. ¶ 11.)

---

[1] Unless otherwise noted, all declarations cited in this Appeal were exhibits to Dkt. 97, IBM's Opposition to Plaintiff's Motion to Compel Requests for Production and Depositions and For Leave to Exceed Ten Depositions and to Extend the Discovery Period.

IBM's executive officers – such as CEO Virginia Rometty and then-CFO Martin Schroeter – were not involved in any aspect of this resource action or the selection of Langley for termination.  (Rometty Decl. ¶ 4; Schroeter Decl. ¶ 4; LeBlanc Decl. ¶ 15; Lasher Decl. ¶ 13; Krishna Decl. ¶ 14.)  Neither IBM's CEO nor its CFO (nor any other senior executive) instructed Cloud and Hybrid Cloud leaders as to how they should structure the resource action, much less that they should structure it to terminate older employees.  (*Id*.)  The decision to conduct the resource action that impacted Langley and all of the planning for it took place within Cloud and Hybrid Cloud, not in some other IBM group or at more senior levels of management.  (Lasher Decl. ¶ 13; Krishna Decl. ¶ 14; LeBlanc Decl. ¶ 15.)

Much of the planning for the resource action occurred in 2016, before Cloud and Analytics merged to form Hybrid Cloud.  In late 2016, Cloud's Senior Vice President LeBlanc consulted with his Vice President of Finance Stephen Lasher, his Vice President of Human Resources Sam Ladah, and his General Managers to determine whether a resource action was necessary to cut costs in an effort to improve profitability.  (LeBlanc Decl. ¶ 12; Lasher Decl. ¶ 10.)  After they decided that it was, the Cloud group's General Managers worked with their managers and human resources leaders to develop headcount reduction recommendations based on the financial projections and needs of their sub-units.  (*Id.*)  Lasher consolidated the recommendations and submitted to the Controller's Office a request for restructuring funding to cover severance expenses associated with the resource action.  (LeBlanc Decl. ¶ 13; Lasher Decl. ¶¶ 10-11.)  In early 2017, the Controller's Office granted the request, drawing from a funding

3

pool[2] known as "Baccarat" (LeBlanc Decl. ¶ 13; Lasher Decl. ¶¶ 9-11), and IBM's Project Office, which assists with resource actions, labeled the resource action "CLDR," (Kennedy Decl. ¶¶ 6-7.)

After funding was approved, Senior Vice President LeBlanc (before the formation of Hybrid Cloud) and Senior Vice President Krishna (thereafter) worked with the group management team to allocate the headcount targets to the group General Managers, who, in turn, distributed headcount targets to their reports. (Lasher Decl. ¶ 12; Krishna Decl. ¶ 12; LeBlanc Decl. ¶ 14.) First- and second-line managers decided which individuals within their teams to separate based on performance and other age-neutral metrics. (Lasher Decl. ¶ 12; Kennedy Decl. ¶¶ 9-10.) Langley's first-line manager, Overbay, selected him for termination, effective June 30, 2017. (Kennedy Decl. ¶ 11; Overbay Decl.[3] ¶ 14.)

**B.    This Litigation and Discovery to Date.**

In May 2018, Langley filed the instant single-plaintiff matter, alleging disparate treatment on the basis of age. (*See* Dkt. 1.) Since then, IBM has responded to four sets of written document requests, encompassing dozens of individual requests, along with interrogatories and requests for admission. (Lampe Decl. ¶¶ 2-3, 10-11.)

As part of its document production in this case, IBM conducted reasonable searches of the documents and data of over 20 custodians from within the Cloud and Hybrid Cloud groups,

---

[2] In late 2016, IBM's Controller's Office announced that restructuring funds were available to groups that wished to participate in a resource action in the first quarter of 2017. (Lasher Decl. ¶ 9.) Each group determined for itself whether to participate in a resource action, and groups that elected to do so could request funding amounts. (*Id.*)

[3] IBM filed the Overbay Declaration as an exhibit to Dkt. 126, the Company's Motion for Summary Judgment.

ranging from Langley's first- and second-line managers to the groups' Senior Vice Presidents, senior HR leaders, and senior finance leaders. (*Id*. ¶ 4.) IBM designed the searches to capture (among other things) any directives that Cloud and Hybrid Cloud managers may have received from senior leadership outside the Cloud and Hybrid Cloud groups. (Dkt. 180, Tr. of Sept. 4, 2019 Hearing at 37:3-13.) For example, in conducting the searches, the Company used terms that include (but are not limited to) "head count target," "RA target," "resource action target," "layoff target," "head count plan," and "Baccarat." (*Id*.) Additionally, IBM searched documents and data from approximately 10 additional custodians outside of the Cloud and Hybrid Cloud groups, including employees in the Project Office and hiring managers to whom Langley submitted applications after the Company informed him that he would be laid off. (Lampe Decl. ¶ 4.)

As a result of these searches, IBM made extensive document productions on topics including the resource action that impacted Langley, headcount targets and layoff selection decisions in that resource action, financials on the IBM product that Langley supported, financials on the Cloud and Hybrid Cloud groups, early professional hires (an IBM phrase for entry level hires), Langley and his comparators' performance, and Cloud's and Hybrid Cloud's fall and spring planning documents. (Lampe Decl. ¶¶ 4-6; Kennedy Decl. ¶ 12.) In addition, from documents and data from custodians and files outside Cloud and Hybrid Cloud, IBM has produced materials including portions of SVP Forum documents, additional fall and spring planning documents, early professional hire guidance, emails from the Resource Project Office, documents and data regarding Langley's job search, resource action guidance and training materials, and company-wide policies and procedures. (Lampe Decl. ¶ 6.)

5

IBM has also made available for deposition numerous executives from both inside and outside the Cloud and Hybrid Cloud groups. From within Cloud and Hybrid Cloud, Langley deposed LeBlanc, Cowley, Ladah, Lasher, and Vice President of Human Resources for Software Sales Yara Saad. (Lampe Decl. ¶ 12.) The Company also offered Krishna for deposition, but Langley cancelled it the night before it was scheduled. (*Id*.) Beyond Cloud and Hybrid Cloud, IBM made available high-level witnesses, such as former Vice President of Human Resources, Employee Relations and Engagement Alan Wild and IBM's Controller Robert Del Bene (who Langley initially requested, but then decided not to depose). (*Id*.) Langley also deposed the Company's highest ranking human resources officer, Chief Human Resources Office Gherson. (*id*.), and IBM made a corporate witness available for a seventeen-topic 30(b)(6) deposition. (Dkt. 183 at 3-4.)

      **C.**    **Langley's Demand For Document Discovery from Senior-Level Executives.**

In two sets of document requests, Langley seeks company-wide discovery from IBM's highest executives. From his first set, Requests 24-27 seek any document from CEO Rometty, current CFO James Kavanaugh, Senior Vice President of Corporate Strategy Ken Keverian, and Chief Human Resources Officer Diane Gherson that was created between 2013 to the present and that contains any one of 26 different search terms. (Dkt. 86, Exh. 1.) From Langley's fourth set, Requests 150 and 153-54 seek additional documents from Gherson, Kavanaugh, Keverian that were created between 2015 and the present and that contain one of two other search terms. (Dkt. 86, Exh. 14.) And from this same set, Request 156 seeks any document from former CFO Schroeter that was created from 2015 to the present that contains any one of 26 terms similar to those identified in his first set of requests. To be clear, these requests demand a pure "word search method" of production by seeking any document that contains just one of the more than

6

26 generic terms Langley selected, regardless of the whether the document has *any* connection to Langley, his termination, or the broader Cloud/Hybrid Cloud group.

On December 10, 2018, Langley first moved to compel responses to Requests 24-27. He argued that IBM should produce documents from CEO Rometty, current CFO Kavanaugh, Senior Vice President of Corporate Strategy Keverian, and Chief Human Resources Officer Gherson because his termination was the product of a "systematic, nationwide scheme to clandestinely fire a large chunk of its older employees to make room for top millennial talent in all areas of the company." (Dkt. 21 at 3-4.) IBM responded that Langley had not met his burden to obtain this discovery because the evidence reveals that these senior-level executives "had no involvement with Langley, his employment, or his termination," and because Langley cannot show that they possess "unique or personal knowledge" of any matter relevant to this case. (Dkt. 29, at 13-14.)

On January 30, 2019, Magistrate Judge Austin denied Langley's motion without prejudice. (Dkt. 52 at 4.) In doing so, the Magistrate held that discovery at the "Hybrid Cloud Group" level and discovery related to Langley's "resource action" was generally permissible (*id.* at 3-4), and he also stated that "[a]s discovery progresses, information may be learned that justifies going outside the [Hybrid Cloud] organization for targeted inquiries" (*id.* at 4). But in the hearing on Langley's motion, Magistrate Judge Austin stated that company-wide discovery was inappropriate in this single-plaintiff case. (Dkt. 54, Tr. of Jan. 17, 2019 Hearing, at 30:2-4 ("But I understand and agree also from the IBM standpoint that it can't be completely company wide as well, and that would be overbroad.").)

On the last day of the discovery period, Langley filed a second motion to compel, this time asking Magistrate Judge Austin to compel (among other things) production of documents

7

from CEO Rometty, current CFO Kavanaugh, Senior Vice President of Corporate Strategy Keverian, Chief Human Resources Officer Gherson, and former CFO Schroeter in response to his Request Nos. 24-27, 150, 153-54, and 156.  (Dkt. 86.)  On September 20, 2019, the Magistrate ordered IBM to respond to these requests.  (Dkt. 185 at 6-8.)[4]

## ARGUMENT

When a party appeals from a magistrate judge's non-dispositive order, such as a discovery ruling, the Article III judge receiving the appeal must "set aside any portion" of the order that he or she finds "clearly erroneous or contrary to law."  FED. R. CIV. P. 72(a); *see also* 28 U.S.C. § 636(b)(1)(A); W.D. Tex. Local Rules for the Assignment of Duties to a U.S. Magistrate Judge, Rule 4(a).  The district judge must reverse the magistrate's factual determinations if it is "left with the definite and firm conviction that a mistake has been committed," and the magistrate's application of the law to the facts is subject to an "abuse of discretion standard."  *Med Vision, Inc. v. Medigain, LLC*, 2017 WL 1190494, at *7 (N.D. Tex. March 31, 2017) (internal citations omitted).  However, the magistrate's "legal conclusions . . . are reviewable de novo."  *Id.* (reversal required if magistrate "erred in some respect in [his] legal conclusions").

Applying these standards, this Court should set aside the portion of Magistrate Judge Austin's September 20, 2019 order (Dkt. 185 at 7-8) that requires the Company to produce documents in response to Langley's Request Nos. 24-27, 150, 153-54, and 156.

---

[4] The Magistrate also ordered IBM to produce additional documents from certain Hybrid Cloud executives in response to Langley's Request Nos. 149 and 151-52.  (Dkt. 185 at 8.)  IBM does not appeal that portion of the order.

8

## I. THE ORDER IS CONTRARY TO THE LAW GOVERNING DOCUMENT DISCOVERY FROM SENIOR-LEVEL EXECUTIVES.

As a matter of law, Langley is not entitled to the documents he seeks with his Request Nos. 24-27, 150, 153-54, and 156. Federal Rule of Civil Procedure 26(b)(2)(C) provides that a court "*must* limit the frequency or extent of discovery otherwise allowed by these rules" if: "(i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;" or, "(ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action." FED. R. CIV. P. 26(b)(2)(C)(i) & (ii) (emphasis supplied). Applying this rule, courts allow document discovery from a company's highest-level executives only if the requesting party makes "a sufficient showing that this information is necessary and not cumulative of other materials," *Harris v. Union Pac. R.R. Co.*, 2018 WL 2729131, at *4 (D. Neb. June 6, 2018) (denying request for CEO's e-mails), and that the "high level executives have unique or personal knowledge of the subject matter," *Lutzeier v. Citigroup Inc.*, 2015 WL 430196, at *7 (E.D. Mo. Feb. 2, 2015); *see also BlackBerry Ltd. v. Facebook, Inc.*, 2019 WL 4544425 at *6-*7 (C.D. Cal. Aug. 19, 2019) (denying discovery on relevance grounds where proponent failed to establish that the CEO had "unique or personal knowledge of the subject matter" at issue in the case) (internal citation omitted).

These standards are fatal to Langley's Request Nos. 24-27, 150, 153-54, and 156. Below, Magistrate Judge Austin expressly (and correctly) held that Langley *failed* to demonstrate that CEO Rometty, current CFO Kavanaugh, and former CFO Schroeter had unique or personal knowledge material to Langley's claims. (Dkt. 185 at 7-8 (concluding that Langley had not met his burden to show that IBM's "CEO, CFO or former CFO have 'unique' information relevant to his claims," and also concluding that Langley "can obtain . . . information these witnesses may

9

have from other sources"). Further, Langley never argued – and Magistrate Judge Austin never found – that Senior Vice President of Corporate Strategy Keverian or Chief Human Resources Officer Gherson had unique relevant information that could not be obtained from other sources.

Nevertheless, Magistrate Judge Austin compelled responses to Langley's requests because "numerous public statements by IBM's CEO" suggest that documents possessed by the executives at issue may be *relevant*. (Dkt. 185 at 7 (holding that "the requesting party is entitled to insist on [additional custodians] if it establishes the relevance of the documents it seeks from those custodians") (internal quotes and cite omitted).) But that is not the correct legal standard. The standard is whether the executive possesses *unique* relevant information that cannot be obtained from other sources. (*Supra* at 1.) Indeed, Magistrate Judge Austin himself held that "IBM is correct that requiring production of records from senior executives is appropriate only where there is 'a sufficient showing that this information is necessary and not cumulative of other materials.'" (Dkt. 185 at 6-7 (quoting *Harris*, 2018 WL 2729131, at *4).)

As to CEO Rometty, current CFO Kavanaugh, and former CFO Schroeter, Magistrate Judge Austin specifically found that it "appears that Langley *can* obtain the same information these witnesses may have from other sources." (*Id.* at 8 (emphasis added); *see also id.* at 7-8 (holding that it does "not yet appear that the CEO, CFO or former CFO have 'unique' information").)[5] Further, Magistrate Judge Austin identified no alleged statements or other

---

[5] The "public statements" that Langley cited in his motion papers are general comments that have no nexus to him. (Dkt. 86 at 6-7 (citing statements by Rometty that '"50% of IBM is millennials" and "it's in IBM's DNA to keep changing and this is just what you do").) As such, they are no bases upon which to order production of documents or data from Rometty's files or the files of any other senior executive. *See*, *e.g.*, *Blackberry*, 2019 WL 4544425 at *7 (rejecting claim that Wall Street Journal article authored by CEO justified wide-ranging discovery in patent infringement case, since "nothing in the . . . Article indicates or suggests that [the CEO] has

evidence from Gherson, Kavanaugh, Kevarian, or Schroeter indicating that they possess *any* documents relevant to Langley's claims, let alone unique relevant documents.  Magistrate Judge Austin did not address those executives at all, other than in his determination that Langley failed to demonstrate that CFO Kavanaugh and former CFO Schroeter possess unique relevant knowledge that could not be obtained through other sources.  In short, the Magistrate acted contrary to law in ordering production from Rometty, Gherson, Kavanaugh, Keverian, and Schroeter (Request Nos. 24-27, 150, 153-54, 156).

## II.     THE ORDER IS CONTRARY TO LAW GOVERNING SELECTION OF DOCUMENT CUSTODIANS.

Even if the persons from whom Langley seeks documents were not senior executives, the Magistrate's Order would remain contrary to law.  This is because, as the Magistrate appeared to recognize (Dkt. 185 at 7), a party responding to a request for electronic discovery generally is "entitled to select the custodians most likely to possess responsive information." *Mortg. Resolution Production Servicing, LLC v. JPMorgan Chase Bank*, 2017 WL 2305398, at *2 (S.D.N.Y. May 18, 2017) (internal cites and quotes omitted).  If there is a dispute as to the appropriate scope of electronic discovery, the party seeking to compel additional custodians "bears the burden of establishing the relevance of the documents it seeks from those custodians." *Id.*  And, unless the producing party's choices as to custodians are "manifestly unreasonable" or "the requesting party demonstrates that the resulting production is deficient," the court should "play no role in . . . designating custodians."  *Id.*; *Ford Motor Co. v. Edgewood Properties, Inc.*,

---

personal knowledge regarding the accused technology"); *cf. Rogers v. Pearland Indep. Sch. Dist.*, 827 F.3d 403, 408 (5th Cir. 2016) (holding that "the pattern-or-practice method of proving discrimination is unavailable in a private, non-class action"); *Roy v. U.S. Dep't of Agri.*, 115 F. App'x 198, 201 (5th Cir. 2004) (similar, holding "pattern and practice" method of proof "is inapplicable" to the plaintiff's "individual claim").

11

257 F.R.D. 418, 427 (D.N.J. 2009) (speculation insufficient "to grant burdensome discovery requests late in the game").

Here, the pool of custodians from which IBM produced documents was not "manifestly unreasonable" and the Company's resulting production was by no means "deficient." To the contrary, the custodians here included more than 20 from within the Cloud and Hybrid Cloud groups, including all of the decisionmakers in the resource action that impacted Langley, from the first-line manager who selected him for termination through the Senior Vice Presidents of the Cloud and Hybrid Cloud groups, along with senior human resource and finance leaders. (Lampe Decl. ¶ 4.) The custodians also included approximately 10 from *outside* the Cloud and Hybrid Cloud groups, including employees in the Project Office and hiring managers to whom Langley submitted applications after the Company informed Langley that he would be laid off. (*Id.*) Langley likewise had access to all these individuals for deposition (some of which he elected to take and some of which he elected to forego). (*Id.* at 12.)

Against this backdrop, adding custodians would be duplicative, cumulative, and contrary to law. *See* FED. R. CIV. P. 26(b)(2)(C)(i). Langley does not dispute that the custodians from within Cloud and Hybrid Cloud are the individuals who decided to hold the resource action that impacted him, or that they are the individuals who selected him for termination. And he did not satisfy his burden of establishing that IBM's production from within Cloud/Hybrid Cloud was insufficient to capture any input or instructions from outside of Cloud/Hybrid Cloud regarding Langley's resource action.

At most, Langley complained at the hearing below that IBM did not produce in this case a handful of documents that it produced in a separate matter, *Iacono v. IBM*, 2:17-cv-08083 (C.D. Cal.). But, as IBM explained to the Magistrate, *Iacono* involves a plaintiff who separated

from the Company more than a year before Langley, and who worked in a different group from the Cloud and Hybrid Cloud groups, and who was part of a completely different management reporting structure. (Tr. of Sept. 4, 2019 Hearing, at 37-38, 52.) It is not at all surprising that IBM produced different documents in *Iacono* than it did here, and that fact does not suggest that Langley is entitled to production from additional custodians, let alone custodians from among the Company's most senior executives.

### III.  THE ORDER IS CONTRARY TO LAW BECAUSE IT PROVIDES LANGLEY WITH DISPROPORTIONATE, IRRELEVANT DISCOVERY.

Even if Langley had demonstrated an entitlement to additional custodians and to production from the Company's most senior executives (although he has not), the Order remains contrary to law. Langley's "word search method" calls for the production of all documents from files of the at-issue executives that hit on one of more than 26 generic terms, untethered to the Cloud and Hybrid Cloud groups or to time periods pertinent to his case. (*Supra* at 6.) For multiple reasons, then, the portion of the September 20, 2019 Order that compels responses to Request Nos. 24-27, 150, 153-54, and 156 will result in disproportionate discovery and the production of documents that are irrelevant to any claim or defense. *See*, *e.g.*, FED. R. CIV. P. 26(b)(1) (limiting discovery to matters "relevant to any party's claim or defense and proportional to the needs of the case").

As an initial matter, the Order will provide Langley with improper, company-wide discovery. In January 2019, the Magistrate correctly stated that such discovery would not be appropriate in this single-plaintiff case. (*See* Tr. of Jan. 17, 2019 Hearing, at 30:2-4 ("But I understand and agree also from the IBM standpoint that it can't be completely company wide as well, and that would be overbroad.")); *see also Dumas v. O'Reilly Auto. Stores, Inc.*, 2017 WL 2573956, at *5 (M.D. La. June 14, 2017) (finding it "'most natural' to focus on [the] employing

13

unit or work unit from which came the employment decision"). Nevertheless, the Order allows just that. CEO Rometty, Chief Human Resources Officer Gherson, current CFO Kavanaugh, Senior Vice President of Corporate Strategy Kevarian, and former CFO Schroeter have company-wide, global responsibilities, and, accordingly, their ESI is company-wide and global in scope. As a result, the Magistrate's Order will require the production of documents related to international operations and U.S. areas of the Company in which Langley never worked.

Further, the temporal parameters in the at-issue requests, dating back as far as 2013 and extending to the present, are overbroad and call for patently disproportionate discovery. *See*, *e.g.*, *Wallace v. Tesoro Corp.*, 2016 WL 7971286 at *6 (W.D. Tex. Sept. 26, 2016) (agreeing "that the six year period requested is overbroad and not proportional to the needs of the case"). Thus, the Order requires production of documents that have nothing to do with Langley because they relate to time periods years before and years after Langley's June 2017 separation.

But even if Langley's search terms could be limited to exclude documents pertaining to areas of the Company in which Langley never worked and temporally irrelevant periods, his wide-ranging terms would still by nature cull any number of materials that are not tied to this case and instead patently immaterial. *See e.g.*, *FlowRider Surf Ltd. v. Pac. Surf Designs, Inc.*, 2016 WL 6522807, at *7-8 (S.D. Cal. Nov. 3, 2016) (denying motion to compel production of "all documents that 'hit' on the parties' ESI search terms without further culling for relevance"); *Lutzeier*, 2015 WL 430196 at *8 (rejecting search terms that "are too generic and are likely to produce a large number of documents that are irrelevant to this case"). For example, the term "retired," one of Langley's 28 search terms (Dkt. 86, Exh. 14 at Request Nos. 24-27), may hit on a personal discussion about what a former colleague has been doing since he or she retired, as well as a business communication about a product the Company had "retired" from service. The

term "RA," another of the 28 (*id.*), may hit on documents discussing research assistants, a position frequently abbreviated with the initials "R" and "A." And the term "EEOC" (*id.*) may hit on discussions of the "EEOC's" wellness regulations, a conference at which an "EEOC" commissioner spoke, or a news article about an "EEOC" investigation of another company.

Moreover, even to the extent Langley's search terms hold meanings tied to his case, the Order will result in discovery that is disproportionate and irrelevant to this single-plaintiff case, since the requests lack meaningful temporal or relevance parameters. For example, the term "RIF" may capture documents pertaining to a force reduction in Europe or Asia six years ago. "Spring Plans" and "Fall Plans" may capture documents pertaining to strategic discussions about the Company's approach to particular clients during certain times of the year. And "Operating HR Team" may capture documents about the team's lunch order during a meeting two years after Langley's departure from IBM.[6]

Despite all this, the Magistrate suggested that Langley's "word search method" was warranted because the parties have a "dispute" about whether the "relevant 'resource action'" was CLDR or something else. (Dkt. 185 at 5-6; *see also* Dkt. 86 at 4 (argument from Langley that "'CLDR' is an absolute fiction" and that he was "part of a company-wide layoff plan codenamed 'Operation Baccarat'").) But, contrary to Langley's contentions, the evidence in this

---

[6] Of Langley's 28 search terms, 26 are generic and are not tied to the resource action that impacted him or to his termination. (Dkt. 86, Exhs. 1 (Request Nos. 24-27) & 14 (Request Nos. 153-54, 156).) The terms include the following: (1) Early Professional Hire; (2) Early Professional; (3) Early Professionals; (4) EPH; (5) Seniority Mix; (6) Reduction Initiative; (7) Resource Action; (8) RA; (9) RIF; (10) Retired; (11) layoff targets; (12) Millennial; (13) Millennial Corps; (14) head-count planning; (15) EEOC; (16) Bain & Company; (17) Bain; (18) Spring Plan; (19) Spring Plans; (20) Fall Plan; (21) Fall Plans; (22) Spring Strategy; (23) Operating Team HR; (24) Operating Team Sales Deployment; (25) Talent Remix; (26) SVP Forum. (*Id.*) The last two of Langley's 28 terms – "Jonathan Langley" and "Langley" – are the only non-generic search terms proposed. (*Id.*)

case *conclusively* demonstrates that he separated from IBM as part of the CLDR resource action, and that "Baccarat" was simply the name of a pool of funds that Cloud and Hybrid Cloud leadership tapped into to use towards the severance payments and other expenses associated with the CLDR resource action. (Kennedy Decl. ¶¶ 6-7; LeBlanc Decl. ¶ 13; Lasher Decl. ¶¶ 9-11.)

In any event, and at most, a dispute over whether Langley's resource action was "CLDR" or "Baccarat" might have been grounds for Langley to issue *targeted* document requests relating to the subject of Baccarat. (Dkt. 52 (order presumptively "limit[ing] discovery to the 'resource action' of which Langley's termination was a part").) But that is not what Langley sought, and the Magistrate did not order production confined to Baccarat. Rather, Langley issued wide-ranging requests to IBM's most senior executives, calling for an expansive "word search method" that will unquestionably extend discovery to time periods, areas of the Company, resource actions, and any number of other subjects that have absolutely nothing to do with Langley or his claims. It was clear error for the Magistrate to allow that discovery.

## **CONCLUSION**

The Court should grant IBM's partial appeal and set aside the portions of the Magistrate's September 20, 2019 Order (Dkt. 185 at 7-8) that require the Company to produce documents in response to Langley's Request Nos. 24-27, 150, 153-54, and 156.

Dated: October 4, 2019                    Respectfully submitted,

/s/ *Alison B. Marshall*
Alison B. Marshall*
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
Phone: (202) 879-7611
Fax: (202) 626-1700
abmarshall@jonesday.com
**Admitted Pro Hac Vice*

Matthew W. Lampe*
JONES DAY
250 Vesey Street
New York, NY 10281
Phone: (212) 326-7838
Fax: (212) 755-7306
mwlampe@jonesday.com
**Admitted Pro Hac Vice*

Shannon H. Ratliff
(Texas Bar No. 16573000)
Davis, Gerald, & Cremer, P.C.
300 West 6th Street
Suite 1830
Austin, TX 78701
(512) 493-9601
shratliff@dgclaw.com

*Attorneys for Defendant*
*International Business Machines Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on October 4, 2019, true and correct copies of the foregoing were served via ECF on the Court and all counsel of record.  Additionally, a hard copy of the foregoing was served via overnight delivery on Magistrate Judge Andrew W. Austin at the following address:

> Magistrate Judge Andrew W. Austin
> United States District Court
> Western District of Texas, Austin Division
> 501 West Fifth Street
> Suite 4190
> Austin, TX 78701

/s/ *Alison B. Marshall*
Alison B. Marshall
