IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| JONATHAN LANGLEY, | § | |
| | § | |
| VS. | § | NO. A-18-CV-443-DAE |
| | § | |
| INTERNATIONAL BUSINESS | § | |
| MACHINES CORPORATION | § | |

**REPORT AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

TO:   THE HONORABLE DAVID A. EZRA
UNITED STATES DISTRICT JUDGE

Before the Court are IBM's Motion for Summary Judgment (Dkt. No. 126); Plaintiff's Response (Dkt. No. 188); and IBM's Reply (Dkt. No. 168). The District Court referred these Motions to the undersigned Magistrate Judge for report and recommendation pursuant to 28 U.S.C. §636(b) and Rule 1(c) of Appendix C of the Local Rules.

### I. BACKGROUND

This is an age discrimination case in which Jonathan Langley sues his former employer IBM for age discrimination under the ADEA and the Texas Labor Code. Langley was 59 years old when, in 2017, IBM terminated him after 24 years of employment. At the time of his termination, Langley was employed in sales in IBM's Hybrid Cloud business unit. Langley asserts he was laid off because of IBM's focus on hiring younger employees, while simultaneously laying off older workers in so-called "Resource Actions" (IBM lingo for a reduction-in-force). He claims that in its resource actions IBM applied subjective criteria to screen out older workers, and did so in its selection of him as one of the employees to be laid off in the resource action that led to his termination. IBM responds that its decision to terminate Langley was made as part of a reduction-in-force, and it used age-neutral criteria to identify him for inclusion in the RIF.

IBM moves for summary judgment, arguing that Langley cannot demonstrate a prima facie case of age discrimination, and, even if he can, there is no dispute of material fact that IBM had a legitimate, non-discriminatory reason for its decision to lay Langley off.

## II. STANDARDS

**A.  Summary Judgment**

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A genuine fact issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. In making this determination, the Court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Salazar-Limon v. City of Houston*, 826 F.3d 272, 274-75 (5th Cir. 2016).

The party requesting a summary judgment bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, then the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted." *Anderson*, 477 U.S. at 248. On the other hand, if there are genuine disputes of fact, summary judgment is unwarranted, and the case must be submitted to a jury.

B.     *McDonnell Douglas*[1]

The ADEA makes it unlawful for an employer "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a) (1998). Plaintiffs may prove that they were intentionally discriminated against using either direct or circumstantial evidence. *See Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000). Because direct evidence is rarely available in such cases, the Supreme Court has adopted a burden-shifting analysis for courts to use in analyzing summary judgment motions in employment discrimination cases relying on circumstantial evidence. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that rubric, a plaintiff must create an inference of discrimination by initially establishing a prima facie case of discrimination. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 142 (2000). A prima facie case creates a rebuttable presumption that discrimination occurred. *Id.* The burden of production then shifts to the employer, which must articulate a legitimate non-discriminatory reason for its employment decision. *See Evans v. City of Houston*, 246 F.3d 344, 350 (5th Cir. 2001). If the employer provides such a reason, in order to defeat summary judgment, the plaintiff must demonstrate there are fact questions regarding whether the employer's proffered reason is valid, or instead is a pretext for discrimination. *See Evans*, 246 F.3d at 350.

The plaintiff has the burden to establish a prima facie case. *St Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). The elements of a prima facie case vary depending on the type of discrimination claim brought. *See McDonnell Douglas*, 411 U.S. at 792. Here, the parties have

---

[1] Age discrimination claims brought under the Texas Labor Code are evaluated under the same analytical framework as ADEA claims. *See Reed v. Neopost United States, Inc.*, 701 F.3d 434, 439 (5th Cir. 2012). The analysis in the text, and citation of relevant statutes and case law, will therefore be limited to the ADEA, though it applies with equal force to Langley's Texas Labor Code claims.

analyzed the case using the Reduction in Workforce (RIF) paradigm. Under that paradigm, a prima facie case is established by evidence that:

> (1) the plaintiff is within the protected age group under the ADEA; (2) he or she is adversely affected by the employer's decision; (3) he or she was qualified to assume another position at the time of the discharge or demotion; and (4) evidence either circumstantial or direct, from which a fact finder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue.

*McMichael v. Transocean Offshore Deepwater Drilling, Inc.*, 934 F.3d 447, 456 n.4 (5th Cir. 2019). On the fourth element, plaintiffs must present some evidence that the employer did not treat age neutrally. *See Amburgey v. Corhart Refractories Corp.*, 936 F.2d 805, 812 (5th Cir.1991). The evidence must specifically lead a fact finder to conclude that either the defendant consciously refused to relocate the plaintiff or retain the employee as a result of his or her age, or regarded age as a negative factor when making its determination as to who would be terminated in the RIF. *Id.* Only a minimal showing is necessary to meet the burden of establishing a prima facie case of age discrimination. *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 41 (5th Cir. 1996).

### III. ANALYSIS

**A.     Langley's Prima Facie Case**

IBM does not dispute the first three elements of Langley's prima facie case, and only challenges the fourth element—whether it treated age neutrally in its RIF. IBM presents evidence it claims shows that age was not a factor in the decision to choose Langley for termination, pointing to declarations of his direct and second-line supervisors that they selected Langley for the RIF, and that age played no role in their decisions. There are, however, a number of disputed fact questions on this point. Langley has presented substantial evidence suggesting that in making its lay off decisions related to the subject reduction in force generally, and in deciding to lay him off specifically, IBM did not treat age neutrally.

For instance, there are fact disputes regarding even the fundamental question of who the relevant decision makers were in Langley's termination. IBM contends that the immediate decision makers were Kim Overbay, who headed the 4-person team of which Langley was a part, and her immediate supervisor, Andrew Brown, who led several Cloud Sales teams, including the Hybrid Cloud Integration sub-unit. IBM further notes that the higher level decisions related to the reduction in force were made by Steve Cowley, who headed the Cloud Sales sub-unit, and his boss, Robert LeBlanc, who was the Senior Vice President of IBM's Cloud Group. Noting that Langley testified in his deposition that he did not think any of these four IBM employees were biased against older workers,[2] IBM argues that summary judgment is proper. Langley responds that Brown and Overbay were not the relevant decision makers in his termination, as they were simply carrying out the directives of others, and particularly those of both IBM's Human Resources department and its upper management. There is a substantial body of evidence supporting Langley's position.

The summary judgment evidence shows that in 2016, LeBlanc, as the Sernior VP of the Cloud Group, decided that there should be restructuring done in sub-units handling Hybrid Cloud Integration and the PureApp product line. LeBlanc testified that he consulted with the group's Vice President of Finance Stephen Lasher, Vice President of Human Resources Sam Ladah, and his General Managers to determine whether a resource action should be used in this process. Ultimately, LeBlanc decided to use a resource action, explaining that the "goal of participating in the resource action was to cut costs in an effort to improve profitability." Dkt. No. 126-12 at ¶ 12. LeBlanc,

---

[2]*See* Dkt. No. 126-3 at 6-13 (Langley's deposition testimony stating he was unaware of age based animus on the part of LeBlanc or Cowley, that Brown was "a straight shooter" and "a good guy," and Langley has no reason to believe he would discriminate; and that Overbay was "fair and honest," and he never observed any behavior from her suggesting animus.).

5

through Lasher, applied to IBM's Controller for the funding it would need for the lay offs.[3] At this point, IBM's Project Office gets involved. According to IBM's Manager for North America Workforce Restructuring,

> Once the funding for a resource action is authorized, the Project Office works with the various business units participating in the action to administer the action. My team assigns each resource action a four-letter acronym that we use to define the action and track its execution. Thus, the acronym that we assign is based on the business unit that is undertaking the resource action.

Dkt. No. 96-4 at 2. This office labeled the lay off involving Langley the "CLDR." In addition to keeping records related to lay offs, the Project Office also counsels managers regarding the process for selecting employees for lay off and provides them advice, templates, and other forms. *Id.* In this case, LeBlanc worked with his management team to decide how many people to lay off and how to allocate those reductions among the Cloud Group's sub-units. Those decisions were then passed down the management chain, from LeBlanc to Cowley to Brown, with Brown directing Overbay to select two of the four team members from Langley's team for the RIF.

Undercutting IBM's position are a number of inconsistencies in IBM's own evidence. Overbay claims in her Declaration that she was not informed of the Resource Action, and did not select Langley for termination, until February of 2017. Dkt. No. 126-13 ¶¶ 13-14. Yet, emails reflect that Overbay knew Langley had been selected before this, as early as January 19, 2017. Dkt. No. 154-4 at 4; IBML-001621A. In a chat on that date with Allison Thompson of HR, Overbay asks about the process to transfer Langley to a different team, and it is clear that the two are discussing this because Langley is going to be laid off from his position. Overbay asks why she cannot simply

---

[3] The IBM Controller's annual budget includes funds for resource actions, and those funds are available in a given year to groups across IBM wanting to participate in a resource action. The Controller gives the company wide expenditures for lay offs in any given year a single identifying code name. In 2017 that name was "Baccarat."

do an internal transfer of Langley from her team to another, and Thompson states, "Because everyone has headcount targets. We are not transferring him with headcount as Andrew [Brown]'s counting him as reduction. N[orth] A[merica] can not add to their onboard headcount without authorization to do so." Moreover, a month before this, on December 6, 2016, Brown notified Langley directly of his likely future layoff. Dkt. No. 151-4 at 1-2. And an email chain from late January 2017 between Brown's boss—Cowley—and Yara Saad, a Human Resources Vice President, includes Jonathan Langley's name on a list of individuals chosen for layoff.[4] Dkt. No. 151-28. Thus, Overbay's testimony that she chose Langley for termination in February 2017 is not supported by the summary judgment evidence.

Further, IBM is not consistent regarding who chose Langley for termination. Initially, it contended that Overbay made the decision. However, in its Reply, IBM asserts that Overbay's supervisor, Brown, was the actual decision maker, pointing to the chat between HR and Overbay in which they refer to Brown as "counting Langley as a reduction." Dkt. No. 168 at 2. This is in direct conflict with Overbay's Declaration, upon which IBM relies to identify its legitimate nondiscriminatory reason for laying Langley off, where she asserts she selected Langley for layoff based on *her* assessment of his performance relative to his group in February of 2017, *after* the chat took place.

Other evidence suggests even more possible decision makers. For example, the IBM Human Resources department's "Fall Plans" suggest that high level IBM executives were encouraging managers to lay off workers like Langley to make room for younger employees.[5] Further, in a

---

[4]IBM asserts that Langley was not chosen for layoff at that time but was merely designated as "Redeploy." However, all the individuals on the list were designated as either "Redeploy" or "Transfer Out" but the title of the document is "RA/Transfer List."

[5]*See, e.g.*, Dkt. No. 151-7 at IBML-002439 (stating corporate objectives as "Increase early professional hiring to grow next gen application and analytics developers organically"); IBML-

January 18, 2017 email, Kevin Kubicki, then the Director of Talent at IBM Cloud, wrote to the Human Resources "Partners," including Allison Thompson (Brown's HR "Partner") regarding the resource action that included Langley, and states "we should think of this as an opportunity to remix our headcount, freeing up space for new/better talent." Dkt. No. 151-27. In an interview from May-June 2015, IBM Chief Human Resources Officer Diane Gherson was quoted in an article as stating,

> "The Millennials are bringing skills that the people in the companies they're joining don't have. That is something pretty profound. These skills are very valuable and important to IBM and so we are finding we value early professionals in new ways—ways we previously wouldn't have thought of.

Dkt. No. 151-13. Another internal IBM document entitled "the Maturing Workforce" includes such statements as, "Successor generations X and Y are generally much more innovative and receptive to technology than Baby Boomers," and "Baby Boomers accustomed to making decisions on their own may find it difficult to shift to a collaborative culture, which can cause tension between older and younger employees." Dkt. No. 151-11, Langley-IBM 0279, 0117. Langley points to all of this evidence to demonstrate that, at a minimum, there are fact questions regarding whether IBM's executives and Human Resources viewed age negatively and whether HR, with direction from the executives, served as the real decision makers behind the employees who were chosen in the RIF.

There is also summary judgment evidence showing that despite Brown's and Overbay's attempts to "redeploy" Langley into other positions within IBM, and despite other managers' willingness to hire him, HR prevented that from happening, often in deference to making an

---

002445 (suggesting the use of "E[arly] P[rofessional] H[ire] development tracks to grow and retain skills" and "increase recruiting process for next generation skills."); IBML-002449 (chart showing "[headcount] reductions required for affordability and to enable revitalization hiring"); IBML-003091 (Cloud HR Fall Plan Draft dated November 4, 2016, compares EPH in 2015 as at 48.5% and year-to-date 2016 as 56.4% of the Cloud workforce, suggesting an effort to increase the number of younger employees); and Dkt. No. 151-14, IBML-000321 (noting policy to exclude from reductions in force "recent" Early Professional Hires).

"external hire," the majority of which were aimed at younger employees. Emails establish that after Brown notified Langley in December 2015 that he was likely going to lose his job as part of a layoff Langley attempted to apply to other positions within IBM, and another group agreed to hire him in January, while other managers also expressed interest in him. Despite this, all of the moves were blocked by Human Resources, IBM policy mandating external hiring, or requirements of high level executive approval. Dkt. No. 151-4 at 4-5, 8, 12-13, 16, 28. Thus, notwithstanding that there were supervisors within IBM who wanted to have Langley work with them and had room to hire him, he was instead terminated on June 30, 2017. Dkt. No. 151-5. A factfinder could conclude from this evidence that IBM consciously refused to retain Langley because of his age.

      As Langley notes, there is a legal doctrine supporting his argument—the "cat's paw" theory. That theory allows a plaintiff to demonstrate discriminatory intent with evidence that the alleged decision maker—who may have acted without any age-based animus—was not the real decision maker, but instead was acting as the "cat's paw" for another person, who *did* have a discriminatory motive. *See Reeves*, 530 U.S. at 151 (finding that when a person is "motivated by age-based animus and was principally responsible for [the] petitioner's firing," that animus can be imputed to the employer); *see also Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990). To succeed under this theory the plaintiff must show that the person exerted so much leverage over the decision as to be the *de facto* decision maker. *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 228 (5th Cir. 2000) (finding that the existence of a fact issue as to pretext was bolstered by evidence that the person exhibiting discriminatory animus "was the de facto decision maker"). Here, Langley argues that the summary judgment evidence shows that Overbay was not only effectively told who to lay off (*i.e.*, two people of a four-person team, all of whom were 59 or older), but that all of her and her supervisor's attempts to place Langley in a different position were overruled by HR and executive level employees, who insisted Langley had to be terminated to meet the "headcount" requirements.

Further, the numerous public and internal statements of IBM's CEO and CFO expressing the need for the company to "refresh" its workforce creates a fact question regarding whether LeBlanc and Cowley were simply following those directives when they directed their subordinates where to make cuts during the RIF.

In sum, the summary judgment evidence demonstrates that (1) Langley is over the age of 40 and is thus in the class protected by the ADEA; (2) he was "adversely affected"—*i.e.* terminated—by the challenged decision; (3) he was qualified to assume another position within IBM when he was discharged; and (4) there is evidence from which a factfinder could conclude that IBM intended to discriminate against older workers in making decisions regarding layoffs and internal transfers. This meets Langley's burden with respect to demonstrating a prima facie case of age discrimination. *McMichael*, 934 F.3d at 456 n.4.  Indeed, IBM does not offer any evidence to rebut Langley's evidence that IBM consciously refused to relocate or retain Langley, and had policies requiring managers to "meet headcount" quotas and favoring the hiring of younger workers.  This undisputed evidence is more than enough at this stage to demonstrate that IBM's refusal to retain Langley was a result of his age, and that it regarded age as a negative factor in the analysis. *See Amburgey*, 936 F.2d at 812.

**B.     IBM's Proffered Reason for Layoff**

The burden thus shifts to IBM to proffer a legitimate nondiscriminatory reason for its layoff decisions. *McDonnell Douglas*, 411 U.S. at 802.  IBM identifies its nondiscriminatory reason for Langley's termination as a reduction in force. IBM asserts Langley was chosen for layoff because his group's leadership determined a RIF was necessary to reduce costs in order to improve financial performance. IBM asserts that within Cloud Sales, Brown's team took reductions because he had a large organization and some of its products, including PureApp, the IBM product Langley sold, were struggling, and IBM had "curtailed investment" in it.  IBM maintains that Brown allocated

reductions to Overbay, who chose Langley based on her comparison of his skills, performance ratings, and trends to others on his team. An "economically-motivated RIF constitutes a legitimate, nondiscriminatory reason for an employee's termination." *EEOC v. Tex. Instruments Inc.*, 100 F.3d 1173, 1181 (5th Cir. 1996). IBM's evidence of the reason for its RIF is enough to carry its burden of production.[6]

**D.     Pretext[7]**

Given the evidence IBM has submitted alleging a legitimate nondiscriminatory reason for its termination, "the presumption of discrimination created by the prima facie case disappears, and the plaintiff is left with the ultimate burden of proving discrimination." *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002). To carry this burden, the plaintiff must present "a genuine issue of fact as to whether the reasons articulated by the [defendant] for discharging him were pretextual." *Amburgey,* 936 F.2d at 813. A plaintiff may show that the defendant's articulated reasons were pretextual in two ways: (1) "directly by persuading the court that a discriminatory

---

[6]This is not to say that there isn't contrary summary judgment evidence. For example, Langley submits evidence indicating that Overbay, with help from HR, manipulated her performance ratings of Langley's team members to get preordained results of the "lowest performers" chosen for the lay off. Dkt. No. 151-34 at 2. There is also evidence that Brown forced Overbay to adjust downward Langley's last evaluation prior to the lay off. Dkt. No. 151-29. But because IBM's burden at this stage is one of production, not proof, IBM has done enough to meet its burden.

[7]The parties dispute whether evidence of a defendant's pattern or practice of discrimination is available to prove discrimination in a private, non-class action case. Pattern or practice evidence can be relevant to the pretext inquiry of the *McDonnell Douglas* framework. *Shiyan Jiang v. Texas Comm'n on Envtl. Quality*, No. 2018 WL 8415878, at *1 (W.D. Tex. Sept. 20, 2018) (citing *Wyvill v. United Companies Life Ins. Co.*, 212 F.3d 296, 302 (5th Cir. 2000)); *Ratliff v. Governor's Highway Safety Program*, 791 F.2d 394, 402 (5th Cir. 1986) ("An employer's past discriminatory policy and practice may well illustrate that the employer's asserted reasons for disparate treatment are a pretext for intentional discrimination."); *Hawkins v. Hennepin Technical Ctr.*, 900 F.2d 153, 155-56 (8th Cir. 1990) (same); *Franklin v. Living Centers-East, Inc.*, 1999 WL 615171, at *1 (E.D. La. Aug. 12, 1999) (same).

reason more likely motivated the employer;" or (2) "indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* As discussed above, IBM offers two reasons for terminating Langley: (1) IBM was phasing out PureApp, the product Langley's team supported, and thus two of the four members of that team needed to be eliminated; and (2) in deciding which two employees to let go, Overbay selected Langley after a subjective evaluation. There are genuine factual disputes regarding whether either of these proffered reasons is credible.

First, the alleged economic basis for the need to lay off employees of Langley's team—that the IBM product that team supported was being phased out—is a disputed fact. IBM's position is that, as articulated by Cowley in his June 2019 deposition, IBM no longer sells PureApp. Dkt. No. 151-33 at 3. In discovery Langley has been able to learn that in fact this is not correct. Internal IBM documents from June 2019 refer to PureApp as a current offering, and show that what are referred to as "Cloud Pak" products appear to be identical to "PureApp" products. *E.g.*, Dkt. No 151-30 ("this technote provides how-to details for IBM Cloud Pak System (or IBM PureApplication System)"). A product video on IBM's current website allows the viewer to click a link with the title "What are Cloud Pak Systems" which brings up a video showing PureApp products. *Id.* In its reply IBM contends that there are no dedicated PureApp sellers and that its sales are below the subpar 2016 level. Dkt. No. 168 at 9. IBM also claims that "today, various parts of the PureApp appliances have been renamed IBM Cloud Pak System." *Id.* There is, therefore, a fact issue as to whether IBM in fact "curtailed investment" in the PureApp product, as it claims, or simply renamed it and moved it to another part of the (rather byzantine) organization that is IBM. Thus, there is evidence that IBM's proffered economic reason for Langley's layoff—its curtailment of investment in PureApp—is not true.

Further, IBM's assertion that Overbay selected Langley for the layoff in February 2017 based on how he compared to others in his group rings hollow in light of the evidence that Langley, Brown,

Overbay, and IBM Cloud HR were all aware that Langley had been selected for the RIF months prior to this date. Moreover, the evidence shows that Langley was a strong performer. He received the largest bonus in his group in the quarter prior to his layoff, Dkt. No. 151-2 citing IBML-000888, and had been chosen for the "Tiger Team," a group chosen based on performance. Dkt. No. 151-3 at ¶ 7. Overbay lauded Langley for his strong performance in exceeding his European sales goals—he was only one of two on his team to exceed those goals. Dkt. No. 151-32. And despite Overbay's support and efforts to place Langley in other sales jobs at IBM, HR employees and IBM policies prevented his transfer—even when other managers had a strong interest in hiring him. IBM's claim that Overbay selected Langley for termination based on her evaluation of his performance is disputed, and a jury could conclude from the evidence before the Court that this claim is not credible, and not the real reason for Langley's termination.[8]

Coupled with the evidence supporting his prima facie case, Langley has made a sufficient showing of pretext, and summary judgment in this case is not appropriate.

## IV. RECOMMENDATION

The Court **RECOMMENDS** that the District Court **DENY** Defendant International Business Machines Corporation's Motion for Summary Judgment (Dkt. No. 126).

---

[8] In the summary judgment briefing, the parties debate whether Langley can establish pretext through expert statistical testimony suggesting that the lay offs impacted older workers disproportionately, and HR practices expert testimony suggesting that IBM deviated from standard practices as well as its own policies in the lay offs at issue. The Court need not resolve that debate here, as there is more than enough non-expert evidence to demonstrate fact questions requiring the trial of this case. Having said that, the Court notes that though statistical evidence alone is not usually sufficient to support a finding of pretext, it "may occasionally establish pretext where it is combined with additional evidence. " *Deloach v. Delchamps, Inc.,* 897 F.2d 815, 820 (5th Cir. 1990).

## V.  WARNINGS

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987). A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from *de novo* review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 150-53, 106 S. Ct. 466, 472-74 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

SIGNED this 20th day of December, 2019.

_____
ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE