**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| JONATHAN LANGLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-cv-00443-DAE |
| | ) | |
| INTERNATIONAL BUSINESS | ) | |
| MACHINES CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**DEFENDANT INTERNATIONAL BUSINESS MACHINES CORPORATION'S
OBJECTIONS TO REPORT AND RECOMMENDATION
<u>OF THE UNITED STATES MAGISTRATE JUDGE</u>**

The Report and Recommendation ("R&R") on Defendant IBM's Motion for Summary Judgment errs in its application of the legal standards, disregards undisputed, determinative facts, and is incorrect in its articulation of IBM's business reasons for terminating Plaintiff Jonathan Langley.  IBM respectfully submits that, on this Court's *de novo* review, its Motion for Summary Judgment should be granted.

To establish a *prima facie* case of age discrimination, Langley must offer evidence from which a factfinder might reasonably conclude that IBM intended to discriminate in terminating his employment.  Langley concedes that his first-, second-, third-, and fourth-line managers—the managers who decided to conduct a reduction-in-force in his business group, determined the number of positions to cut, concluded that Langley's team should be reduced, and selected Langley—lacked *any* age bias.  Citing a "cat's paw" theory, the R&R nonetheless concludes that there is a triable issue of fact as to whether Langley's managers "were simply carrying out the directives of others" who harbored age bias. (Dkt. 201 at 5, 9-10.)  But none of the evidence that the R&R cites establishes that Langley's managers were *actually influenced* by someone biased or that they were carrying out the biased directions of others.  No such evidence exists.

IBM is separately entitled to summary judgment because Langley cannot establish that IBM's explanation for his termination is pretextual or unworthy of belief.  Langley was a sales lead for an IBM product known as "PureApp." At the time Langley was terminated, PureApp sales were significantly declining, and revenue from the product was shrinking.  Langley's managers concluded that this trend would continue given the increasing use of cloud-based technology over premises-based technology like PureApp, and Langley's business group curtailed its investment in PureApp.  Thus, when headcount reductions were necessary due to the group's failure to meet its financial objectives, Langley's manager decided to cut the number of

PureApp sales leads on her team.  She selected Langley because his performance and skills were lower than his co-workers' on a relative basis, not because of his age.

The R&R is simply wrong in concluding that an issue of fact relating to pretext exists because "IBM's position is that … IBM no longer sells PureApp," when, according to the R&R, "in fact this is not correct" because IBM still offers the product.  (Dkt. 201 at 12.)  IBM has never taken the position that it no longer sells PureApp; rather, at the time Langley was terminated, IBM decided to curtail further investment in PureApp due to its declining sales. In the face of this poor performance and the expected trend, Langley's manager concluded that the PureApp sales leads team should be reduced. Because a misstatement of the evidentiary record is the premise for the R&R's recommendation as to pretext, the R&R should be rejected.  The R&R also ignores the well-established legal principle that simply because the business decision on which a reduction-in-force is predicated is later proved wrong or not implemented is legally insufficient to establish pretext.  There must be evidence that the employer knew *at the time of the reduction* that its reason was not true; there is no such evidence here.  The undisputed facts prove the contrary.

Finally, the R&R wrongly states that Langley's manager selected him for termination because he was a poor performer.  (Dkt. 201 at 12-13.)  Here, too, that has never been IBM's position. Langley was selected based on his manager's assessment of his skills and performance relative to the other PureApp sales leads.  Notably, Langley has never argued that he was more skilled or a better performer than the others on his team, of which he was the *youngest*.

## I.     THE SUMMARY JUDGMENT RECORD

### A.     Langley Was a PureApp Sales Lead in IBM's Cloud Business.

At the time of his layoff in 2017, Langley was a sales lead in the Cloud Sales organization within IBM's Cloud group for an IBM product called PureApp (also known as

PureApplication).[1] (Dkt. 126-3 at 80:9-16; Dkt. 126-8 at ¶ 4; Dkt. 126-13 at ¶ 4.) PureApp was an integrated software product that contained middleware. (Dkt. 126-3 at 77:12-17; Dkt. 126-13 at ¶ 5.)  It was primarily an on-premises product, involving a two-ton physical box containing software that was installed at a customer's premises. (Dkt. 126-13 at ¶ 5.)

As a PureApp sales lead, Langley supported dedicated PureApp sellers who worked in different geographic regions, and he was expected to be a subject matter expert regarding the product.  (Dkt. 126-13 at ¶¶ 4, 7-8.)  Langley was working exclusively on PureApp in the years leading up to his separation. (Dkt. 126-3 at 80:9-16.)

In 2016, the Cloud group was led by Senior Vice President Robert LeBlanc.  (Dkt. 126-3 at 252:11-18; Dkt. 126-12 at ¶¶ 4, 9.)  Cloud had a number of sub-units, including Cloud Sales, led by Steve Cowley.  (Dkt. 126-12 at ¶ 7; Dkt. 126-8 at ¶¶ 4-5.)  Cloud Sales handled sales of products that other sub-units within Cloud produced.  (Dkt. 126-8 at ¶ 5.)  Andrew Brown (who reported to Cowley) led an organization that handled sales for the Cloud group's Hybrid Cloud Integration ("HCI") sub-unit.  (Dkt. 126-8 at ¶¶ 4-5; *see* Dkt. 126-3 at 94:10-12.)  HCI's portfolio included middleware offerings, one of which was PureApp.  (Dkt. 126-8 at ¶ 5.)  Kim Overbay managed the team that handled PureApp sales.[2] Langley was a sales lead on Kim Overbay's PureApp team. (Dkt. 126-3 at 80:9-16; Dkt. 126-8 at ¶ 4; Dkt. 126-13 at ¶ 4.)

---

[1] IBM is a global technology company made up of several groups defined by the services and products that they provide.  (Dkt. 126-12 at ¶ 5; Dkt. 126-11 at ¶ 4.)  Each is led by a Senior Vice President, a chief executive responsible for the group's revenue, expenses, and profits.  (Dkt. 126-12 at ¶¶ 4, 6; Dkt. 126-11 at ¶ 8.)  Each group has its own Vice President of Finance, who acts as a CFO, and a Vice President of Human Resources.  (Dkt. 126-11 at ¶ 8; Dkt. 126-12 at ¶ 6.)  Each contains sub-units led by General Managers, who have line managers working beneath them.  (Dkt. 126-11 at ¶ 8; Dkt. 126-12 at ¶ 6.)

[2] Prior to February 2017, Kim Overbay reported directly to Andrew Brown; in February 2017, she began reporting directly to Kellie Penzien, who in turn reported to Brown.  (Dkt. 126-3 at 89:6-12; Dkt. 126-8 at ¶ 4; Dkt. 126-13 at ¶ 6.)

Overbay also managed a team for a different product, WebSphere Application Server, also known as WebSphere. (Dkt. 126-13 at ¶ 4.)  So, the line of authority was Langley < Overbay < Brown < Cowley < LeBlanc.

**B.     In 2016, Cloud SVP LeBlanc Decides to De-Invest in PureApp.**

By early 2016, the sales of PureApp were weak. (Dkt. 126-14 at ¶ 7.)  The PureApp Offering Management Team—which was responsible for PureApp's product management and development—expected PureApp revenues to continue to decline as customers migrated away from on-premises products to cloud-based applications.  (*Id.* at ¶¶ 5, 7.)  Accordingly, the Cloud group began making plans to transition away from PureApp and toward more viable strategic cloud solutions. (*Id.* at ¶¶ 8-11.)  In April 2016, LeBlanc decided to curtail investment in the PureApp product line, reducing development activity and the number of dedicated field sellers (whom Langley supported).  (*Id.* at ¶¶ 8, 12; Dkt. 126-12 at ¶ 11.)  As a result, and as is reflected in Langley's 2016 performance evaluation, during 2016, 68% of the dedicated PureApp sellers and 50% of the PureApp developers were cut.  (Dkt. 123-1 at 5.)  For the 2016 year, PureApp significantly underperformed against its revenue plan.  (Dkt. 126-13 at ¶ 9; *see also* Dkt. 126-3 at 140:14-16 ("We struggled in 2016.").)

**C.     Brown's Managers Engage in Resource Planning in 4Q2016.**

In October and November 2016, at the request of Andrew Brown, Kim Overbay engaged in a staff planning exercise designed to help identify the best employees needed to meet her teams' objectives for 2017.  (Dkt. 126-13 at ¶ 12.)  Overbay first assessed her direct reports and identified their three strongest areas of expertise.  (*Id.*)  Then, in November 2016, she identified which six employees from across her WebSphere and PureApp teams should continue working in a worldwide role. (*Id.*)  She determined that Langley, along with two other employees, could be moved into field roles.  (*Id.*)  Overbay sent Brown an email with her recommendations on

November 8, 2016.  (Dkt. 123-2.)  Contrary to the R&R, this exercise was not part of the selection process for the reductions that impacted her team in 2017, and Overbay did not identify Langley for termination at this time.  (Dkt. 126-13 at ¶ 12.)

**D.      Langley Seeks Other Roles in 2016 and Early 2017.**

In 2016 and early 2017, before he was notified of his layoff on March 30, 2017, Langley was exploring other potential roles within IBM, although he did not formally apply for any positions until after receiving layoff notification. (*See* Dkt. 151-4; Dkt. 126-16.)  Specifically, on December 6, 2016, after a face-to-face meeting with Brown, Langley asked Brown to consider him for a "wider role."  (Dkt. 151-4 at 3.)  Brown responded later that same day, stating "I am going to have to reduce not remission the team - I am working with Kim but right now I dont see a fit sorry." (Dkt. 151-4 at 2.)  That evening, Langley and Brown exchanged messages through IBM's internal text system; Brown confirmed "nothing is final … we are working through it all … please do not communicate this as I need to get time with Kim."  (Dkt. 168-3.)

In January 2017, on Langley's behalf and consistent with her recommendation that Langley be considered for a field role, Overbay sought a transfer for him to a field seller role under Keith Whitehead.  Specifically, on January 19, 2017, Overbay reached out to one of the HR partners, Allison Thompson, and asked her whether Overbay should initiate the transfer. (Dkt. 151-4 at 4.)  Thompson responded "Do they have a valid posting to accept the transfer against??  If not we'd need some sort of authorization that they have the open headcount to hire against."  (*Id*.)  In a subsequent exchange, on January 23, 2017, Thompson stated that Whitehead's position had to be posted, and he had to have approval to hire. (*Id*. at 18.)  In the same email chain, Keith Whitehead was advised by his HR partner: "Please gain CFO approval prior to transferring." (*Id*. at 16-17.)  There is no record evidence that Whitehead ever sought budget authority from the CFO, and thus, no evidence of an open position.

**E.      In Late 2016, LeBlanc and His Management Team Request Funding Authorization for Headcount Reduction.**

By year end 2016, LeBlanc, in consultation with his Vice President of Finance Steve Lasher, his Vice President of Human Resources Sam Ladah, and his General Managers, concluded that Cloud needed to reduce headcount to cut costs.  (Dkt. 126-11 at ¶¶ 10-11; Dkt. 126-12 at ¶ 12.)  Though many of the Cloud sub-units and organizations were strong, others did not meet their financial objectives in 2016.  (Dkt. 126-11 at ¶ 10; Dkt. 126-12 at ¶ 14.)  In particular, the group's HCI sub-unit, which included PureApp and other middleware products, experienced significant financial challenges.  (Dkt. 126-11 at ¶ 10.)  Not only did HCI fail to meet its revenue and profit objectives for 2016, its revenue shrank year-over-year.  (*Id*. at ¶ 13.)

Once they concluded that a headcount reduction (or "resource action") was necessary, Cloud's General Managers worked with their managers and human resources leaders to develop reduction recommendations based on the financial projections and needs of their respective sub-units.  (Dkt. 126-12 at ¶ 12; Dkt. 126-11 at ¶ 11; Dkt. 126-8 at ¶ 8.)  Lasher consolidated the recommendations and submitted a funding request for the severance expenses associated with the action to the Controller's Office in late 2016.  (Dkt. 126-12 at ¶ 13; Dkt. 126-11 at ¶¶ 9, 11.)  In early February 2017, the Controller's Office granted Lasher's request (Dkt. 126-11 at ¶ 12), and IBM's Project Office, which assists with resource actions, labeled the action CLDR.  (Dkt. 97-3 at ¶¶ 6-7.)  LeBlanc worked with Cloud's management team to allocate reduction targets to the group's sub-units, and the sub-units' General Managers then allocated targets to their reports. (Dkt. 126-11 at ¶ 14; Dkt. 126-12 at ¶ 15.)

**F.      Overbay Selects Langley for Layoff with Brown's Agreement.**

Within the Cloud Sales sub-unit, Brown's teams were subject to reductions because those teams were collectively large and sold products for the underperforming HCI sub-unit.  (Dkt.

126-8 at ¶ 8.)  Further, Cowley indicated that he wanted reductions to focus on face-to-face

sellers rather than on technical or digital (on-line) sales positions.  (*Id*.; Dkt. 126-7 at 221:1-21.)

Brown, in turn, distributed headcount reduction targets to his reports based upon financial

projections and the needs of their teams.  (Dkt. 126-8 at ¶ 9.)  As part of this process, Brown

directed Overbay to select two employees, reasoning that her face-to-face selling teams

supported HCI products and, in particular, her PureApp team supported a product in which the

Company had curtailed investment.  (*Id*. at ¶ 10; Dkt. 126-13 at ¶ 13.)  Brown gave Overbay

responsibility to determine whom to select from her teams for the resource action.  (Dkt. 126-8 at

¶ 10; Dkt. 126-13 at ¶ 13.)  The R&R states that Brown directed Overbay to take two cuts from

her PureApp team (Dkt. 201 at 6), but there is no record basis for this statement.

Overbay first decided to take cuts from her PureApp sales team, rather than her

WebSphere team, which was experiencing strong sales.  (Dkt. 126-13 at ¶¶ 9-11, 13.)  Like

Brown, Overbay reasoned that IBM would have a decreasing need for employees to support

PureApp.  (*Id*. at ¶ 13.)  Overbay then compared the relative skills, performance ratings, and

current performance trends of her team members.  (*Id*. at ¶ 14; *see also* Dkt. 123-3.)  Overbay

rated Langley lowest and selected him for layoff.  (Dkt. 123-3.)  Langley was the youngest of the

PureApp sales leads. (Dkt. 126-10 at ¶¶ 6-7.)

Overbay notified Langley in March 2017 that he had been selected for layoff.  (Dkt. 126-

13 at ¶ 21.)  Overbay also notified Langley that he would have 90 days to find another job.  (Dkt.

126-3 at 193:23-194:6.)  During this period, Langley applied to three IBM-internal job postings.

(*Id*. at 198:16-199:7, 203:22-204:17, 211:4-10; Dkt. 126-15 at ¶¶ 4-5; Dkt. 126-16.)  Two of

these – the WW Cloud & Cognitive Portfolio Executive posting and the Director, IP Partnership

Hybrid Cloud Software posting – were for openings that were later cancelled and thus never

filled.  (Dkt. 126-15 at ¶¶ 6-7.)  The third – Cloud Software - SaaS Sales – was a "pipeline requisition."  (*Id.* at ¶ 8.)  It was not tied to a particular position but was rather a means to source resumes for potential future openings.  (*Id.*)  As of the filing of IBM's Motion for Summary Judgment, the Company had not hired anyone against that posting.  (*Id.*)  Though the positions that Langley applied for were not filled, nine other employees selected for layoff in the CLDR resource action did find positions within IBM, and they did not separate.  (Dkt. 126-10 at ¶ 9.)  These employees were all over age 40; four were over 50; and two were over 60.  (*Id.*)

       **G.**    **No Dedicated PureApp Sellers Remain.**

       Langley left IBM on June 30, 2017.  (Dkt. 126-13 at ¶ 21.)  IBM did not replace him; now, it employs no dedicated PureApp sales leads or sellers.  (*Id.* at ¶¶ 22, 24.)  IBM did continue to sell PureApp after Langley's separation, but the majority of PureApp sales were to existing customers, and the residual sales were modest, well below the 2016 levels.  (*Id.* at ¶ 23.)  Two years later, effective June 28, 2019, the remaining parts of PureApp were repackaged and renamed Cloud Pak.  (Dkt. 156-7 at 3; Dkt. 168-10 at ¶ 6.)  The term "Cloud Pak" is not unique to PureApp but rather is part of a broader Hybrid Cloud strategy to develop products to help clients accelerate their application modernization efforts.  (Dkt. 168-10 at ¶ 8.)

**II.**    **PROCEDURAL HISTORY**

       On May 25, 2018, Langley filed a two-count complaint, alleging "Disparate Treatment Involving Termination."  (Dkt. 1.)  In Count I, Langley alleges that "IBM terminated [him] because of his age" in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a)(1).  (*Id.* at ¶ 68.)  In Count II, Langley alleges that his termination violated Texas's age discrimination statute.  (*Id.* at ¶ 73.)  Langley makes no claim of failure to transfer or re-hire.  On July 15, 2019, IBM moved for summary judgment. (Dkt. 113.)  The Magistrate Judge signed a Report and Recommendation recommending the denial of summary judgment on

December 20, 2019, which was served on December 27, 2019.  (Dkt. 201.)

## III.   OBJECTIONS

A district court's review of a magistrate report on a dispositive motion is *de novo*.  28

U.S.C. § 636(b)(1).  Thus, the entire summary judgment record must be reviewed at this

juncture, and "[w]here the record taken as a whole could not lead a rational trier of fact to find

for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Indus. Co., Ltd.*

*v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Conclusory or unsubstantiated assertions,

improbable inferences, and unsupported speculation cannot defeat summary judgment.  *Forsyth*

*v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994).  A *de novo* review of the record here shows that

IBM's Motion for Summary Judgment should be granted.

### A.   IBM Objects to the R&R's Finding that There Is an Issue of Fact As To Whether Langley Has Established a *Prima Facie* Case (R&R at 4-10).

To survive IBM's Motion, Langley must first establish a *prima facie* case of age

discrimination.  *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 439 (5th Cir. 2012) (applying the

"*McDonnell Douglas* burden-shifting framework" to ADEA and Texas claims).  IBM does not

dispute, for purposes of summary judgment, that Langley can establish prongs one through three

of his *prima facie* case.  However, Langley cannot establish the fourth prong, which requires

"evidence, circumstantial or direct, from which a factfinder might reasonably conclude that the

employer intended to discriminate in reaching the decision at issue."  *Nichols v. Loral Vought*

*Sys. Corp.*, 81 F.3d 38, 41 (5th Cir. 1996).  The R&R erred in finding factual disputes here.

As the R&R acknowledges (Dkt. 201 at 5, n.2), Langley concedes that Overbay, Brown,

Cowley, and LeBlanc – his first-, second-, third-, and fourth-line managers – harbored no age

bias.[3]  Thus, the R&R resorts to an erroneous application of the cat's paw theory, concluding that IBM's HR team, with direction from high-ranking executives who Langley claims were age biased, were the *de facto* decision-makers in his termination.  (Dkt. 201 at 7-10.)  But there is simply no record evidence supporting this claim.

A cat's paw theory is no free lunch.  It is "proper to impute [others'] discriminatory attitudes to the formal decisionmaker" only if the "employee can demonstrate that [the] others had influence or leverage over the official decisionmaker."  *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 653 (5th Cir. 2004).  A plaintiff must prove (1) that another employee exhibited discriminatory animus, and (2) that the biased employee influenced the unbiased decisionmaker with regard to the challenged decision.  *See id.*  Thus, where there is no evidence of an actual nexus between a biased employee and the ultimate decisionmaker, the defendant is entitled to summary judgment.  *Higgins v. Lufkin Indus.,* 633 F. App'x 229, 233 (5th Cir. 2015) ("the cat's paw theory of liability is inapplicable" where plaintiff "offers no evidence that Redd influenced Duford's decision to fire her"); *Holliday v. Commonwealth Brands, Inc.*, 483 F. App'x 917, 922 (5th Cir. 2012) (rejecting cat's paw theory: "Holliday has not offered any evidence showing that Trauth had 'influence or leverage' over . . . the CBI employees who made the decision to terminate Holliday."); *Bryant v. Compass Grp. USA Inc.*, 413 F.3d 471, 477-78 (5th Cir. 2005) (cat's paw "fail[ed] because [plaintiff] offered no evidence that the official decisionmakers were involved in the conspiracy, knew about the conspiracy, or should have known about the

---

[3] In deposition, Langley conceded that LeBlanc and Cowley did not harbor animus based on age.  (Dkt. 126-3 at 95:9-21, 100:22-101:15; Dkt. 126-5 at 37:4-9.)  Similarly, Langley conceded that Brown was "a straight shooter" and "a good guy," and Langley had no reason to believe that he would discriminate.  (Dkt. 126-3 at 99:17-100:7, 195:15-16.)  Finally, Langley conceded that Overbay was "fair and honest," and he never observed any behavior from her suggesting animus.  (Dkt. 126-3 at 91:25-92:18.)

conspiracy.").

      **1.**     **The R&R Errs in Finding a Factual Issue Regarding Whether Any Age-Biased Actor Influenced Langley's Termination.**

Here, and even assuming, *arguendo,* that IBM's HR team or senior executives harbored an age animus—and they did not—there is no evidence that any age-biased actor influenced Overbay's decision to terminate Langley.  The record evidence cited in the R&R (Dkt. 201 at 6-8) is taken badly out of context and does not demonstrate the causal link necessary for the application of a cat's paw theory.

*First*, the R&R (Dkt. 201 at 7) relies on excerpts from planning documents for various IBM business groups in various years and erroneously concludes that these "suggest that high level IBM executives were encouraging managers to lay off workers like Langley to make room for younger employees."  But the R&R identifies no link between those plan excerpts, some of which identify plans related to entry-level hiring, and the decisions that led to Langley's termination.  Langley never deposed his two immediate managers, Overbay and Brown, and so never explored whether they even saw the documents or received any such encouragement. Langley did depose LeBlanc and Cowley, but he does not, and cannot, offer evidence or testimony that they received any such direction or encouragement.

In any event, the fact that a company concentrates its hiring at the entry-level does not give rise to an inference of age discrimination.  IBM defines "early professional" by experience, not age (Dkt. 151-15 at 6), which is not discriminatory even if experience "correlate[s] with age." *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 608-11 (1993); *Sack v. Bentsen*, 1995 U.S. App. LEXIS 5714, at *18-19 (1st Cir. Mar. 20, 1995) (recent graduation not so correlated with age as to constitute age-based preference).  Moreover, efforts to recruit and hire recent college graduates simply do *not* constitute age discrimination.  *See Carraher v. Target Corp.*, 503 F.3d

11

714, 719 (8th Cir. 2007) (increased emphasis on college recruiting was not evidence of age

discrimination against older workers); *Grossmann v. Dillard Dep't Stores, Inc*., 109 F.3d 457,

459 (8th Cir. 1997) ("That Dillards recruits recent college graduates is not evidence it

discriminates against older workers."); *Arafat v. Sch. Bd. of Broward Cnty.*, 549 F. App'x 872,

875 (11th Cir. 2013) (bare fact that employer encourages employment of recent graduates does

not constitute age discrimination, and comment regarding preference for "fresh" graduates did

not necessarily implicate age-based preference).

    *Second*, the R&R (Dkt. 201 at 8) cites a January 18, 2017 email from Director of Talent

Kevin Kubicki to speculate that someone other than Overbay and Brown may have made the

decision to select Langley for layoff.  Kubicki's email, however, has no tie to Langley.  Rather,

while Kubicki writes "I would strongly recommend that we take a hard look at this 'manage-out'

list," the list that he references, which is part of the record but overlooked by the R&R, does not

include Langley's name.  (Dkt. 151-27.)  Thus, the email does not suggest that Kubicki had a

role in, or influence on, Langley's selection for separation.

    *Third*, the R&R's reliance (Dkt. 201 at 8, 10) on a 2015 quote from CHRO Diane

Gherson and from other uncited "public and internal statements of IBM's CEO and CFO" in no

way supports a cat's paw theory.  There is simply no evidence that any of the decision-makers—

LeBlanc, Cowley, Brown, or Overbay—ever saw this article or were in any way influenced by

comments Gherson or other executives made before Langley's separation and, thus, none support

a cat's paw theory.  *Bell v. Raytheon Co.*, 2009 WL 2365454, at *7-8 (N.D. Tex. July 31, 2009)

(granting summary judgment where plaintiffs "presented a series of remarks, none of which is in

temporal proximity — or in any other way related — to the decision not to hire Cox"); *see also*

*Reed*, 701 F.3d at 441 (plaintiff must show "(1) discriminatory animus (2) on the part of a person

that is either primarily responsible for the challenged employment action or by a person with influence or leverage over the relevant decisionmaker.").

*Finally*, the R&R (Dkt. 201 at 8) cites the "Maturing Workforce" document, an article published in the UK in 2006, *11 years before* Langley's termination.  But there is simply no connection between a publication from the consulting arm of IBM UK, Ltd., which surveyed *other companies* and encouraged IBM's customers to *retain* older workers, and Langley's termination more than a decade later. (Dkt.151-11.) Again, there is no showing that LeBlanc, Cowley, Brown, or Overbay ever saw this article or knew of its contents.  In short, stray evidence of purported age bias provides no support for the idea that their decisions were influenced by it.

In sum, there is no link between any of the documents Langley presented in opposing summary judgment and Overbay's selection of Langley for termination.

### 2.    The R&R Errs in Concluding that HR's Discriminatory Actions Relating to Redeployment Resulted in Langley's Termination.

The R&R (Dkt. 201 at 8-9) also errs in concluding that HR was somehow the *de facto* decision-maker in Langley's separation because "there were supervisors within IBM who wanted to have Langley work with them and had room to hire him," but HR "prevented that from happening, often in deference to making an 'external hire,' the majority of which were aimed at younger employees."  Simply put, there is no evidence that a supervisor "who wanted" Langley "had room to hire him," let alone that such a supervisor hired a younger employee instead. Notably, Langley makes no claim of discrimination in transfer or rehiring decisions.  *See* Dkt. 1. Rather, Langley's so-called evidence that HR prevented his hiring is a random assortment of emails, with no foundation, that simply show that there were no available positions.  (Dkt. 151-4.)  They are not evidence of any younger employees being hired or transferred.

For example, Dkt. 151-4 at 4-5, 12 and 16, which the R&R cites (Dkt. 201 at 9), relate to Overbay's effort to transfer Langley to a PureApp seller position on Keith Whitehead's team in North America.  As noted *supra* at 5, Whitehead was told by HR that he needed to have budget authority from his CFO to post a position before Langley could transfer.  (Dkt. 151-4 at 6.) These emails provide no evidence that Whitehead "had room to hire" Langley; rather, in Dkt. 151-4 at 12, the last communication on this topic, Whitehead simply states "no update from Janet on her headcount."  Nor do the emails show that HR did anything to block the transfer, that the requirement that a manager have budget authority applied only to older workers, or that the position went to a younger employee.  Notably, Langley did not depose Keith Whitehead despite identifying him in his 2018 disclosures.

Likewise, Dkt. 151-4 at 8 does not further Langley's cause.  It only shows that Langley asked Terry Lode, a Software Manager, whether Lode was permitted to hire – and Lode, whom Langley again identified but did not depose, advised that his "hire ticket was withdrawn." *Id.* This email in no way indicates that HR had taken *any* action – let alone taken an action based on age bias and/or directed at Langley.

The R&R's reliance on Dkt. 151-4 at 13 is also unfounded.  Abiy Yeshitla, a manager whom Langley again did not depose despite identifying him in his disclosures, simply states his understanding that he couldn't hire from "internal."  (Dkt. 151-4 at 13.)  It does not indicate the basis for his understanding, whether HR had any role in his understanding, whether he otherwise had "room to hire" Langley, or whether he filled any positions, let alone with a younger employee.

Finally, the R&R's reliance on Dkt. 151-4 at 28 is misplaced.  Here, HR Partner Barbara Heathcote describes the approval process for removing an employee from a resource action.

14

(*Id.*)  This process never applied to Langley, as no manager sought approval to move him into an open position.  Moreover, Langley offers no evidence that this process hindered the placement of older employees.  To the contrary, the record reflects that nine other employees selected for layoff in the same CLDR resource action as Langley (all over 40, four over 50, and two over 60) successfully found new positions, four of whom went through this process – dispelling any suggestion of age bias.  (Dkt. 126-10 at ¶ 9.)

In sum, Langley presents no actual evidence of an available position that ultimately went to a younger employee at HR's direction, nor any other specific facts, to prove a cat's paw case.

### 3.     The R&R Errs in Concluding that Issues of Fact Exist As To the Decision-Makers Or the Timing of Langley's Termination Decision.

The R&R further errs in finding that there is a triable issue of fact as to the *prima facie* case because there are inconsistencies in IBM's evidence as to who made the decision to select Langley and when.  (Dkt. 201 at 5, 6.)  This recommended finding is a classic red herring because, without Overbay and Brown, Langley is left with no one to finger for his termination.  Yet, Langley has the burden of establishing that someone with a discriminatory intent made (or influenced) the decision to select him for layoff.  There is no record evidence that anyone other than Overbay, with Brown's approval, made the decision – let alone anyone with age animus.

Notably, because Langley chose not to depose Overbay or Brown, their declarations as to the selection process are uncontested.  (Dkt. 126-8; Dkt. 126-13.)  Langley merely speculates as to their motives, and the R&R erred in adopting Langley's speculation.[4]  The supposed

---

[4] *See, e.g. Hugo v. Millennium Labs., Inc.,* 590 F. App'x 541, 545 (6th Cir. 2014) ("Hugo failed to depose [those] responsible for Millennium's initial termination decision. Thus, the only facts before us regarding the relevant decisional process are those offered by Millennium"); *Dorsey v. Morgan Stanley*, 507 F.3d 624, 628 (7th Cir. 2007) ("Dorsey's assertion that a juror could find Lowery played a role in Zabuski's complaint is simply too speculative, especially in light of the fact that Dorsey failed to depose Zabuski on this matter.").

inconsistencies in IBM's evidence identified in the R&R simply do not exist.

*First*, referring to an instant messaging chat (Dkt. 151-4 at 4) between Overbay and Allison Thompson, the R&R concludes that "Overbay knew Langley had been selected … as early as January 19, 2017" because "it is clear that the two are discussing this because Langley is going to be laid off from his position." (Dkt. 201 at 6.)  The R&R's conclusion is unfounded.  In fact, Overbay and Thompson were not discussing Langley's *termination*, but rather Langley's *potential transfer* from Overbay's team to a field sales role, consistent with Overbay's November 2016 recommendation to Brown. (*Supra* at 4-5.)  Overbay made the case to Brown and Thompson that such a transfer would reduce Brown's headcount by one. (Dkt. 151-4 at 7 ("It will be a net zero change for NA and a -1 HC change for our team.").)

Likewise, the R&R (Dkt. 201 at 7) errs in concluding that a December 6, 2016 email amounts to "Brown notif[ying] Langley directly of his likely future layoff."  As set forth above, *supra* at 5, Brown was responding to Langley's request for a wider role.  Nowhere does Brown notify Langley that he will be "reduced;" instead, the message is simply that Brown cannot "remission" a broader position for Langley.  (*Id.*)  Indeed, in an instant message exchange later that same day Brown says specifically that "nothing is final."  (Dkt. 168-3.)

Lastly, the R&R (Dkt. 201 at 7) errs in concluding that a January 2017 email between Cowley and HR Vice President Yara Saad "includes Jonathan Langley's name on a list of individuals chosen for layoff." (Dkt. 156-5.)  This is incorrect. The email is part of the workforce planning exercise, described above, *supra* at 4-5, and it labels Langley as "ReDeploy"—a point the R&R apparently glosses over because the title of the document is "RA/Transfer List."  (Dkt. 156-5; Dkt. 201 at 7, n.4.)  Notably, B.B., another PureApp Sales lead, also appears on this list in the same way, and Overbay never selected him for layoff. *Compare* Dkt. 156-5 *with* Dkt. 123-3.

Given the undisputed testimony as to the method, actors, and timing of Langley's layoff decision, there is simply no support for the R&R's conclusion that a dispute of fact exists here.

**B.     IBM Objects to the R&R's Finding that There Is an Issue of Fact As To Pretext (R&R at 11-13).**

Because Langley cannot establish his *prima facie* case of age discrimination, summary judgment is proper, and the Court need not consider the R&R's pretext recommendations. In any event, IBM has presented legitimate, non-discriminatory reasons for terminating Langley's employment, and there is no record evidence that IBM's articulated reasons were pretextual. The R&R wholly misstates the actual record evidence regarding IBM's reasons.

**1.     The R&R Misstates IBM's Articulated Reason for Reducing the Number of PureApp Sales Leads.**

The R&R (Dkt. 201 at 12) identifies IBM's articulated reason for terminating Langley as: "IBM no longer sells PureApp."  The R&R then concludes that there is an issue of fact regarding pretext because IBM still sells PureApp, in the form of Cloud Pak.  (*Id.*)  The R&R is simply wrong.  IBM has *never* taken the position that it no longer sells PureApp and has *never* articulated that as a rationale for Langley's termination.  To the contrary, IBM has consistently stated in its Motion (Dkt. 113 at 3-4, 7, 16) and supporting declarations (Dkt. 126-13 at ¶¶ 22-23), that PureApp sales *continued* but that the Company curtailed investment in the product, that it no longer employs dedicated PureApp sellers, and that PureApp sales are very low. Specifically, in her unchallenged declaration (Dkt. 126-13), Overbay stated:

- ¶ 22:  Today, IBM employs no sellers or sales leads who are dedicated to selling PureApp, either in Worldwide Top or in the geos. Rather, some sellers on my team sell a portfolio of different products, and the PureApp product is a small part of that portfolio.

- ¶ 23:  Today, the majority of PureApp sales are to existing customers. Those residual sales are modest, substantially below even the levels in 2016 (which were significantly down from that year's plan).

In his Opposition to IBM's Motion (Dkt. 155-1 at 18), Langley attempted to restate

IBM's position, citing deposition testimony from Cowley that he believed IBM no longer sold PureApp.  In its reply, IBM made clear that Cowley's testimony was mistaken and that Cowley acknowledged that he knew only "a little" about PureApp.  (Dkt. 168 at 10.)  IBM re-affirmed that PureApp sales continued, albeit at a low level, without dedicated PureApp sellers.  (Dkt. 168 at 9-10.)  IBM further provided a declaration from Chuck Murray, who works in offering management for Hybrid Cloud products, who stated that "[t]here have been multiple generations of the PureApp appliance, which are still being sold and serviced by IBM today."  (Dkt. 168-10 at ¶ 5.)

For his part, Langley has made statements demonstrating that he was well aware of IBM's decision to curtail investment in PureApp at the time:

- Langley's 2016 Checkpoint (performance review) stated:  "*PureApplication had a difficult year due to tremendous change and transformation at IBM.  We lost over 68% of the dedicated PureApplication sellers.  We also lost 50% of the Development team.  We ended up finishing the year at 53.2% of plan delivering 39.4M on a plan of 74.1M and 29% of our SaaS plan.*"  (Dkt. 123-1 at 5.)

- In April 2017, Langley wrote to Brown:  "*I found out today that our sole remaining UK seller on Pure, Austin is being made redundant.  **So clearly PA is on life support now**.*"  (Dkt. 151-4 at 21.)

- Langley testified in deposition as follows regarding his 2016 Checkpoint: "*We had a difficult year due to tremendous change.*" (Dkt. 168-2 at 32:13-18.)

- Langley similarly testified that "*[a]fter 2015, there were decisions made to - - in my understanding, to invest less in the development and move it more towards a  - - what we could call a data center product. Cloud, if you like.*" (Dkt. 126-3 at 125:25-126:3.)

Langley's admission that PureApp was—in his own words—"on life support" in 2017 is fatal to a finding that there is any issue of fact as to whether IBM's decision to cut headcount on the PureApp team, because the product was struggling, is pretextual.

### 2. IBM's 2019 Decision to Re-Package PureApp as Part of a Cloud Pak Does Not Establish Pretext.

Even if the rollout of Cloud Pak represents a reversal of course by IBM, the R&R (Dkt.

201 at 12) errs in concluding that IBM's 2019 decision to repackage the PureApp product as part of the Cloud Pak product raises a dispute as to pretext.  Langley's own evidence establishes that Cloud Pak rolled out on June 28, 2019, more than two years *after* Overbay selected Langley for layoff.  (Dkt. 156-7 at 2; *see also* Dkt. 168-10 at ¶ 6.)  For temporal reasons alone, then, the Cloud Pak rollout is immaterial to an assessment of Overbay's decision-making in 2017.

The fact that a business decision on which a reduction in force is predicated is later reversed or never implemented is insufficient, standing alone, to establish pretext.  Rather, the plaintiff must provide affirmative evidence that the employer did not honestly believe its explanation at the time of the decision.  *See Jones v. RS & H, Inc.*, 775 F. App'x 978, 988 (11th Cir. 2019) (affirming summary judgment for the employer; while reason for RIF – anticipated decline in workload – did not ultimately materialize, the plaintiff must "present evidence from which a reasonable jury could find that the defendant did not honestly believe the facts upon which he allegedly based his non-discriminatory decision"); *Perez v. Colwell Sys., Div. of Deluxe Corp.,* 83 F. Supp. 2d 976, 984 (C.D. Ill. 1999) (rejecting challenge to RIF predicated on expected implementation of new technology, concluding that employer's "delay in installing the new technology and, indeed, its failure ever to install the new technology does not imply age discrimination" absent evidence that the employer did not honestly intend to install the technology in the first instance); *Smith v. Allstate Ins. Co.*, 195 F. App'x 389, 395 (6th Cir. Aug. 16, 2006) (similar); *see also Mendoza v. El Paso Cnty.*, 2012 WL 1952278, at *8 (W.D. Tex. May 30, 2012) (court should not "engage in second-guessing of an employer's business decisions" when conducting pretext analysis).

Here, Langley presents no evidence that, in 2016, IBM did not honestly believe that PureApp sales would continue to decline and that its investment in PureApp should be curtailed.

To the contrary, the evidence is clear that in 2016, PureApp, as Langley puts it, was "on life support." (Dkt. 151-4 at 21.) The R&R should be rejected for this reason as well.

### 3. The R&R Misstates the Process and Rationale for Selecting Langley.

Finally, the R&R (Dkt. 201 at 13) is also flawed in concluding that there are genuine factual disputes regarding "IBM's claim that Overbay selected Langley for termination based on her evaluation of his performance." *First*, Langley was the youngest of the four PureApp sales leads reporting to Overbay. *Supra* at 7. That fact alone negates any purported issue of fact as to whether Overbay's stated rationale for selecting Langley was somehow pretextual.

*Second,* whether Langley was a "strong" performer, standing alone, is immaterial. (Dkt. 201 at 13.) As Overbay stated in her declaration (Dkt. 126-13 at ¶ 14), she selected Langley for layoff based on her assessment of his skills and performance *relative* to the other PureApp sales leads on her team. (*See also* Dkt. 123-3.) Significantly, Langley has never argued that he was more skilled or a better performer than the other three PureApp sales leads against whom he was compared, nor can he dispute that he was the youngest.

*Third*, as set forth *supra* at 4, 7, there is no record evidence to create a dispute as to when Overbay made her selection decision. But, in any event, whether Overbay made her assessment in November 2016 or February 2017 is immaterial. By November 2016, IBM had already decided to curtail investment in PureApp (Dkt. 126-14 at ¶ 8; Dkt. 126-12 at ¶ 11) and had already cut 68% of the dedicated field sellers and 50% of the PureApp developers (Dkt. 123-1 at 5). Thus, the same conditions existed in November 2016, undercutting any claim that Overbay's rationale for selecting Langley was pretextual.

### CONCLUSION

For all the reasons stated herein, IBM respectfully requests that the Court reject the Report and Recommendation and enter judgment in its favor as to all claims.

Dated: January 10, 2020

Respectfully submitted,

*/s/ Alison B. Marshall*
Alison B. Marshall*
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
Phone: (202) 879-7611
Fax: (202) 626-1700
abmarshall@jonesday.com
*Admitted Pro Hac Vice*

Matthew W. Lampe*
JONES DAY
250 Vesey Street
New York, NY 10281
Phone: (212) 326-7838
Fax: (212) 755-7306
mwlampe@jonesday.com
*Admitted Pro Hac Vice*

Shannon H. Ratliff
(Texas Bar No. 16573000)
Davis, Gerald, & Cremer, P.C.
300 West 6th Street
Suite 1830
Austin, TX 78701
(512) 493-9601
shratliff@dgclaw.com

R. Paul Yetter
(Texas Bar No. 22154200)
Tracy N. LeRoy
(Texas Bar No. 24062847)
Yetter Coleman LLP
811 Main Street
Suite 4100
Houston, TX 77002
(713) 632-8000
pyetter@yettercoleman.com
tleroy@yettercoleman.com

*Attorneys for Defendant*
*International Business Machines Corporation*

21

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 10, 2020, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system, which sent notification of such filing to the Court and

Langley's counsel. Additionally, a hard copy of the foregoing was served via overnight delivery

on Magistrate Judge Andrew W. Austin at the following address:

> Magistrate Judge Andrew W. Austin
> United States District Court
> Western District of Texas, Austin Division
> 501 West Fifth Street
> Suite 4190
> Austin, TX 78701

*/s/ Alison B. Marshall*
Alison B. Marshall
