THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| JONATHAN LANGLEY | § | |
|     Plaintiff | § | |
| | § | |
| v. | § | CASE NO. 1:18-CV-00443-DAE |
| | § | |
| INTERNATIONAL BUSINESS MACHINES | § | |
| CORPORATION | § | |
|     Defendant | § | |

**PLAINTIFF'S RESPONSE TO DEFENDANT INTERNATIONAL BUSINESS
MACHINES CORPORATION'S OBJECTIONS TO REPORT AND
RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Plaintiff Jonathan Langley in response to Defendant International
Business Machines Corporation's (IBM) Objections to Report and Recommendation of the
Unites States Magistrate Judge (Dkt. 206).

## I. SUMMARY OF THE ARGUMENT

IBM's objections march down the same, familiar path of willful blindness to the
operative facts that it has treaded throughout this case. (*See, e.g.,* Dkt. 52, 75, and 185.) Jonathan
Langley provided summary judgment evidence that Magistrate Judge Austin properly recognized
was a "*substantial* body of evidence supporting Langley's position," before coming to the
conclusion that IBM's motion for summary judgment should be denied in all respects. (Dkt. 201
at 5)(emphasis added.) In contrast, IBM made the decision to provide this Court with only a
paltry handful of self-serving declarations to support its motion for summary judgment. There is
no question the evidence Plaintiff submitted is sufficient to survive IBM's motion for summary
judgment and afford Langley his day in court in front of a jury of his peers.

Internal high-level planning documents show IBM set goals to make its workforce younger. Statements made directly by IBM executives support the existence of a discriminatory plan and ageist culture within IBM during the relevant time period. IBM's discriminatory scheme to create a younger work force utilized rolling layoffs, which targeted older workers while simultaneously exempting younger "Early Professional Hires" from those layoffs. After twenty-four years of impressive employment with IBM, Jonathan Langley was terminated in one of these rolling layoffs—internally known as "Operation Baccarat." IBM's summary judgment declarations allege Langley's first-line manager, Kim Overbay, was the decisionmaker who selected Langley for RA ("Resource Action," or IBM code for layoff) on February 16, 2017. On that same day, Overbay allegedly completed a Selection Worksheet, in which she purportedly evaluated her four subordinates—all over 59 years old—and selected for termination the two with the lowest performance rating. Unfortunately for IBM, its summary judgment narrative is disproven by its own internal documents below.

The plaintiff's summary judgment record, which is predominately comprised of internal IBM documents, shows Langley received the largest performance bonus of his cohort in the final quarter of 2016.[1] Despite his stellar performance, Andrew Brown, Langley's second-line manger, told Langley in December 2016 he was going to lose his job.[2] The record contains an email proving HR/Talent executive, Kevin Kubicki, was preselecting individuals for layoff during operation Baccarat; stating to colleagues "we should think of this as an opportunity to remix our headcount, freeing-up space for new/better talent."[3] A January 19, 2017 electronic message from HR to Overbay states Langley had already been counted as a headcount reduction,

---

[1] *See* Dkt. 151-32, Ex. 25.
[2] *See* Dkt. 151-3, Ex. B.
[3] Dkt. 151-27, Ex. 20 B.
[4] Dkt. 151-27, Ex. 20 IBML-001621A.
[5] Dkt. 151-28, Corrected Ex. 21 at 1690A.

despite the fact it was 28 days before his alleged "selection" according to IBM's summary judgment narrative.[4]  Additional corroborating evidence shows an HR spreadsheet from January 25, 2017 (22 days before his alleged selection) that lists Langley's status as "RA."[5]  The record also shows both Overbay and Brown made diligent efforts to keep Langley employed at IBM through intra-company transfer.[6]  HR, high-level executives, and mandates on external hiring, blocked Brown and Overbay's attempts.[7]  It is without question, reasonable minds could look at such evidence and conclude that IBM intended to systematically discriminate against Langley and others based on age, and its summary judgment evidence is merely a pretext.

## II. ARGUMENTS AND AUTHORITIES

### A.  Langley Established his Prima Facie Case.

Under *McDonnell Douglas*, the ADEA plaintiff must first establish a prima facie case of discrimination.[8]  Courts across the nation have recognized that "[e]mployers are rarely so cooperative as to include a notation in the personnel file, 'fired due to age,' or to inform a dismissed employee candidly that he is too old for the job."[9] As a result, plaintiffs are often forced to piece together circumstantial evidence to show that discrimination did occur. IBM does not dispute Langley proved the first three prongs of his prima facie case, and instead only challenges the fourth and final prong—whether Langley provided a scintilla of evidence establishing IBM discriminated against him in reaching its decision to terminate his employment.

---

[4] Dkt. 151-4, Ex. 1 at IBML-001621A.

[5] Dkt. 151-28, Corrected Ex. 21 at 1690A.

[6] *See* Dkt. 151-4, Ex. 1; Dkt. 151-25, Ex. 18.

[7] *See id.*

[8] *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 793 (1973).

[9] *Thornbrough v. Columbus & Greenville R. Co.*, 760 F.2d 633, 638 (5th Cir. 1985), abrogated by St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993) (overruled on other grounds in *St. Mary's Honor Center v. Hicks*, 509 U.S. 502); *see United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 716 (1983).

(Dkt. 206 at 10.) The summary judgment record clearly provides a wealth of evidence that establishes IBM's intent to discriminate against older workers, including Jonathan Langley.

### 1. IBM's Objections Invite this Court to Apply the Wrong Test for Analyzing IBM's Statements that Prove Discriminatory Age Animus.

Discriminatory intent of an employer can come from the intent of a nominal decisionmaker, or from evidence of discriminatory intent displayed by other persons who likely influenced the nominal decisionmaker.[10] The evidence proves that Overbay is—at most—a rubber stamp for IBM's real decisionmakers. The evidence reflects that someone other than Overbay made the decision to include Langley in the layoff, and both Overbay and Brown tried to transfer Langley within IBM to other divisions that wanted his skillset.[11] The evidence shows despite the efforts by both Brown and Overbay, high-level executives blocked Langley's ability to remain employed with the company.[12]

The Magistrate Judge also properly recognized the numerous public and internal statements by IBM executives expressing the need to refresh its workforce, which alone create a fact issue regarding whether LeBlanc or Cowley were merely following those executive directives when determining which divisions to target for layoffs. (Dkt. 201 at 10.) The Magistrate Judge's recommendation is supported by the fact that Overbay was instructed to select two persons for layoffs within a four-person team, all of whom were 59 or older, which is effectively—and suspiciously—shooting fish in a barrel if the goal is to ensure older workers are separated from the company.[13] (Dkt. 201 at 9-10.)

---

[10] *See Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 226-27 (5th Cir. 2000).
[11] *See* Dkt. 151-28, Corrected Ex. 21 at IBML-1690A; Dkt. 151-4, Ex. 1.
[12] *See* Dkt. 151-4, Ex. 1.
[13] Plaintiff also offered expert testimony of the statistical analysis of IBM's suspicious age ranges of employees targeted to be considered for layoffs. Dkt. 188 at 19 – 22 (incorporating by reference Dkt. 138, Ex. 2, *Kuang Supplemental Report* at 10-12, 16-21. The Magistrate Judge did not rely upon such evidence, but noted that he could have done so in supporting his decision

IBM cited the four-point direct evidence test in the *Bell* and *Reed* decisions to try to argue that there is no proof that the decisionmakers here were exposed to IBM's public or internal discriminatory statements, and argued that Langley's evidence failed to satisfy the "temporal proximity" prong of the test. (Dkt. 206 at 12-13.) However, the four-part direct evidence test used in *Bell and Reed* is not used to determine the relevance of company statements offered as circumstantial evidence of the company's age discrimination. Instead, the Fifth Circuit uses a more flexible test when analyzing circumstantial evidence that would not even consider the temporal proximity of IBM's discriminatory statements.[14] Under the correct two-part test for circumstantial evidence, "the plaintiff need only show (1) discriminatory animus (2) on the part of a person that is either primarily responsible for the challenged employment action *or by a person with influence or leverage over the relevant decisionmaker*."[15] Thus, not only is IBM's proffered test the wrong test to use here as a matter of law, the Fifth Circuit explicitly approves of the consideration of circumstantial evidence—such as the very public and internal discriminatory statements made by IBM executives and employees at issue here. IBM also conveniently failed to point out that there were numerous ageist statements in the summary judgment record that were in fact temporally proximate to Langley's termination.[16] Courts do not allow companies like IBM to pretend that statements made by its executives are irrelevant, as if

---

finding that a Plaintiff had adequately demonstrated a genuine issue of material fact regarding pretext. (Dkt 201 at 13.).

[14] *See Reed v. Neopost USA, Inc.*, 701 F.3d 434, 441 (5th Cir. 2012) (The court ultimately determined that circumstantial evidence meriting the more relaxed two-part test is reserved for circumstantial evidence where there is additional evidence of discriminatory conduct, which Langley has provided).

[15] *Id.* (emphasis added).

[16] Dkt 151-11, Corrected Ex. 7 at Langley-IBM 0110–0130 (containing negative stereotypes about older workers from 2015); Langley-IBM 01320152, 0295-0298  (containing negative stereotypes about older workers from 2016).

"[the executive] had nothing more to do with company policy than the janitor or watchman."[17] IBM's arguments here that its executive statements had no effect on company policies should likewise be disregarded outright.

### 2. Langley's Evidence Establishing a Causal Nexus More than Satisfied his Summary Judgment Burden of Proof.

Langley successfully established a fact issue regarding the existence of a causal nexus, and IBM's arguments otherwise should be reserved for trial where they legally belong. The Magistrate Judge properly concluded that the internal IBM corporate planning documents—infused throughout with terminology such as "Early Professional Hire," "seniority mix," "skills remix," "next generation," "refresh," "revitalization hiring," "reinvention of the workforce," and "transformation"[18]—were in fact discriminatory code words tailored toward promoting IBM's age discrimination goals, and revealed that "IBM executives were encouraging managers to lay off workers like Langley to make room for younger employees." (Dkt. 201 at 7.) In context, the use of these discriminatory code words alone arguably creates a fact issue that renders summary judgment inappropriate.

The evidence the Magistrate Judge cited in his Report as establishing a causal nexus alone is more than sufficient to defeat summary judgment, but it is by no means the only summary judgment evidence that connects the dots between IBM's company-wide discriminatory scheme and Langley's layoff. The Hybrid Cloud corporate planning documents offered as summary judgment evidence were created in the fall of 2016 and contain corporate headcount plans to be implemented during the 2017 calendar year.[19] Langley was laid off in 2017, presumably pursuant to the referenced headcount targets. IBM HR executive and Director

---

[17] *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 334 (3rd Cir. 1995).
[18] Dkt. 151-7, Corrected Ex. 4 at IBML-003094, 002502, 002568, 002449, 003096.
[19] *See* Dkt. 151-7, Corrected Ex. 4 at IBML-003090-003096; Dkt. 151-18, Ex. 13, Sam Ladah Dep. Tr. at 60:8-22.

of Talent, Kevin Kubicki, sent an email related to *Langley's layoff specifically*—Operation Baccarat—that contain shared terminology and discriminatory code words also used in the Hybrid Cloud planning documents.[20] More specifically, the Director of Talent's email preselected individuals for layoff and stated "we should think of this as an opportunity to remix our headcount, freeing-up space for new/better talent."[21] The IBM Director of Talent's email was sent to Alison Thompson.[22]Alison Thompson is the IBM HR executive who told Overbay in a January electronic message that Jonathan Langley could not be transferred to another IBM business unit because someone else had already counted Langley as a headcount reduction.[23] Despite someone telling Langley's manager that Langley had already been selected as a headcount reduction in January by someone other than Overbay, IBM falsely claimed that Langley was not selected to be laid off until February, and that the selection was made by Overbay herself.[24] (Dkt. 126-13 ¶¶ 13-14.) If IBM does not consider those causal nexus dots properly connected between IBM's high-level corporate planning documents and Langley, the undersigned counsel is unsure what would.

Despite these neatly connected dots, IBM now objects to the Report on grounds that even if "senior executives harbored an age animus…there is no evidence that any age-biased actor influenced Overbay's decision to terminate Langley" sufficient to establish a fact issue regarding a causal link. (Dkt. 206 at 12.) In other words, IBM argues for a legal standard where no plaintiff could legally survive summary judgment without first obtaining a direct admission of guilt by a manager in any one of the many ADEA cases currently pending against it. Luckily for Langley,

---

[20] *See* Dkt. 151-27, Ex. 20 at IBML-003866; Dkt. 151-7, Corrected Ex. 4 at IBML-003090-003095.
[21] *See* Dkt. 151-27, Ex. 20 at IBML-003866.
[22] *See id.*
[23] *See* 151-4, Ex. 1 at IBML-001621A.
[24] *See id.*

the law of the land does not require the hyper-specific, on-the-nose evidence that IBM seems to believe is needed to *merely survive summary judgment*.

In overturning summary judgments mistakenly granted in favor of employers, courts have recognized that discrimination law violators—especially sophisticated corporations like IBM—have "***learned not to leave the proverbial 'smoking gun' behind…[and] defendants of even minimal sophistication will neither admit discriminatory animus or leave a paper trail demonstrating it***."[25] The court went on to say that "a plaintiff's ability to prove discrimination indirectly, circumstantially, must not be crippled…because of ***crabbed notions of relevance***" like the ones asserted here by IBM.[26] Even the Supreme Court's seminal *McDonnell Douglas* case recognizes the relevance of evidence reflecting the employer's "general policy and practice with respect to [the protected class]."[27] The Supreme Court adopted this test specifically for employment discrimination cases because direct evidence is so rarely available.[28] The law does not require that Langley present evidence to prove that discrimination absolutely occurred, only that a reasonable juror could conclude from the evidence that it did.[29] Langley's summary judgment evidence is more than sufficient to allow a reasonable juror to conclude that his lay off was a product of IBM's discrimination, and IBM's motion for summary judgment should be denied accordingly.

---

[25] *See Aman v. Cort. Furniture Rental Corp.*, 85 F.3d 1074, 1082 (3d Cir.1996)(overturning the district court's decision to grant summary judgment in the employer's favor, holding that use of "code words" in discussing black employees generally was enough to survive summary judgment and reach a jury for the ultimate decision.)(emphasis added).

[26] *Id.* (citing *Riordan v. Kempiners*, 831 F.2d 690, 698 (7th Cir. 1987)) (emphasis added).

[27] *McDonnell Douglas Corp. v. Green*, 411 U.S.792, 804-05 (1973); *see also Ezold v. Wolf, Block, Schorr, and Solis-Cohen*, 983 F.2d 509, 542 (3d Cir. 1992).

[28] Dkt. 201 at 3 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

[29] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-252 (1986).

### 3.  IBM's Case Law and Cat's Paw Arguments Only Serve to Mislead this Court.

IBM's grossly misrepresented case precedence—and especially the context IBM presents them in—only serve to mislead this Court and direct it away from the controlling Fifth Circuit precedent on the issue. IBM cited *Holliday, Higgins,* and *Bryant* to imply that cat's paw analysis is simply not applicable to the case at hand. (Dkt. 206 at 11.) The evidence submitted in *Holliday* and *Higgins*, however, bears no comparison to the summary judgment evidence here. Unlike in those cases, Langley's summary judgment evidence is replete with evidence of discriminatory intent by executives with power or leverage over the decisionmakers who selected Langley to be laid off. Langley also never committed a nexus-breaking voluntary act akin to refusing to take a drug test or criminal theft.

IBM cited *Holliday* for the proposition that cat's paw theory should be rejected in cases where the plaintiff cannot show that an employee with discriminatory animus had influence or leverage over the terminating decisionmaker. (Dkt. 206 at 11.) This brazenly disconnects the facts of *Holliday* from it's holding. The *Holliday* court did not wholly reject the cat's paw theory or create an impossibly high cat's paw burden as implied by IBM, but simply held that the evidence was insufficient to establish liability.[30] The plaintiff in *Holliday* conceded that his direct supervisor—who had made discriminatory statements—had no "actual authority" over the employer's decision to terminate him, nor did he offer evidence that his direct supervisor had "influence or leverage" over the higher level employees who ultimately terminated his employment.[31] In contrast, Langley has offered evidence indicating that his termination was, in fact, motivated by discriminatory animus that originated at executive levels of IBM, and that

---

[30] *Holliday v. Commonwealth Brands, Inc*., 483 F. App'x 917, 922 (5th Cir. 2012).
[31] *Id.* at 921-22.

those executives possessed sufficient influence or leverage over *de facto* decisionmakers so as to implement their unlawful scheme via Resource Action layoffs.

IBM similarly misrepresented *Higgins* and *Bryant* to suggest that they were directly comparable cases where the cat's paw causal nexus was broken because of a lack of evidence. (Dkt. 206 at 11.) This is false. In reality, the conduct that severed the causal nexus in *Higgins* and *Bryant* was the plaintiffs' voluntary acts—refusing to submit to a drug test and theft, respectively—which were the true reasons for each plaintiff's termination.[32] Langley was not laid off because he willingly violated any IBM company policy or committed any other voluntary act. To this day, in contrast, IBM's explanations for the reason Langley was laid off remain vague, amorphous, and ever-changing.

Even more compelling is the radical difference between the evidence in *Bryant* and here. The *Bryant* plaintiff's *only* evidence of a racially discriminatory conspiracy—allegedly perpetrated by three Hispanic employees—was that the three employees were Hispanic, and the plaintiff himself was white—nothing more.[33] Criminal theft charges notwithstanding, if *Bryant* had instead submitted several years worth of internal corporate planning documents reflecting that his company: (1) had created goals to drastically increase the overall percentage of Hispanic employees in his division; (2) planned to make room for new Hispanic hires through the use of layoffs; and (3) *exempted existing Hispanic employees from those layoffs*, then *Bryant's* case would have certainly survived summary judgment. Because Langley has submitted just that sort of evidence here that reflects company-wide discrimination based on age rather than race, denying summary judgment is appropriate.

---

[32] *See Higgins v. Lufkin Indus.*, 633 F. App'x 229, 231, 233 (5th Cir. 2015); *see also Bryant v. Compass Grp. USA Inc.*, 413 F.3d 471, 476– 77 (5th Cir. 2005).
[33] *Bryant v. Compass Grp. USA Inc.*, 413 F.3d 471, 477 (5th Cir. 2005).

Both *Holliday* and *Higgins* are distinguished by *Zamora*, which refined the parameters of the but-for causation standard in the context of the cat's paw theory of relief.[34]  In *Zamora*, the court notes the Supreme Court, in *Nassar*, does not discuss whether a "supervisor's discriminatory unlawful animus may be imputed to the decisionmaker; it simply requires that the supervisor's influence with the decisionmaker be strong enough to actually cause the adverse employment action."[35] The *Zamora* court noted *Staub* bolstered this reasoning, explaining, "that refusing to allow cat's paw analysis would undercut a law designed to prevent employment discrimination."[36] IBM makes that very argument here.

## B.  Langley Established a Fact Issue that IBM's Age-Neutral Explanation was a Pretext for Discrimination.

Under the ADEA, a plaintiff may prove a claim of disparate treatment with either direct or circumstantial evidence.[37] Much of the evidence that creates a fact issue in Langley's prima facie case also creates a fact issue regarding pretext, and Langley incorporates such evidence herein for the purpose of proving pretext. To establish pretext under the circumstances of this case, Langley must "raise a genuine issue of material fact as to whether [IBM's] proffered reason"—that Langley was organically selected for a reduction in force layoff (1) by a low-level manager and (2) the failure of the PureApp division—"was not the true reason, but was merely pretext for discrimination."[38] The evidence presented to prove pretext "must allow a reasonable jury to find that the proffered reason is 'false or unworthy of credence,' and that the true reason

---

[34] *Zamora v. City Of Houston*, 798 F.3d 326, 332 (5th Cir. 2015) (holding that, read together, *Staub* and *Nassar* (*infra* note 39, 40) "make clear that cat's paw analysis remains viable in the but-for causation context.").

[35] *Id.,* at 332 (discussing *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 346 (2013)).

[36] *Id.* (citing *Staub v. Proctor Hosp.*, 562 U.S. 411, 420 (2011)).

[37] *See Woodhouse v. Magnolia Hosp.*, 92 F.3d 248, 252 n. 3 (5th Cir. 1996); *See also Bauer v. Albermarle Corp.*, 169 F.3d 962, 966 (5th Cir. 1999).

[38] *Jones v. R.G. Barry Corporation*, 2017 WL 10495666 at 7 (W.D. Tex. 2017) (citing *inter alia Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 142– 43 (2000)).

is discrimination."[39] Considering the totality of the evidence, there is no question that reasonable minds could determine that IBM's cover story is exactly that—a cover story.

### 1. IBM's Proffered Narrative that Kim Overbay was the True Decisionmaker, Using her Own Subjective Evaluation, is Proven False by its Own Company Documents.

Langley's evidence that IBM's proffered narrative—that first-line manager Overbay is the real decisionmaker who selected Langley with no regard to age—is full of glaring inconsistencies and even impossibilities, which the Magistrate Judge explicitly recognized. (Dkt. 201 at 6-7.) When a plaintiff sufficiently discredits the employer's proffered non-discriminatory reasons, he or she does not need to produce additional evidence beyond the prima facie case in order to survive summary judgment.[40] Overbay claims that she did not learn about the proposed layoff until February of 2017, and that she first made the decision to select Langley to be laid off later that month. (Dkt. 201 at 6; Dkt. 126-13 at ¶¶13-14.) This is squarely contradicted by IBM's own documents.

Andrew Brown told Langley two months before the proffered selection date that Langley was going to lose his job in the near future.[41] One month before the proffered selection date, Langley's name appeared on an HR planning document wherein he was designated for layoff.[42] Later that same month—but still before IBM claims Langley was first selected for layoff—an IBM HR employee stated Langley had already been counted as a reduction.[43] Either Brown and IBM's HR department are magically prescient, *or* (1) Langley had already been selected for

---

[39] *Jones v. R.G. Barry Corporation*, 2017 WL 10495666 at 2 (W.D. Tex. 2017) (citing *Vaughn v. Woodforest Bank*, 665 F.3d 632, 637 (5th Cir. 2011); *Laxton v. Gap Inc.*, 333 F.3d 572, 579 (5th Cir. 2003)).

[40] *See Burton v. Teleflex Inc.,* 707 F.3d 417, 427 (3d Cir. 2013); *see also Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 147–48 (2000).

[41] Dkt. 151-4, Ex. 1 at IBML-000826.

[42] Dkt. 151-25, Ex. 18 at IBML-001621A.

[43] *Id*.

layoff before the February date IBM claims it occurred on, and (2) that decision was made by a different person altogether than the person IBM claims. Langley's evidence sufficiently discredits IBM's proffered non-discriminatory explanation by proving Overbay was not the decisionmaker.

Further supporting the Magistrate Judge's conclusions that a fact issue exists for pretext, are the documents reflecting Overbay's *powerlessness* regarding the ultimate decision of whether Langley would remain employed by IBM, thus casting doubt regarding who really made the decision to terminate Langley, and why. The evidence reflects that Overbay thought highly of Langley generally, and that Langley should remain employed by IBM.[44] Overbay lauded him for his success in his European sales goals.[45] Langley received the largest bonus in his unit—the business unit Overbay supervised—in the quarter prior to his layoff, and he was chosen for the IBM "Tiger Team" for his stellar performance.[46] Overbay initially gave Langley higher ratings in what would be Langley's last performance review, but an IBM executive above her ordered her to reduce them.[47] Leading up to IBM's proffered farce of a layoff decision date, Overbay made every effort to ensure Langley and his skills stayed at IBM by helping him transfer to other IBM business units that wanted him.[48] The *only* reason Overbay was not successful in getting Langley transferred within IBM was because an IBM HR employee formally blocked her attempt.[49] There is unequivocally a fact issue regarding whether IBM's proffered non-discriminatory reason—that

---

[44] *See* Dkt. 201 at 6 – 7.
[45] Dkt. 151-32, Ex. 25 at IBML-000888 ("Significant overachiements [sic] in… Europe (111% of plan-Jonathan Langley…").
[46] Dkt. 151-3, Ex. B, at ¶ 7.
[47] Dkt. 151-29, Corrected Ex. 22 (showing that Langley's original rating of "Achieves" was downgraded to "Expects More" in 2 out of 5 categories.); Dkt. 151-34, Ex. 27.
[48] Dkt. 151-4, Ex. 1.
[49] Dkt. 151-4, Ex. 1 at IBML-001621A, 000255, 001524.

Overbay selected Langley to be laid off based on her _own_ subjective evaluation—was just a pretext for the company-wide age discriminatory scheme.

### 2.  The Documents Reflecting Langley's Blocked Transfers are Evidence of Pretext.

IBM's act of affirmatively blocking Langley's transfer within IBM is itself evidence that IBM's proffered age-neutral reason for his termination is false. The intentionally draconian hurdles created by IBM to prevent Langley from retaining his employment at IBM are evidence of pretext.

Plaintiff produced evidence establishing IBM's conduct regarding the blocking of employee transfer was atypical for businesses generally, and was an element of IBM's discriminatory scheme. Plaintiff's HR expert, Rhoma Young, concluded it was outside the norm that IBM created obstacles to make it nearly impossible for employees selected for layoffs to transfer within IBM.[50] In fact, the aberrant nature of IBM's transfer obstacles was confirmed by IBM itself through the testimony of Alan Wild.[51] In Ms. Young's experience, companies normally desire to retain their employees and _encourage_ employee transfer within a company.[52] Further, despite IBM's cries that Langley's Resource Action was financially motivated, IBM has been hiring in large numbers while simultaneously laying off thousands—the fire-and-hire scheme.[53] Ms. Young finds this practice highly unusual and not in conformance with accepted HR standards and procedures.[54] The blocking of Langley's transfer was outside of normal business practice and alone is sufficient to create a fact issue.

---

[50] Dkt. 151-20, Ex. 14A, Young Dec., at ¶17.
[51] Dkt. 151-8, Corrected Ex. 5, Wild Dep. Tr., at 232–234:5-11.
[52] Dkt. 151-20, Ex. 14A, Young Dec., at ¶17.
[53] _Id._ at ¶19.
[54] _Id._

Even IBM's managers, including Overbay, found HR's practice of blocking transfers and demanding external hires confounding.[55] The evidence showed one IBM manager wanted Langley so badly he transferred another employee to a new role to make room to accept Langley as a transfer.[56] Overbay appears to have recognized the nonsensical nature of blocking Langley's transfer, and she displayed frustration with the decision by telling the blocking HR partner that, "we are not making this easy"[57] and "this process seems to change and become more difficult."[58] Brown likewise took actions to help Langley's transfer get approved, and in his own words, "pushed for [Langley] in a number of roles."[59] IBM's practice of blocking talented, older employees from transferring to other divisions within IBM creates a fact issue as to whether IBM's cover story was a pretext for discrimination.

### 3. The Hiring of College-Aged Persons—and the Exemption of those Persons from Layoffs—is Evidence of Pretext Pursuant to Controlling Fifth Circuit Precedent.

IBM misrepresents the case law regarding entry level hiring completely, and ignores the controlling Fifth Circuit precedent on the issue. IBM conveniently omits the portion of the *Hazen Paper* decision where the Supreme Court held that its holding "does not preclude the possibility that an employer who targets employees with particular pension status on the assumption that these employees are likely to be older thereby engages in age discrimination."[60] In other words, the Supreme Court did not intend for *Hazen Paper* to be construed in the uncompromising manner IBM attempts to wield it. (Dkt. 206 at 12.) The Supreme Court determined that focusing on criteria that correlates with age can still constitute discrimination on a case-by-case basis.[61]

---

[55] *See* Dkt. 151-4, Ex. 1.
[56] *See* Dkt. 151-4, Ex. 1. at IBML-001487–001489.
[57] *Id.* at IBML-001621A.
[58] *Id.* at IBML-001505.
[59] *Id.* at IBML-001517.
[60] *Hazen Paper Co. v. Biggins*, 507 U.S. 604 at 612–13 (1993).
[61] *See, e.g.*, *id.* at 604.

Other courts have agreed that *Hazen Paper* does not act as an uncompromising bar to finding age discrimination hidden under the guise of age-correlated criteria. In *Tramp*, the Eighth Circuit reversed a district court's granting of a summary judgment based on *Hazen Paper*, and found that targeting higher healthcare costs as a criteria for employment created a fact issue for discrimination because a reasonable jury could conclude from the evidence that the Defendant employer believed that "age and healthcare costs were analytically distinct."[62] In this case, an IBM executive has admitted knowledge that "Early Professional Hire" has a correlation with age, and the overall evidence surrounding the use of code words like Early Professional Hire indicate that it would fit into the *Hazen Paper's* caveat regarding when targeting experience can indeed constitute age discrimination.[63] The *Tramp* court went on to hold that "[t]his is not to say that discrimination occurred here, but that summary judgment prematurely disposed of the issue," which further illustrates that IBM's proffered high bar for Langley to survive summary judgment has no basis in the law.[64]

IBM misrepresents *Grossman* and *Carraher* to argue that recruiting of college-aged persons can never be evidence of age discrimination. (Dkt. 206 at 12-13.) In both cases, the respective courts only note that the mere recruitment *alone* of college-aged students does not create an age discrimination fact issue.[65] The operative evidence in Langley's case is not merely that IBM recruited college-aged students. The operative evidence is that its heightened recruitment efforts were part of IBM's fire-and-hire scheme, where layoffs of older workers *made room for* college-aged replacement employees, with the goal of creating a younger

---

[62] *Tramp v. Associated Underwriters, Inc.*, 768 F.3d 793, 798 (8th Cir. 2014).

[63] *See* Dkt. 151-16, Ex. 11, Gherson Dep. Tr., at 86:20-24; 88:16-20 (testifying that the majority of Early Professionals Hires tend to be younger persons, under forty); Dkt. 151-7, Corrected Ex. 4.

[64] *Tramp*, 768 F.3d at 802.

[65] *Carraher v. Target Corp.*, 503 F.3d 714 (8th Cir. 2007); *Grossmann v. Dillard Dep't Stores, Inc.*, 109 F.3d 457 (8th Cir. 1997).

workforce. Recruitment of college-aged replacement employees is merely the coup de grâce that completes IBM's fire-and-hire scheme.

In contrast, neither *Carraher* nor *Grossman* contain any systematic, multi-faceted discriminatory schemes. The *Carraher* plaintiff was not fired in a concerted effort to make room for the hiring of younger employees; he was fired because "he walked off the job…and failed to return to work or otherwise inform his supervisors of his plans," a reason completely divorced from his employer's college recruiting.[66] Nor was the *Grossman* plaintiff fired in a concerted or systematic discriminatory scheme; he was fired because employees under his supervision had been conducting an embezzlement scheme and was fired three days after the scheme was discovered.[67] IBM's suggestion that college-aged recruiting played a role in either one of these cases as part of a discriminatory, systemic scheme is a gross mischaracterization.

Most egregiously, IBM fails to bring to this Court's attention *Williams*[68], the controlling Fifth Circuit precedent on this issue, which IBM's two cited cases explicitly rely upon. *Williams* stands for the proposition that college-aged recruitment alone does not create a fact issue, but *Williams* also holds that **an ADEA fact issue <u>does</u> exist "when those [college] recruits are insulated from reduction [in-force] at the expense of employees within the protected age group**."[69] The discriminatory fact pattern envisioned by *Williams* is the *mirror image* of Langley's summary judgment evidence, which establishes that IBM exempts college-aged hires—i.e. Early Professional Hires—from eligibility in the layoffs that led to Langley's termination.[70] Based on controlling Fifth Circuit precedent, there can be no question that IBM's

---

[66] *Carraher,* 503 F.3d at 717.
[67] *Grossmann,* 109 F.3d at 458.
[68] *See Williams v. Gen. Motors Corp*., 656 F.2d 120, 131 (5th Cir. 1981).
[69] *Id.* at 131 (emphasis added).
[70] Dkt. No. 151-14, Ex. 9A at IBML-000321.

simultaneous recruitment and insulation of college-aged persons create a fact issue that precludes summary judgment.

### 4. IBM's Shifting, Inconsistent Narrative About Why Langley's Business Unit was Targeted for Layoffs is Itself Evidence of Pretext.

IBM's explanations regarding the fate of PureApp are ever-changing and *completely* inconsistent with Plaintiff's proffered evidence. Steve Cowley, the General Manager of Cloud Sales & WW Top Organization, testified that IBM no longer sold PureApp products *whatsoever*.[71] When asked if PureApp is now repackaged as Cloud Pak, Cowley testified with a definitive "no."[72] IBM now claims it has "*never* taken the position that it no longer sells PureApp and has never articulated that as a rationale for Langley's termination." (Dkt. 206 at 18.) It asks the Court to disregard its prior sworn statements and rely instead on its declarations drafted for Summary Judgment. IBM's own inconsistent sworn testimony alone creates a fact issue as to the reason for terminating Langley. This conflicting evidence at the very least is a disputed fact, and when taken in conjunction with Plaintiff's proffered evidence showing IBM "simply renamed [PureApp] and moved it to another part" of the company, appears to be an outright falsehood. (Dkt. 201 at 12.)

IBM's position that an employer's subsequent decisions are not probative on the issue of pretext only applies if the employer's stated business reason for engaging in the layoff remains constant, which is not the case here. IBM's neutral business reason for terminating Langley has continuously changed and lacks credibility. This is what makes PureApp's transformation to

---

[71] Dkt. 151-33, Corrected Ex. 26, Cowley Dep. Tr. at 181:15-25.
[72] *Id.* at 257:1-8.

CloudPak suspect. IBM conveniently failed to disclose that Cloud Pak was simply PureApp renamed until *after* it realized Plaintiff had discovered this on its own.[73]

### III. CONCLUSION

Magistrate Judge Austin got it right. In response to IBM's motion for summary judgment, Langley presented comprehensive evidence that created a fact issue as to whether IBM created a fire-and-hire discriminatory scheme that ultimately led to his termination. Langley also offered a wealth of evidence proving that IBM's narrative—that Overbay selected Langley for layoff based on her own subjective evaluation—is an absolute fiction not supported by the evidence. Instead, Langley was targeted for termination long before his boss ever allegedly selected him— her selection was merely a pretextual *fait accompli*. IBM's objections are merely critiques of the certainty of the evidence, a practice that should be reserved for trial. It is now time to afford Jonathan Langley his day in court.

### IV.  PRAYER FOR RELIEF

WHEREFORE PREMISES CONSIDERED Plaintiff respectfully requests that the Court adopt the Report and Recommendation of the United States Magistrate Judge (Dkt. 201) and deny IBM's Motion for Summary Judgment and for all other relief for which he may be justly entitled.

---

[73]  *Id.*; Dkt. 168 at 2, 10 (IBM's first acknowledgment of Cloud Pak was in its Reply to Plaintiff's Response to IBM's Motion for Summary Judgment);

Respectfully submitted,

_____

Heidi A. Coughlin
State Bar No. 24059615
Archie Carl Pierce
State Bar No. 15991500
Blair J. Leake
State Bar No. 24081630
Brantley Ross Pringle, Jr.
State Bar No. 16330001
WRIGHT & GREENHILL, P.C.
900 Congress Avenue, Suite 500
Austin, Texas 78701
512/476-4600
512/476-5382 (Fax)
HCoughlin@w-g.com
CPierce@w-g.com
BLeake@w-g.com
RPringle@w-g.com

*Attorneys for Plaintiff*
*Jonathan Langley*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 31, 2020, I electronically filed the Response of Plaintiff

using the CM/ECF system, which sent notification of such filing to the Court and Defendant's

counsel.  Additionally, a hard copy of the foregoing was served via hand-delivery on Magistrate

Judge Andrew W. Austin at the following address:

Magistrate Judge Andrew W. Austin
United States District Court
Western District of Texas, Austin Division
501 West Fifth Street, Suite 4190
Austin, TX 78701


_____
Heidi A. Coughlin